1    COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP
2    DARREN J. ROBBINS (168593)
     RANDALL J. BARON (150796)
3    STEPHEN J. ODDO (174828)
     DAVID T. WISSBROECKER (243867)
4    655 West Broadway, Suite 1900
     San Diego, CA 92101
5    Telephone: 619/231-1058
     619/231-7423 (fax)
6    darrenr@csgrr.com
     randyb@csgrr.com
7    steveo@csgrr.com
     dwissbroecker@csgrr.com
8
     Lead Counsel for Plaintiff
9
     [Additional counsel appear on signature page.]
10
                    UNITED STATES DISTRICT COURT
11
                   CENTRAL DISTRICT OF CALIFORNIA
12
                          WESTERN DIVISION
13
     JIM BROWN, Individually and On        )   No. CV-06-03731-GHK(JTLx)
14   Behalf of All Others Similarly Situated, )
                                           )   CLASS ACTION
15                      Plaintiff,         )
                                           )   CONSOLIDATED SECOND
16           vs.                           )   AMENDED COMPLAINT
                                           )
17   BRETT C. BREWER, DANIEL L.            )
     MOSHER, LAWRENCE MOREAU,              )
18   JEFFREY SCOTT EDELL, BRADLEY          )
     G. WARD, DAVID S. CARLICK,           )
19   ANDREW SHEEHAN,                       )
     CHRISTOPHER S. LIPP, RICHARD          )
20   ROSENBLATT, JAMES QUANDT,             )
     WILLIAM WOODWARD, THOMAS              )
21   WEISEL PARTNERS GROUP, INC.,          )
     THOMAS WEISEL PARTNERS LLC,           )
22   MONTGOMERY & CO., LLC,                )
     VANTAGEPOINT VENTURE                  )
23   PARTNERS, VP ALPHA HOLDINGS           )
     IV LLC, VANTAGPOINT VENTURE           )
24   PARTNERS IV (Q) LP,                   )   DEMAND FOR JURY TRIAL
                                           )
25   _____
26   [Caption continued on following page.]

27

28

1

2 | VANTAGEPOINT VENTURE )
PARTNERS IV LP and )
3 | VANTAGEPOINT VENTURE )
PARTNERS IV PRINCIPALS FUND )
4 | LP, )
)
5 |      Defendants, )
)
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

1. This is a stockholder class action brought on behalf of the holders of the common stock of Intermix Media, Inc. ("Intermix" or the "Company") against certain senior officers and directors of Intermix (the "Individual Defendants"), its Investment Banks Weisel[1] and Montgomery & Co., LLC ("Montgomery") (collectively, the "Investment Banks") and its venture capitalist investor VantagePoint Venture Partners ("VantagePoint") arising out of the unfair sale of Intermix to News Corporation ("News Corp."), in violation of federal and state law, and defendants' violations of §14(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder.[2]

2. Defendants participated in a course of conduct that commenced no later than the third quarter of 2003, as certain of the defendants began to fully comprehend the true value of MySpace.com ("MySpace"), a website the Company acquired and began to develop in 2002. Defendants first obtained control of the Company in late 2003, and thereafter completed the sale of Intermix to News Corp. in 2005 at a price that did not adequately value the Company's crown-jewel asset, MySpace, in order to secure personal benefits for themselves at the expense of the Company's public shareholders.

3. Specifically, on or about December 30, 2003, the Board of Directors ("Board") of eUniverse caused a proxy statement to be filed with the SEC and disseminated in connection with a shareholder vote to be held on January 29, 2004 (the "2003 Proxy"). The false and misleading 2003 Proxy was utilized to: (i) secure reelection of the Board; and (ii) obtain shareholder approval of the terms of an

---

[1] "Weisel" collectively refers to defendants Thomas Weisel Partners Group, Inc. and Thomas Weisel Partners LLC.

[2] Intermix was known as eUniverse, Inc. ("eUniverse") until July 15, 2004, when it changed its name to Intermix Media, Inc.

1

1   agreement the Board had caused eUniverse to enter into with VantagePoint, a

2   California-based venture capital firm.[3]

3          4.      In 2005, subsequent to securing control of the Company following the

4   issuance of the false and misleading 2003 Proxy, defendants undertook a flawed sales

5   process designed to favor themselves and Company insiders to the detriment of

6   Intermix's public shareholders, culminating in the sale of Intermix to News Corp. at

7   the inadequate and unfair price of $12 per share – a price that did not adequately value

8   Intermix's MySpace asset (the "Acquisition").   As a result of the Acquisition,

9   defendants secured: (i) extinguishment of outstanding derivative suits charging

10  defendants with misconduct in connection with accounting violations, insider trading

11  and an adware/spyware scam; (ii) a deeper pocket to indemnify themselves for any

12  outstanding suits that weren't extinguished in the Acquisition; and (iii) hundreds of

13  millions of dollars in insider benefits in the form of continued employment,

14  accelerated stock options, and preferred stock preferences.

15         5.      Thereafter, on or about August 25, 2005, the Intermix Board together

16  with the Investment Banks and VantagePoint caused a proxy statement to be filed

17  with the SEC and disseminated in connection with a September 30, 2005 shareholder

18  vote (the "2005 Proxy"). The false and misleading 2005 Proxy was utilized to obtain

19  shareholder approval of the sale of the Company to News Corp. and deprive Intermix

20  shareholders of the full value of their interests in Intermix.   The preparation and

21  dissemination of the false and misleading proxy statements induced shareholder action

22  which resulted in substantial harm to plaintiff and Intermix's other shareholders.[4]

23

24

25   [3]   VantagePoint is a Delaware limited partnership with its principle place of
26   business in San Francisco, California.

27   [4]   The relevant time period for this action is December 30, 2003 through
     September 30, 2005 (the "Relevant Period").

28

6.      On September 30, 2005, defendants completed the sale of the Company – and its crown jewel asset MySpace – to News Corp., via numerous breaches of defendants' fiduciary duties and pursuant to the false and misleading 2005 Proxy.

7.      The Company's public stockholders suffered billions of dollars in damages as a result of defendants' preparation and dissemination of false and misleading proxy statements in violation of federal law and breaches of fiduciary duty in connection with the Acquisition.

## THE ACTION

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332, because complete diversity exists between plaintiff Jim Brown, who is a citizen of Massachusetts, and each defendant because no defendant is a citizen of Massachusetts.  The Court also has jurisdiction pursuant to 28 U.S.C. §1331, as plaintiff's claims arise in part out of the laws of the United States, §27 of the 1934 Act and for violations of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

9.      Venue is proper in this District because Intermix had its principle place of business in this District.  Plaintiff's claims arose in this District and plaintiff suffered harm in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify live at the jury trial permitted on these claims in this Court.  Moreover, each individual defendant, as Company officers and/or directors, has extensive contacts with this District.

## PARTIES

10.      Plaintiff Jim Brown acquired 1000 shares of Intermix common stock on July 13, 2000.  Plaintiff Brown held his shares on the record date for the January 29, 2004 and September 30, 2005 shareholder votes and throughout the Relevant Period. Plaintiff Brown is a citizen of Massachusetts.

3

1    11.    Defendant Brett C. Brewer ("Brewer") served as President of the

2  Company and a director since August 29, 2000.  Brewer is a citizen of California.

3  Brewer was a director throughout the Relevant Period and was responsible for the

4  preparation, review and/or dissemination of the 2003 Proxy and the 2005 Proxy, both

5  of which were false and misleading when filed with the SEC, disseminated to Intermix

6  shareholders and voted upon by shareholders at the January 2004 and September 2005

7  shareholder meetings.  By preparing, reviewing and/or disseminating the false and

8  misleading 2003 Proxy, Brewer was able to maintain his seat on the Intermix Board,

9  procure millions of dollars worth of personal benefits in the form of continued

10  employment and stock option grants and ensure that the VantagePoint Transactions

11  were approved by Intermix shareholders.   Brewer beneficially owned almost

12  1.2 million shares of the Company's common stock, giving him significant influence

13  over the Board.  Brewer also received material personal benefits in connection with

14  the Acquisition and his preparation, review and/or dissemination of the 2005 Proxy,

15  including the expectation that the consummation of the Acquisition would extinguish

16  his liability in the existing derivative suits, indemnify him for prior and

17  contemporaneous misconduct, and immediately monetize his illiquid stock holdings in

18  the Company.

19    12.    Defendant Daniel L. Mosher ("Mosher") was a director since

20  December 8, 1999.  Mosher is a citizen of California.  Mosher also served as a

21  member of the Company's Audit and Nominating Committees.  Mosher was a director

22  throughout the Relevant Period and was responsible for the preparation, review and/or

23  dissemination of the 2003 Proxy and the 2005 Proxy, both of which were false and

24  misleading when filed with the SEC, disseminated to Intermix shareholders and voted

25  upon by shareholders at the January 2004 and September 2005 shareholder meetings.

26  By preparing, reviewing and/or disseminating the false and misleading 2003 Proxy,

27  Mosher was able to maintain his seat on the Board.  Mosher also procured material

28  personal benefits in connection with the Acquisition and his preparation, review

4

1  and/or dissemination of the 2005 Proxy, including the expectation that the Acquisition

2  would extinguish his liability in the existing derivative suits, indemnify him for prior

3  and contemporaneous misconduct, and immediately monetize his illiquid stock

4  holdings in the Company.

5       13.  Defendant Lawrence Moreau ("Moreau") was a director since May 22,

6  2003. Moreau is a citizen of California. Moreau was a director throughout the

7  Relevant Period and was responsible for the preparation, review and/or dissemination

8  of the 2003 Proxy and the 2005 Proxy, both of which were false and misleading when

9  filed with the SEC, disseminated to Intermix shareholders and voted upon by

10  shareholders at the January 2004 and September 2005 shareholder meetings. By

11  preparing, reviewing and/or disseminating the false and misleading 2003 Proxy,

12  Moreau was able to maintain his seat on the Board. Moreau also procured material

13  personal benefits in connection with the Acquisition and his preparation, review

14  and/or dissemination of the 2005 Proxy, including the expectation that the

15  consummation of the Acquisition would extinguish his liability in the existing

16  derivative suits, indemnify him for prior and contemporaneous misconduct, and

17  immediately monetize his illiquid stock holdings.

18       14.  Defendant Jeffrey Scott Edell ("Edell") served as a director from

19  October 14, 2003 to December 7, 2004. Edell is a citizen of California. Edell served

20  as Chairman of the Board and as a member of the Company's Compensation and

21  Audit Committees.  Edell was responsible for preparing, reviewing and/or

22  disseminating the materially false and misleading 2003 Proxy, and in so doing enabled

23  himself to maintain his seat on the Board.

24       15.  Defendant Bradley G. Ward ("Ward") served as a director from

25  October 16, 2003 to June 2, 2004. Ward is a citizen of Nevada. Ward served on the

26  Company's Compensation Committee.  Ward was responsible for preparing,

27  reviewing and/or disseminating the materially misleading 2003 Proxy, and in so doing

28  enabled himself to maintain his seat on the Board.

16.     Defendant David S. Carlick ("Carlick") served as a director since October 31, 2003. Carlick is a citizen of California. Carlick was a member of the Company's Nominating Committee. Throughout the Relevant Period, Carlick was a director of Intermix and a managing director of VantagePoint.   Carlick was responsible for the preparation, review and/or dissemination of the 2003 Proxy and the 2005 Proxy, both of which were false and misleading when filed with the SEC, disseminated to Intermix shareholders and voted upon by shareholders at the January 2004 and September 2005 shareholder meetings.   As a result of his preparing, reviewing and/or disseminating the 2003 Proxy, Carlick secured and maintained his seat on the Board. Carlick also procured tens, if not hundreds, of millions of dollars in benefits for himself and/or VantagePoint via the VantagePoint transaction that was improperly approved via the false and misleading 2003 Proxy.  By virtue of his position as a principal of VantagePoint and VantagePoint owning a 22% interest of the Company, Carlick possessed and exercised significant influence and control over the Intermix Board. Carlick also procured tens, if not hundreds, of millions of dollars of benefits for himself and VantagePoint as a result of the Acquisition and his preparation, review and/or dissemination of the 2005 Proxy, including the expectation that the Acquisition would extinguish his liability in the existing derivative suits, indemnify him and VantagePoint for their prior and contemporaneous misconduct and result in preferential financial treatment for his and VantagePoint's stock holdings in the Company.

17.     Defendant Andrew Sheehan ("Sheehan") served as a director since October 31, 2003. Sheehan is a citizen of California. Sheehan was a member of the Company's Compensation Committee. Throughout the Relevant Period, Sheehan was a director of Intermix and a managing director of VantagePoint.   Sheehan was responsible for the preparation, review and/or dissemination of the 2003 Proxy and the 2005 Proxy, both of which were false and misleading when filed with the SEC, disseminated to Intermix shareholders and voted upon by shareholders at the January

6

1   2004 and September 2005 shareholder meetings.  As a result of his disseminating the

2   2003 Proxy, Sheehan secured and maintained his seat on the Board.  Sheehan also

3   procured tens, if not hundreds, of millions of dollars of benefits for himself and/or

4   VantagePoint via the VantagePoint transaction that was approved via the false and

5   misleading 2003 Proxy.  By virtue of his position as a principal of VantagePoint and

6   VantagePoint owning a 22% interest of the Company, Sheehan possessed and

7   exercised significant influence and control over the Intermix Board.  Sheehan also

8   procured tens, if not hundreds, of millions of dollars of benefits for himself and/or

9   VantagePoint as a result of the Acquisition and his preparation, review and/or

10  dissemination of the 2005 Proxy, including the expectation that the Acquisition would

11  extinguish his liability in the existing derivative suits, indemnify him and

12  VantagePoint for their prior and contemporaneous misconduct and result in

13  preferential financial treatment for his and VantagePoint's stock holdings in the

14  Company.

15       18.    Defendant Christopher S. Lipp ("Lipp") was Senior Vice President and

16  General Counsel of Intermix – a position he served in since October 26, 2001 and

17  continued in after the Acquisition.  Lipp is a citizen of California.  Lipp was

18  responsible for the preparation, review and/or dissemination of the 2003 Proxy and the

19  2005 Proxy, both of which were false and misleading when filed with the SEC,

20  disseminated to Intermix shareholders and voted upon by shareholders at the January

21  2004 and September 2005 shareholder meetings.  As a result of his participation in the

22  preparation, review and dissemination of the 2003 Proxy, Lipp procured substantial

23  personal benefits in the form of continued employment and millions of dollars in stock

24  option grants.  Lipp also procured material benefits as a result of the Acquisition and

25  his disseminating the 2005 Proxy, including the expectation that the Acquisition

26  would extinguish his liability in the existing derivative suits, indemnify him for prior

27  and contemporaneous misconduct, and immediately monetize his illiquid stock

28  holdings in the Company.

19. Defendant Richard Rosenblatt ("Rosenblatt") became a director and was Chief Executive Officer ("CEO") of the Company from February 2004 until after the Acquisition. Rosenblatt is a citizen of California. Rosenblatt was promised by News Corp. that he would retain and did retain his position with the Company. Rosenblatt was responsible for the preparation, review of and/or dissemination of the false and misleading 2005 Proxy. Rosenblatt procured tens of millions of dollars of personal benefits as a result of shareholder approval of the Acquisition, including lucrative employment benefits with News Corp., and the expectation that the Acquisition would extinguish his liability in pending derivative suits, provide indemnification for prior and contemporaneous misconduct, and monetize his illiquid Intermix stock holdings.

20. Defendant James Quandt ("Quandt") served as a director of the Company since June 2004. Quandt is a citizen of California. Quandt was responsible for the preparation, review and/or dissemination of the materially misleading 2005 Proxy, pursuant to which Quandt procured material benefits including the expectation that the Acquisition would extinguish his liability in the existing derivative suits, indemnify him for prior and contemporaneous misconduct, and monetize him illiquid stock holdings in the Company.

21. Defendant William Woodward ("Woodward") was a director since February 9, 2005. Woodward is a citizen of California. Woodward was responsible for the preparation, review and/or dissemination of the false and misleading 2005 Proxy, which was designed to extinguish defendants' liability arising out of the existing derivative suits, indemnify him for prior and contemporaneous misconduct, and obtain preferential treatment for his and VantagePoint's stock holdings in the Company.

22. Defendant Weisel is an investment bank with its principle place of business in San Francisco, California. It is the successor in interest to Thomas Weisel Partners LLC. Upon information and belief, defendant Thomas Weisel Partners LLC is a subsidiary of Thomas Weisel Partners Group, Inc. Thomas Weisel Partners LLC

1  is a Delaware limited liability company with its principal place of business in San

2  Francisco, California.  Thomas Weisel Partners Group, Inc. and Thomas Weisel

3  Partners LLC are collectively referred to herein as "Weisel."  Weisel prepared and

4  issued a false and misleading fairness opinion on the consideration to be received by

5  Intermix in the Acquisition.  Weisel consented to the incorporation of the fairness

6  opinion into the 2005 Proxy.

7      23.    Defendant Montgomery is an investment bank that issued a false and

8  misleading fairness opinion on the merger between Intermix and an affiliate of News

9  Corp.  That fairness opinion was incorporated into the 2005 Proxy.  Montgomery is a

10  Delaware limited liability company with its principal place of business in Santa

11  Monica, California.  Montgomery consented to the incorporation of the fairness

12  opinion into the 2005 Proxy.

13      24.    Defendant VantagePoint, including without limitation, defendants VP

14  Alpha Holdings IV, L.L.C., VantagePoint Venture Partners IV (Q), L.P.,

15  VantagePoint Venture Partners IV, L.P. and VantagePoint Venture Partners IV

16  Principals Fund, L.P. (collectively, referred to herein as "VantagePoint") at the time of

17  the Acquisition controlled more than 22% of Intermix's voting shares, and was the

18  Company's largest shareholder.  VantagePoint is a Delaware limited liability

19  partnership with numerous affiliated entities, and its principal place of business is in

20  San Francisco, California.  VantagePoint is controlled by defendants Carlick and

21  Sheehan.

22      25.    Defendants Brewer, Mosher, Moreau, Edell, Ward, Carlick, Sheehan and

23  Lipp are sometimes referred to as the "2003 Individual Defendants."  The "2003

24  Individual Defendants" together with VantagePoint are sometimes referred to as the

25  "2003 Defendants."  Defendants Brewer, Mosher, Moreau, Carlick, Sheehan, Lipp,

26  Rosenblatt, Quandt and Woodward are sometimes referred to as the "2005 Individual

27  Defendants."  The "2005 Individual Defendants" together with the Investment Banks

28

1 | and VantagePoint are sometimes collectively referred to herein as the "2005
2 | Defendants."

3 |     26.    Non-party Intermix was a Delaware corporation with its principal
4 | executive offices located at 6060 Center Drive, Suite 300, Los Angeles, California
5 | 90045. Intermix changed its name from eUniverse to Intermix Media, Inc. on July 15,
6 | 2004. Intermix was an interactive entertainment network that operates a network of
7 | websites and email newsletters providing users with entertainment content, products
8 | and services. The Company was one of the largest entertainment and media networks
9 | on the Internet serving over 50 million subscribers each month. The Company's
10 | entertainment-related websites focused on music, film and interactive entertainment
11 | and its web properties included online retailers of music products, video cassettes and
12 | laser discs, and computer games. On September 30, 2005, Intermix shareholders
13 | approved a merger between News Corp. and Intermix pursuant to the false and
14 | misleading 2005 Proxy as detailed herein. The Acquisition was consummated the
15 | same date. Currently, Intermix now operates as a wholly-owned subsidiary of Fox
16 | Interactive Media, Inc. ("Fox"), a wholly owned subsidiary of News Corp.

## CLASS ACTION ALLEGATIONS

17 |
18 |     27.    Plaintiff brings this action as a class action pursuant to Rule 23 of the
19 | Federal Rules of Civil Procedure on behalf of all holders of Intermix common stock
20 | during the Relevant Period who were harmed by defendants' actions described below
21 | (the "Class"). Excluded from the Class are defendants herein and any person, firm,
22 | trust, corporation or other entity related to or affiliated with any defendant.

23 |     28.    This action is properly maintainable as a class action.

24 |     29.    The Class is so numerous that joinder of all members is impracticable.
25 | According to Intermix's SEC filings, there were more than 35 million shares of
26 | Intermix common stock outstanding as of August 10, 2005.

27 |
28 |

30.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.   The common questions include, *inter alia*, the following:

(a)     whether the 2005 Individual Defendants breached their fiduciary duties of loyalty, good faith, due care and candor in connection with the Acquisition;

(b)     whether the 2005 Individual Defendants breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiff and the other members of the Class in connection with the Acquisition;

(c)     whether the 2005 Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Acquisition;

(d)     whether the Acquisition was unfair because it was entered into via an unfair process and at an unfair price;

(e)     whether the 2005 Individual Defendants engaged in self-dealing in connection with the Acquisition;

(f)     whether the 2005 Individual Defendants unjustly enriched themselves and other insiders or affiliates of Intermix;

(g)     whether the 2005 Individual Defendants breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Acquisition, including the duties of loyalty, due care, good faith, diligence, honesty, candor and fair dealing, and/or other fiduciary duties;

(h)     whether the 2005 Individual Defendants, in bad faith and for improper motives, impeded, erected and/or retained barriers to discourage other offers for the Company or its assets;

(i)     whether the 2005 Individual Defendants bear the burden of establishing the entire fairness of the Acquisition;

(j)     whether the 2003 Defendants violated §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by filing a materially misleading definitive proxy;

(k)     whether the 2005 Defendants violated §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by filing a materially misleading definitive proxy; and

(l)     whether plaintiff and the other members of the Class have been damaged as a result of the conduct detailed herein.

31.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

32.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

33.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

34.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

35.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## DEFENDANTS' DUTIES

36.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, participate in, authorize or acquiesce in the wrongful acts complained of herein.

37.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management,

1   policies, practices and controls of the Company.  By virtue of such duties, the officers

2   and directors of the Company were required to, among other things:

3          (a)    ensure that the affairs of the Company were conducted in an

4   efficient, businesslike manner so as to make it possible to provide the highest quality

5   performance of their business;

6          (b)    ensure that the Company was operated in a diligent, honest and

7   prudent manner and complied with all applicable federal and state laws, rules,

8   regulations and requirements, including complying with rules and regulations issued

9   by the SEC, state regulatory agencies and state and federal courts before which the

10  Company appears as a party;

11         (c)    exercise good faith in ensuring that the Company had adequate

12  internal controls such that it is capable of complying with federal law to report all

13  material information to shareholders in the Company's filings with the SEC before

14  shareholder approval of corporate action, and that the Company was actually

15  complying with such laws;

16         (d)    exercise good faith in supervising the preparation and filing of all

17  reports required by law, including reports filed with the SEC, and in examining and

18  evaluating such reports and other information concerning the affairs of the Company;

19  and

20         (e)    exercise good faith in remaining informed regarding the affairs of

21  the Company, including, but not limited to, the Company's compliance with federal

22  law pertaining to its obligations to shareholders, and, upon receipt of notice or

23  information regarding imprudent or unsound conditions or practices, to make

24  reasonable inquiry in connection therewith and take steps to correct such conditions or

25  practices.

26         38.    Furthermore, under Delaware law, in any situation where the directors of

27  a publicly traded corporation undertake a transaction that will result in either (i) a

28  change in corporate control, or (ii) a break up of the corporation's assets, the directors

13

have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation and its shareholders, and if such transaction will result in a change of corporate control, the corporation and its shareholders are entitled to receive a significant premium. To diligently comply with these duties, the directors and/or officers may not take any action that:

(a) adversely affects the value provided to the corporation or its shareholders;

(b) will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c) contractually prohibits themselves from complying with their fiduciary duties;

(d) will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation and its shareholders; and/or

(e) will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the corporation and its public shareholders.

39. In accordance with their duties of loyalty and good faith, the 2005 Individual Defendants, as directors and/or officers of Intermix, were obligated under Delaware law to refrain from:

(a) participating in any transaction where the directors' or officers' loyalties are divided;

(b) participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the corporation or its public shareholders; and/or

(c) benefiting themselves at the expense or to the detriment of the corporation and its shareholders.

40.   Plaintiff alleges herein that the 2005 Individual Defendants, aided and abetted by the remaining 2005 Defendants, knowingly or recklessly violated their fiduciary duties, including their duties of loyalty, due care, good faith, fair dealing, independence and candor owed to Intermix and its public shareholders in connection with the Acquisition.  The 2005 Individual Defendants, aided and abetted by the remaining 2005 Defendants, engaged in self-dealing, and have negotiated for themselves personal benefits, including personal financial benefits and indemnification benefits not shared by Intermix or the Class, or have aided and abetted others who did so.  As a result of the 2005 Individual Defendants' self-dealing and divided loyalties, among other things, the negotiation process for the Acquisition was tainted and unfair.  The members of the Class were not provided with a fair process or a fair price for their Intermix common stock in the Acquisition.

41.   The 2005 Individual Defendants also owe the Company and its stockholders a duty of truthfulness under Delaware law, which includes the disclosure of all material facts concerning the Acquisition.  The 2005 Individual Defendants, aided and abetted by the remaining 2005 Defendants, knowingly or recklessly breached their fiduciary duties of candor and good faith by failing to disclose all material information concerning the Acquisition, the true value of the Company and the conflicts of the 2005 Individual Defendants.

42.   Because the 2005 Individual Defendants, aided and abetted by the remaining 2005 Defendants, knowingly or recklessly breached their duties of loyalty, good faith, fair dealing, independence and candor in connection with the Acquisition and/or aided and abetted others who did so, the burden of proving the inherent or entire fairness of the Acquisition (including all aspects of its negotiation, structure, price and terms) is placed upon the 2005 Individual Defendants as a matter of law.  The 2005 Individual Defendants cannot meet that burden.

15

# BACKGROUND TO DEFENDANTS' ISSUANCE OF THE FALSE AND MISLEADING 2003 PROXY

## Defendants Facilitate the VantagePoint Takeover

43.     Intermix was an online company that operated through two business units, the Intermix Network and its product marketing unit. The Company's product marketing segment sold products through eCommerce websites and telemarketing centers. The network segment consisted of entertainment and community-oriented branded websites, including its crown jewel MySpace, the World Wide Web's most popular site and a meeting place for millions of people around the world.

44.     Intermix was founded in 1999 as an online retailer of music cds. Within two years, the Company had evolved into a network of websites focusing on games and entertainment.   Notwithstanding the internet meltdown of 2000, Intermix continued to operate successfully, reaching a level of traffic on its website that by 2002 placed it in the top 20 nationwide websites nationwide in terms of internet traffic.

45.     On September 9, 2002, Intermix purchased ResponseBase, an email marketing firm whose assets included the domain name MySpace.  At the time, MySpace was being used to peddle a motorized contraption, made in China and called an E-Scooter, for $99.

46.     Nearly a year later, on May 6, 2003, the Company ran into financial trouble when it announced that it would have to restate its previously reported financial results for 2003, which had overstated both the Company's revenues and net income by more than $12 million.  NASDAQ halted trading in Intermix shares after the restatement was announced and ordered trading of the Intermix shares would remain halted until the Company supplied accurate financial information.  Also in May 2003, the Company announced that the SEC had commenced an informal inquiry concerning the Company's accounting issues, and that Intermix had been sued for violations of the federal securities laws.

47.     In the summer of 2003, as a result of the Company's announcement that it would have to restate its financial results, numerous lawsuits were filed by Intermix shareholders in state and federal courts, charging Intermix and certain of its officers and directors with violations of applicable law.  The lawsuits alleged, among other things, that the Company and its officers and directors had issued false and misleading statements about the Company's financial results in order to sell their own Intermix stock at artificially inflated levels.

48.     In addition to these state and federal securities lawsuits, numerous derivative lawsuits were filed against the Company's directors, alleging that they had breached their fiduciary duties and engaged in other misconduct in causing the Company to violate securities laws.  These derivative lawsuits further alleged that the Company's directors had unjustly enriched themselves and other Company insiders by illicitly profiting from Intermix's violations of securities laws.

49.     In August 2003, the Company decided to re-launch MySpace as a social networking database modeled after an existing website known as Friendster.  Within ten days, the Company had relaunched MySpace, using its own employees as a start-up database.  The Company soon set up MySpace as a separate unit, retaining a 66% interest in the social networking site.

50.     In September 2003, NASDAQ delisted the Company's securities from the NASDAQ SmallCap Market, and the Company's securities began to trade on the "Pink Sheets."  As a result of the delisting from NASDAQ, the Company was in financial straits, with its stock essentially frozen.  And, due to significant costs associated with the accounting restatement and defendants' misconduct, the Company was facing excessive debt and possible bankruptcy.  In order to secure funds to address these issues, and raise capital to fund eUniverse's newly-launched MySpace website, the Company's CEO, Brad Greenspan ("Greenspan"), sought out equity investors willing to provide the Company the cash it needed.  After contacting several

1  potential investors, Greenspan reached an agreement with VantagePoint to provide

2  financing for eUniverse (the "VantagePoint Transactions").

3       51.   The financing was to occur in two phases. First, VantagePoint was to

4  provide the Company with a $2 million cash infusion in exchange for an 8% note and

5  the agreement of VantagePoint to retire an outstanding $500,000 promissory note

6  owed by the Company. As part of this first phase of the VantagePoint Transactions,

7  VantagePoint also entered into an agreement with a subsidiary of Sony Corporation of

8  America ("Sony"), 550 Digital Media Ventures (one of the Company's existing

9  preferred shareholders), acquiring an option from 550 Digital Media Ventures to

10 purchase up to 3,050,000 shares of the Company's common stock and 1,750,000

11 shares of Series B preferred stock at $1.10 per share. VantagePoint later exercised

12 this option.

13      52.   Second, the VantagePoint Transactions granted VantagePoint the right to

14 invest an additional $8 million in Intermix in the form of a preferred stock investment

15 at $1.50 a share. The VantagePoint Transactions also provided that VantagePoint

16 would supply Intermix with a $20 million line of credit to be used to fund future

17 mergers and acquisitions. VantagePoint had 75 days to consummate the second phase

18 of the transaction.

19      53.   When requested to perform on its obligation under the second phase of

20 the VantagePoint financing, VantagePoint began to delay, requesting multiple

21 extensions to the original schedule. By September 2003, Greenspan became

22 concerned that VantagePoint was utilizing the delay tactically as a ploy to force the

23 cash-strapped Company to agree to terms that were more favorable for VantagePoint

24 than those agreed to originally.

25      54.   As Greenspan sought to finalize the terms of the second phase of the

26 VantagePoint Transactions, VantagePoint told Greenspan that it intended to renege on

27 its promise to provide the Company the $20 million line of credit. Instead,

28 VantagePoint attempted to use its leverage by stating that it would provide additional

1  funds *only* if VantagePoint would receive in exchange an even greater equity stake in

2  Intermix – a condition that had not been part of the original agreement.

3      55.    The revised financing terms proposed by VantagePoint were not in the

4  Company's best interests and were highly unfavorable to the Company.  In fact, the

5  terms VantagePoint sought were likely to place Intermix in breach of NASDAQ's

6  "change in control" requirement and hamper the Company's ability to be relisted on

7  NASDAQ.  Moreover, even though the Company's stock was trading only on the Pink

8  Sheets, it had nonetheless risen above $2 per share, demonstrating that VantagePoint's

9  proposed $8 million investment at $1.50 per share vastly undervalued the Company.

10  Consequently, Greenspan, with the Board's approval, attempted to find alternative

11  financing that was more beneficial to the Company.

12      56.    After meeting with several of the Company's institutional investors

13  during October 2003, Greenspan began to implement a strategy whereby a number of

14  institutional investors would collectively invest $2.5 million in the Company at $1.85

15  a share.   This strategy came to be known as the "common stock financing."

16  VantagePoint was to be invited to participate in the common stock financing on the

17  same terms as other investors.

18      57.    The Board approved the common stock financing at a meeting on or

19  about October 16, 2003, and agreed to act according to this strategy so long as it was

20  completed prior to the second phase of the VantagePoint Transactions.  Greenspan

21  obtained the documents necessary to close the common stock financing by October

22  23, 2003.  Greenspan subsequently contacted VantagePoint and informed them that

23  their right to invest had expired pursuant to the second phase of their original

24  agreement, but that they could still invest in the common stock financing, together

25  with other institutional investors, at $1.85 per share.

26      58.    Due to the 2003 Defendants' fraudulent, manipulative, deceitful and/or

27  contrived conduct, however, set forth *infra* in ¶74, the common stock financing was

28  never consummated.  Instead, the 2003 Defendants were able to secure the Board's

19

1    approval to implement the VantagePoint Transactions, and, in the process, oust

2    Greenspan from his role as CEO and Chairman.

3        59.    On November 3, 2003, Intermix announced the VantagePoint transaction

4    in an 8-K filed with the SEC. Defendants explained that the $8 million financing

5    package included: (i) VantagePoint's purchase of 5,333,333 shares of a new series of

6    preferred stock (Series C) for $1.50 per share; (ii) VantagePoint's loan of $2 million

7    to the Company; and (iii) VantagePoint's purchase of $500,000 of debt the Company

8    owed an indirect subsidiary of Sony and an accompanying option to acquire certain

9    common stock and Series B preferred stock of the Company owned by the Sony

10    affiliate.    Defendants further noted that, *if shareholders vote to approve the*

11    *financing*, VantagePoint would loan up to $4 million to the Company in exchange for:

12    (i) the Company converting $2.5 million in existing Company debt held by

13    VantagePoint into Series C-1 preferred stock at $2.00 per share; and (ii) the Company

14    issuing VantagePoint a warrant to purchase up to 1,000,000 shares of the Company's

15    Series C preferred stock at $2.00 per share. Defendants also noted that, as part of its

16    investment, VantagePoint had been given two seats on the Board, which would be

17    filled by Carlick and Sheehan, Managing Directors of VantagePoint Management, Inc.

18        60.    As of November 15, 2003, Greenspan was no longer privy to internal

19    information regarding the Company's financial prospects, including the ability to

20    assess the impact of the VantagePoint financing on the Company's net operating loss

21    carryforwards ("NOLs").

22        61.    On December 11, 2003, Greenspan resigned from the Board, and sent a

23    letter to the Board, which read in relevant part:

24           It is with deep regret that I hereby resign my position as a director

25           . . . of eUniverse, Inc. . . .   It is my belief that certain directors of the

26           Board, inspired by their own interests, have embarked upon a scheme to

27           entrench themselves in office. By doing so, I believe these directors

28           have breached their fiduciary duties to the Company and its

20

stockholders.  In addition, I believe the actions and terms of the VantagePoint investment (approved without my consent) may have a material adverse impact on the Company's ability to relist its common stock on The Nasdaq SmallCap Market.  Therefore, I am compelled to take this unfortunate step for many reasons.

I have made no secret of the fact that I do not support the re-nomination of certain directors to the Board.  As the holder of approximately 23% of the Company's voting securities, apparently I have been perceived as a threat to the incumbency of these directors.  I believe that perceiving that their positions were in jeopardy, these directors excluded me from the nominating committee, thereby ensuring that they would control the nomination process.

On October 31, 2003, the Board (without my consent) approved a transaction with VantagePoint Alpha Holdings IV L.L.C. ("VantagePoint") that included, among other things, the initial issuance of 5,333,333 shares of Series C preferred stock to VantagePoint at $1.50 per share.  In doing so, I believe that the Board unwound a substantially more favorable and less dilutive institutional common stock private placement at $1.85 per share that had previously been approved by the Board. . . .  [in] breach of their fiduciary duties.  As I indicated previously, I believe that the terms of the VantagePoint investment may have a material adverse impact on the Company's ability to relist its common stock on The Nasdaq SmallCap Market.  I opposed the issuance to VantagePoint for these reasons, and as a result of my opposition was removed as Chairman of the Board and effectively forced to resign as Chief Executive Officer.

62.  On December 10, 2003, Greenspan filed a complaint with the Court of Chancery of the State of Delaware, alleging that the Board, *inter alia*: (i) improperly

21

1 transferred control of the Company to VantagePoint; (ii) reduced the number of

2 directors to be elected by the common stockholders to less than a majority of the

3 Board; (iii) manipulated the electoral process of the Company; and (iv) disregarded

4 agreements entered into for the protection of Intermix's common stockholders.

5 **The Issuance of the False and Misleading 2003 Proxy**

6      63.    On December 19, 2003, the 2003 Defendants announced that the

7 Company's annual meeting of stockholders would take place on January 29, 2004.

8      64.    Having been informed that Greenspan was making plans to run his own

9 slate of directors and oppose any directors proposed by the Board who sought

10 shareholder ratification of the revised VantagePoint transaction on December 30,

11 2003, the 2003 Defendants filed the 2003 Proxy with the SEC and disseminated it to

12 Intermix shareholders.  The 2003 Proxy was prepared, reviewed and/or disseminated

13 by defendants Brewer, Mosher, Moreau, Edell, Ward, Carlick, Sheehan and Lipp and

14 solicited, among other things, shareholder approval of: (i) the election of defendants

15 Brewer, Mosher, Moreau and Ward as directors; and (ii) the issuance of a warrant to

16 VantagePoint to purchase preferred shares of eUniverse stock at $2 per share, and the

17 conversion of a $2.5 million note held by VantagePoint into additional preferred

18 shares of eUniverse stock at $2 per share.

19      65.    The 2003 Proxy was false and misleading in that it failed to disclose that

20 the VantagePoint Transactions, if approved, would virtually eliminate the Company's

21 ability to use over $60 million worth of Intermix's valuable federal and state NOLs.

22 Specifically, the 2003 Proxy omitted the fact that by consummating the revised

23 VantagePoint transaction, the Company would be deprived of its ability to use over

24 90% of its federal NOLs and almost 75% of its valuable state NOLs.

25      66.    Defendants made a number of statements in the 2003 Proxy that were

26 rendered misleading by their failure to disclose that the VantagePoint Transactions, if

27 approved, would virtually eliminate the Company's ability to use over $60 million

28 worth of Intermix's valuable federal and state NOLs, including:

1       (a)    The text set forth on pages 16-18 of the 2003 Proxy, under the

2 heading "Proposal 2 – To Approve the Issuance of a Warrant to VantagePoint if We

3 Draw Down on a $4 Million Loan Commitment and the Modification of the Terms of

4 an Existing Note Due to VantagePoint, including the Preferred Stock Issuable on

5 Exercise or Conversion and the Conversion of the Preferred Stock into Common

6 Stock at the Applicable Conversion Rate," which purported to explain the full extent

7 of the VantagePoint Transactions:

8         On October 31, 2003, VantagePoint invested $8 million in our

9        Company by purchasing 5,333,333 shares of a new series of convertible

10       preferred stock, designated Series C convertible preferred stock.

11       VantagePoint will receive an additional 426,667 shares of Series C

12       preferred stock as dividends during the year ended October 31, 2004.

13       The Company allocated 20 million shares of authorized preferred stock

14       for the Series C preferred stock and has reserved shares of common stock

15       for conversion of the Series C preferred stock into common stock.  In

16       addition, on July 15, 2003, 550 Digital Media Ventures and

17       VantagePoint entered into an option agreement pursuant to which

18       VantagePoint may purchase up to 3,050,000 shares of our common stock

19       and 1,750,000 shares of our Series B preferred stock owned by 550

20       Digital Media Ventures until January 16, 2004. On October 31, 2003,

21       the option term was extended to April 16, 2004 and VantagePoint agreed

22       to partially exercise its option and purchase 454,545 shares of our Series

23       B preferred stock from 550 Digital Media Ventures for $500,000.  550

24       Digital Media Ventures also agreed to release the Company from any

25       claims that it may have, other than claims relating to the outstanding

26       $1,790,000 convertible secured promissory note held by 550 Digital

27       Media Ventures, including the related security interest, and any current

28       advertising arrangements with the Company.  In connection with the

transaction, 550 Digital Media Ventures waived its anti-dilution protection, preemptive rights and rights of first refusal. 550 Digital Media Ventures agreed to vote in favor of VantagePoint's investment and loan transactions at any Company stockholder meeting or by written consent and not sell any of its Company stockholdings until such transactions are completed.

As consideration for the option, 550 Digital Media Ventures sold to VantagePoint a $500,000 convertible promissory note due from the Company. In anticipation of the preferred stock investment, on July 15, 2003, VantagePoint loaned $2 million to the Company. VantagePoint and the Company agreed to terminate the $500,000 convertible promissory note and issue to VantagePoint a new $2.5 million promissory note. The $2.5 million note bears interest at 8% and is collateralized by a security interest in all of the Company's assets. The Company and VantagePoint also agreed that in the event that VantagePoint does not exercise the option within 120 days of its grant, VantagePoint may transfer the option to the Company in exchange for a warrant to purchase 200,000 shares of the Company's Series B preferred stock at $2.50 per share expiring three years from the date of issuance. This term has now expired and VantagePoint may not transfer the option to the Company.

On October 31, 2003, VantagePoint agreed to make available to the Company or give a bank guarantee for a bank to make available to the Company, a $4 million one-year senior secured bridge loan for certain proposed new business ventures. The bridge loan would bear interest at the prime rate and be secured by a security interest in all of our assets that is senior to the $2.5 million note from VantagePoint and the $1,790,000 note with 550 Digital Media Ventures. The senior

secured bridge loan will be available to the Company to be drawn down until February 28, 2004.  If the Company draws upon the senior secured bridge loan, for each $1 million in loan proceeds we receive the Company will issue a warrant to purchase 250,000 shares of Series C preferred stock at $2.00 per share expiring five years from the date of issuance (the "Bridge Warrant").  In addition, as of October 31, 2003, the Company amended the terms of the $2.5 million note due to VantagePoint to change the due date to February 8, 2004 (ten days after the annual stockholder's meeting) and agreed to seek stockholder approval to permit VantagePoint to convert the note to a prospective series of Company preferred stock, which will be designated Series C-1 preferred stock, at the rate of one share for each $2.00 of principal. If the stockholders approve the addition of the conversion feature to the note, the maturity date of the note will be October 31, 2004.

In connection with the VantagePoint transactions, the Company entered into a management rights agreement pursuant to which VantagePoint is entitled to consult with and advise the Company's management on significant business issues, inspect the Company's books and records and appoint a representative to attend all meetings of the Board as a non-voting observer.

As part of the transaction, VantagePoint appointed Andrew Sheehan and David Carlick to the Company's Board.  The Company entered into indemnification agreements with Mr. Sheehan and Mr. Carlick that grant the new directors more extensive indemnity rights than provided under the Delaware General Corporate Law.

The net proceeds, if any, from the exercise of the Bridge Warrant are expected to be used to fund working capital and general corporate purposes, and could result in the issuance of 1,000,000 additional shares

of Series C preferred stock, a 2.8% increase in the number of outstanding shares. If the $2.5 million convertible secured promissory note payable to VantagePoint is converted to Series C-1 preferred stock, the current portion of long-term debt would be reduced by $2.5 million, stockholders' equity would be increase by $2.5 million and 1,250,000 shares of Series C-1 preferred stock would be issued.   This would represent a 3.4% increase in the number of outstanding shares.   The Company's cash and cash equivalents at September 30, 2003 were $2.0 million and the Company raised approximately $10.5 million in proceeds from private placements of preferred and common stock subsequent to September 30, 2003.

The NASDAQ Marketplace Rules require listed companies to obtain stockholder approval prior to issuing 20% or more of their common stock or voting power.   In the aggregate, the VantagePoint transactions could result in the issuance of additional securities that are greater than 20% of the Company's outstanding common stock, on an as-converted basis.   Although the Company was delisted from The NASDAQ SmallCap Market, we have appealed the NASDAQ Listing Qualifications Hearings Panel's decision and are seeking reinstatement on The NASDAQ SmallCap Market.   As such, the Company is determined to comply with all NASDAQ rules and regulations. Therefore, we are seeking to obtain stockholder approval for the issuance to VantagePoint of the shares of Series C and C-1 preferred stock underlying the amended and restated $2.5 million convertible secured promissory note and the Bridge Warrant, including the preferred stock issuable on exercise or conversion and the conversion of the preferred stock into common stock at the applicable conversion rate.   The Bridge

1    Warrant and the amended and restated $2.5 million convertible secured

2    promissory note are attached as Appendix A and D, respectively.

3         (b)    The following statement under the heading "Recommendation of

4    the Board," set forth on page 18 of the 2003 Proxy:

5         The Board recommends a vote "FOR" the approval of (1) the

6         issuance to VantagePoint of up to 1,000,000 shares of eUniverse, Inc.

7         Series C preferred stock issuable upon the exercise of the warrant issued

8         as consideration for the $4 million bridge loan to the Company and (2)

9         the issuance of the shares of Series C-1 preferred stock issuable upon the

10        conversion of the amended and restated $2.5 million convertible secured

11        promissory note payable to VantagePoint that are convertible into

12        common stock at the applicable conversion rate.

13        67.    The omission from the 2003 Proxy of the fact that the VantagePoint

14   Transactions, if approved, would virtually eliminate the Company's ability to use over

15   $60 million worth of Intermix's valuable federal and state NOLs rendered the

16   foregoing sections misleading because, absent disclosure of the impact of the

17   VantagePoint Transactions on the Company's ability to take advantage of its

18   outstanding NOL's, Intermix shareholders were mislead into believing that voting in

19   favor of the VantagePoint Transactions would not result in an immediate and definite

20   $60 million diminution in the value of their shares.

21        68.    In order to render the foregoing not misleading, the 2003 Defendants

22   should have disclosed in the 2003 Proxy, at a minimum: (i) the fact that the

23   VantagePoint Transactions, if approved, would virtually eliminate the Company's

24   ability to use over $60 million worth of Intermix's valuable federal and state NOLs;

25   and (ii) that the Board's recommendation that Intermix shareholder's vote in favor of

26   the VantagePoint Transactions did not take into account the fact that the VantagePoint

27   Transactions, if approved, would virtually eliminate the Company's ability to use over

28   $60 million worth of Intermix's valuable federal and state NOLs.

69.     The foregoing information was material because Intermix shareholders were entitled to be informed that their approval of a transaction would cause the Company to lose a valuable asset. In fact, ***once shareholder approval of the revised VantagePoint transaction was obtained and the revised VantagePoint transaction was consummated, Intermix was able to use only $4 million of the $43.7 million federal NOLs it had on the books, and only $3.7 million of the $17 million state NOLs.***

70.     Thus, the 2003 Proxy was used to induce shareholder approval of a transaction that caused the Company to forfeit tens of millions of dollars worth of its valuable tax credits.

71.     Defendants were aware of their duty to disclose this material information in the 2003 Proxy, and failed to ensure that this material information was disclosed in the 2003 Proxy.

72.     Had defendants disclosed the truth about (i) the effect of the revised VantagePoint transaction on the Company's ability to use its NOLs, and (ii) the Board's recommendation that shareholders vote in favor of the VantagePoint Transactions, as they were required to do, Intermix shareholders would not have voted to reelect the Board nor would they have or approved the revised VantagePoint transaction. Defendants' preparation of and dissemination of the false and materially misleading 2003 Proxy was an essential link in defendants' accomplishment of the reelection of the Board and the approval of the revised VantagePoint transaction.

73.     Because of the material information omitted from the 2003 Proxy, uninformed shareholders approved proposals 1 and 2 in connection with the January 29, 2004 shareholder meeting. As a result, shareholders incurred millions of dollars in damages attributable to the lost NOLs and the 2003 Defendants' reelection to the Intermix Board.

**The 2003 Defendants' Fraud, Deceit, Manipulation and Contrivance in Connection with Issuance of the 2003 Proxy**

74.     The 2003 Defendants engaged in the following fraudulent, deceitful, manipulative and contrived conduct in connection with the issuance of the false and misleading 2003 Proxy:

(a)     In the summer of 2003, in the wake of allegations that the 2003 Individual Defendants had engaged in accounting improprieties and insider trading in violation of federal securities laws, the 2003 Individual Defendants became concerned that they might be removed from their positions at the Company by Greenspan, who at the time controlled nearly 25% of the Company's shares;

(b)     In the fall of 2003, the 2003 Individual Defendants were presented with an opportunity to oust Greenspan from the Board and thus preserve their positions with the Company after Greenspan rejected the VantagePoint Transactions in favor of the common stock financing. Upon rejection by Greenspan, VantagePoint solicited the aid of certain of the 2003 Individual Defendants, specifically Moreau, Edell, Lipp and Brewer, to ensure that the common stock financing would be rejected in favor of the VantagePoint Transactions. In order for this to occur, VantagePoint, Moreau, Edell, Lipp and Brewer agreed that Greenspan would be removed from the Board, an event which, if it occurred, would benefit all of the 2003 Defendants;

(c)     In exchange for the agreement of Moreau, Edell, Lipp and Brewer to aid in ousting Greenspan from the Board, VantagePoint agreed to retain the 2003 Individual Defendants if the VantagePoint financing was consummated;

(d)     In order to set up Greenspan's ouster from the Board, VantagePoint, Moreau, Edell, Lipp and Brewer agreed that VantagePoint would send a letter to the Board threatening legal action and demanding immediate repayment of the $2.5 million VantagePoint had already loaned the Company if the Board did not complete the VantagePoint Transactions and reject the common stock financing;

1       (e)    Pursuant to this fraudulent scheme, on or about October 27, 2003,
2  VantagePoint sent a letter to the Board.  The letter asserted that the Company had
3  breached the agreement with VantagePoint, demanded immediate repayment of the
4  $2.5 million debt from the first phase of the VantagePoint Transactions, and
5  threatened to take legal action against the Company and those who were participating
6  in the common stock financing investors.  In the letter, VantagePoint falsely claimed
7  that Greenspan had attempted to forestall completion of the VantagePoint
8  Transactions by withholding due diligence materials.  The truth, however, was that
9  VantagePoint was solely responsible for the delay, as it had sought several extensions
10  of its original deadline and then sought to revise the terms;

11       (f)    The letter was considered in a meeting on October 27, 2003, with
12  Moreau, Edell, Lipp and Brewer playing their part in the ruse by feigning surprise at
13  receipt of the letter.  Brewer and Lipp carried the ruse one step further by pretending
14  indignation at the purported dilatory conduct alleged to have been engaged in by
15  Greenspan, and they collectively threatened to immediately resign as officers and
16  directors if Greenspan did not step down as CEO and Chairman;

17       (g)    Faced with the fraudulent, deceitful, manipulative and contrived
18  conduct of VantagePoint, Moreau, Edell, Lipp and Brewer, the Board approved the
19  revised VantagePoint financing and rejected the common stock financing deal
20  negotiated by Greenspan.  Greenspan was forced to resign his positions as Chairman
21  and CEO;

22       (h)    In order to coerce shareholders into approving the VantagePoint
23  Transactions, and secure their reelection to the Board, the 2003 Defendants purposely
24  issued the false and misleading 2003 Proxy, in which defendants failed to disclose the
25  fact that the VantagePoint Transactions would virtually eliminate the Company's
26  ability to utilize over $60 million worth of federal and state NOLs.

27

28

## BACKGROUND TO DEFENDANTS' ISSUANCE OF THE FALSE AND MISLEADING 2005 PROXY

**Defendants Sell the Company to News Corp. Via an Unfair Process and at an Unfair Price**

75.     On or about December 3, 2004, the New York Attorney General, Eliot Spitzer ("Spitzer"), initiated an investigation of Intermix, related to charges that the Company had been deceptively installing hidden spyware software in its programs. The investigation revealed that beginning in 2003 and 2004, the Company had bundled spyware and adware programs with other free software programs without properly informing consumers of the hidden software.

76.     Spitzer's investigation into Intermix's use of spyware and adware continued for four months.  During this time period, the Company failed to disclose that the investigation was taking place.  While the Company kept the New York Attorney General Elliot Spitzer investigation under wraps, Brewer and the Company's largest shareholder VantagePoint, who had in their possession confidential information regarding the existence and development of the investigation, sold material amounts of the Company's stock.

77.     As the Spitzer investigation progressed, the 2005 Individual Defendants became concerned about their potential liability, not only in connection with the New York Attorney General's investigation, but also in the then-outstanding securities and derivative lawsuits based on defendants' misconduct that resulted in the Company's restatement.

78.     On February 10, 2005, Greenspan filed a derivative suit against the Company's officers and directors, alleging harm to the Company caused by defendants' misconduct in connection with the events leading up to the issuance of the 2003 Proxy, as detailed in ¶¶43-58.

79.     Aware that a sale of the Company could extinguish their liability in derivative suits, in February 2005, the 2005 Individual Defendants formed a "Transactions Committee" to find a suitor willing to purchase the Company and grant

31

them indemnification for their prior misdeeds. The 2005 Individual Defendants also viewed a sale of the Company as a chance to monetize their illiquid holdings in Intermix and capture for themselves profits associated with the Company's MySpace asset.

80.   VantagePoint also was looking for a way to cash out its holdings in the Company. VantagePoint had tried to dump stock on the market over the past few months but realized that the only way VantagePoint could really monetize the bulk of its investment quickly would be through a sale of the entire Company.

81.   Notably, the "Transactions Committee" formed by the 2005 Individual Defendants consisted entirely of directors whose interests were aligned with and dictated by VantagePoint: (i) Sheehan, a managing director of VantagePoint; (ii) Rosenblatt, who held millions in illiquid options and intended to use his position on the Transactions Committee to secure continuing employment with any buyer; and (iii) Quandt, who was hand-picked by and completely beholden to VantagePoint.

82.   Over the next three months, defendants conducted preliminary negotiations with at least three potential acquirors.

83.   At about this same time, MySpace experienced unprecedented growth. The website, which integrates web profiles, blogs, instant messaging, email, music downloads, photo galleries, classified listings, events, groups, chat rooms and user forums to create a connected community where users are able to organize and maintain significant aspects of their lives in a readily available virtual space, was growing exponentially.

84.   On April 5, 2005, New York Attorney General Spitzer notified Intermix that he intended to file suit for the Company's surreptitious use of spyware/adware. On April 14, 2005, the Company disclosed the Spitzer investigation and forthcoming lawsuit in a Form 8-K.

85.   On April 28, 2005, New York Attorney General Spitzer filed suit against Intermix for its use of spyware/adware. Between April 25, 2005 and May 9, 2005,

1    Intermix's common stock collapsed from $8.25 to $3.20 a share as news of the Spitzer
2    investigation was made public. On the heels of this news, the three parties that had
3    earlier expressed interest in purchasing the Company temporarily backed off.

4         86.    Between April 25, 2005, and May 9, 2005, the Company's stock price
5    plummeted from $8.25 per share to $3.20 per share as a result of the Spitzer
6    investigation. This fall in the Company's stock price made Intermix ripe for takeover
7    by an opportunistic acquirer to make a bid for the Company while its stock price did
8    not reflect the Company's actual economic prospects.

9         87.    On June 9, 2005, Montgomery informed the 2005 Individual Defendants
10   that News Corp. was willing to purchase the Company and, as demanded by the 2005
11   Individual Defendants, to assume all defendants' personal liability. News Corp. also
12   assured the 2005 Individual Defendants that their personal interests would be well
13   taken care of in the deal and that they would be able to personally capitalize on the
14   value of MySpace.

15        88.    From this point forward, the 2005 Individual Defendants engaged in a
16   sales process which was designed to ensure that the sale of Intermix was
17   consummated with one buyer and one buyer only: News Corp. Defendants failed to
18   conduct any canvas of the market, including failing to contact the potential bidders
19   that had shown interest in purchasing Intermix prior to disclosure of the Spitzer
20   investigation. Defendants did so even though the offer proposed by News Corp. did
21   not adequately value MySpace. Defendants suppressed this information from
22   shareholders.

23        89.    On June 14, 2005, defendants announced that they had settled the Spitzer
24   lawsuit, by causing Intermix to pay $7.5 million. By this point, defendants were
25   already allowing News Corp. to direct their decision-making, as they actively worked
26   with News Corp. in settling the Spitzer litigation.

27        90.    On June 22, 2005, News Corp. signed a confidentiality agreement with
28   the Company and commenced due diligence the next day.

91.     Rosenblatt and Sheehan subsequently directed the "negotiations" with News Corp. The "negotiations," however, did not involve attempting to comply with these defendants' legal duties to act in the best interest of Intermix's public shareholders. Instead, the "negotiations" with News Corp. revolved around the 2005 Individual Defendants maneuvering to secure personal benefits for themselves as part of the sale of Intermix, which benefits were bargained for at the expense of Intermix's public shareholders. For example, in exchange for instant monetization for his Intermix option holdings and a job with the surviving entity, Rosenblatt agreed to participate in the deal. In an email sent to VantagePoint representative Sheehan on June 23, 2005, he made his motives patently clear:

> *"Fox dili starting Monday. Name ur next kid rich. No deal unless I*
> *stay long term. remember your vesting promise."*

92.     That same day, Rosenblatt confirmed that News Corp. was starting to undertake due diligence.

93.     Throughout the summer of 2005, the 2005 Defendants steadfastly refused to negotiate in good faith with any bidder other than News Corp. For example, on July 1, 2005, Rosenblatt was approached by a second investment bank, Weisel, with an offer from Viacom, Inc. ("Viacom") to purchase Intermix. To avoid the potential of a "hostile" offer from Viacom that would yield higher value to Intermix shareholders – *but would likely yield less of the personal benefits to Rosenblatt and the other 2005 Individual Defendants stood to receive in the News Corp. transaction* – Rosenblatt decided to string Weisel and Viacom along, by promising Viacom that it would be allowed to conduct due diligence that never materialized. Viacom would later complain that it had been misled by Rosenblatt and the other 2005 Defendants.

94.     The 2005 Individual Defendants quickly made the decision that they would actively *avoid* conducting a pre-merger market check to determine if the News Corp. deal was in the interests of shareholders. In a July 6, 2006, email sent to Montgomery, Rosenblatt closed the door on the possibility of an auction stating:

34

1     *"Get lang [Mike Lang of News Corp.] to 12 and ill get vantage. Just*

2     *spoke w him . . . he wants to test the market and I'm advising against*

3     *it . . ."*

4     95.    That same day, Rosenblatt confirmed that he had obtained approval of

5 the CEO of MySpace, Chris DeWolfe, to enter into a deal with Fox at $12 per share.

6     96.    On July 12, 2005, Rosenblatt met with Rupert Murdoch and Peter

7 Chernin of News Corp. News Corp. made an offer of $12 per share on the condition

8 that the agreement be executed by July 17, 2005.

9     97.    During this meeting, Rosenblatt communicated to News Corp.

10 information regarding MySpace's breakneck growth. The following day, Rosenblatt

11 sent an email to News Corp. executives, writing, *"I am looking forward to supporting*

12 *the 20 [billion] dream!"*

13     98.    Just prior to this meeting and in order to ensure that Weisel would not

14 foul up the News Corp. deal by pressing defendants for good faith negotiations with

15 Viacom, Rosenblatt "retained" Weisel to work for him and to ultimately write a

16 fairness opinion concerning the Acquisition that would pay Weisel over $3 million,

17 effectively "buying off" the investment banker with the promise of an incentive-based

18 multi-million dollar fee.

19     99.    Rosenblatt retained Weisel despite that fact that he had already retained

20 Montgomery to issue a fairness opinion for which it was to earn a multimillion dollar

21 fee. As Montgomery acknowledged in an email to Sheehan, the retention of

22 Montgomery was part of Montgomery's agreement that *it would "write a fairness*

23 *opinion [as part of the] agreement [and] that this would be the 'love.'"*

24     100.    Through this new relationship between Rosenblatt and Weisel, the 2005

25 Individual Defendants sought to effectively cut-off the flow of information that could

26 lead to a Viacom bid and a bidding war. With Weisel in their camp, defendants were

27 able to deliver Intermix to News Corp. by evading Viacom, who, as late as July 15,

28 2005, stood ready to submit a bid for the Company. As part of their plan to deliver

1  Intermix to News Corp., *the 2005 Individual Defendants refused to provide adequate*
2  *due diligence to Viacom*.  Instead, defendants rebuffed Viacom and accelerated
3  "negotiations" with News Corp., working around the clock to ink an agreement with
4  News Corp. by July 17, 2005.

5      101.   That Viacom was focused on making a bid for Intermix is demonstrated
6  by an email sent by a Viacom representative to Rosenblatt:

7          We are coming with a bid early next week.  We really want to be with
8          you on this and hope to get in the ring for it (just saw Cinderalla Man).
9          Tried to call you, but didn't get through.  My cell is . . . .  Weekend
10         number: . . . .  Some of the team is out there, we are all on top of this.
11         . . . is with me on wanting to be in business with you.

12     102.   Despite Viacom's obvious, demonstrated level of interest, defendants
13  made no attempt to negotiate in good faith with Viacom before entering into the
14  Acquisition.  Indeed, defendants deliberately avoided any communications with
15  Viacom in order to ensure that they could finalize the Acquisition without the
16  intrusion of a third party which had not promised defendants the same benefits as
17  News Corp.

18     103.   As the negotiations with News Corp. proceeded to the final stages,
19  Rosenblatt reminded Sheehan of Sheehan's agreement that if Rosenblatt helped
20  deliver Intermix to News Corp., VantagePoint would "get him a good job."  Sheehan
21  confirmed that it would be "no problemo" to deliver a lucrative employment for
22  Rosenblatt with News Corp.

23     104.   On July 17, 2005, Sheehan continued to work with the 2005 Individual
24  Defendants to ensure that the interests of VantagePoint and the 2005 Individual
25  Defendants – as opposed to Intermix's public shareholders – would be well taken care
26  of in the deal, demanding a liquidation preference for VantagePoint and
27  indemnification for the Board.  In an email sent to Sheehan by News Corp., News
28  Corp. stated:

36

1   Good discussion this evening. We're making progress and are hopeful to
2   get this wrapped-up soon. On the issues, let's close on the remaining
3   ones in a fair and reasonable way – so we can build our relationship.

4       1)   We are willing to pay the liquidation preference upon sale.

5       2)   From the beginning, we've appreciated your commitment to
6   selling your shares. This is the reason why Peter gave on the upside
7   protection in the event of a Fox counter – to ask for profit if we lose is a
8   stretch.

9       3)   *We feel like we have given indemnification on the shares and the*
10   *purchase agreement itself – to do so on an issue we have no*
11   *involvement in whatsoever (i.e. Greenspan) – that seems like too much.*

12       105.   Rosenblatt had one final detail that he needed to iron out before the deal
13   with News Corp. could be finalized. As part of the initial negotiations with News
14   Corp., the Company had secured a $70 million line of credit that it could have used to
15   repurchase the 47% interest in MySpace now held by RedPoint, an option it could
16   exercise for $60 million. Because News Corp. had now made a bona fide offer to
17   purchase the Company, the Board now had the cash and the opportunity to repurchase
18   MySpace and then reject the News Corp. proposal. Defendants could have then spun-
19   off MySpace or searched for a competing offer that adequately valued the Company's
20   crown jewel. But the 2005 Individual Defendants had been given all they had asked
21   for by News Corp. and Rosenblatt convinced his fellow defendants to forego the
22   opportunity to recapture MySpace and maximize shareholder value for Intermix's
23   public shareholders.

24       106.   Immediately following the signing of the merger agreement, but before
25   the shareholder vote, it became even more clear that the terms of the Acquisition were
26   not fair to Intermix shareholders. Throughout July, August and September, MySpace
27   revenue continued to soar, making the future projections that were used by the
28   Investment Banks and the rest of the 2005 Defendants to assert that the terms of the

1 | Acquisition were "fair from a financial point of view" to Intermix shareholders, even
2 | more baseless.

3 |     107.   Importantly, as late as September 25, 2005, both the 2005 Individual
4 | Defendants and the Investment Banks were still actively involved in analyzing the
5 | value of the Company as a whole, and the value of MySpace specifically. In fact,
6 | according to a public filing on September 26, 2005, the 2005 Individual Defendants
7 | and the Investment Banks had thoroughly analyzed and rejected an offer by former
8 | CEO Greenspan to spin off MySpace, which analysis involved a review of the current
9 | and future MySpace revenue and its unprecedented growth.

10 |     108.   Indeed, between the time the deal was announced on July 18, 2005 and
11 | the time shareholder approval of the sale was obtained on September 30, 2005,
12 | MySpace "Page Views" increased by approximately 45% and its "Unique Visitors"
13 | run rate by approximately 16%, according to Nielsen NetRatings (comparing the week
14 | ended August 21, 2005 to the week ended July 10, 2005). In fact, MySpace had
15 | become *the second most popular site on the internet* in page views, and accounted
16 | for *12.4% of all online display ads shown in the United States*.

17 |     109.   Defendants knew that the Acquisition consideration vastly undervalued
18 | MySpace. In a July 13, 2005, email to News Corp. executives Rosenblatt offered
19 | insiders his multibillion dollar view of the MySpace asset: "I am looking forward to
20 | supporting the 20 [billion] dream!" Rosenblatt's "dream" has proven itself a reality.
21 | In the months following the Acquisition, analysts have pegged MySpace's value as
22 | much as $20 billion. Indeed, News Corp. is currently considering a proposal to sell
23 | MySpace to Yahoo, Inc. ("Yahoo"), in exchange for a 25% interest in Yahoo, a deal
24 | that would value MySpace at about $12 billion.

25 |     110.   Even though MySpace was the Company's most significant asset and
26 | growing significantly faster than the rest of the company's assets, the Company did
27 | not separately report the revenues and earnings of MySpace, instead consolidating
28 | them with the rest of the Company's results. By consolidating MySpace's revenues

1    and earnings with the rest of the Company's financials, the 2005 Defendants not only

2    violated GAAP, shareholders were precluded from being informed that MySpace was

3    experiencing unprecedented growth.  MySpace was driving monumental gains in net

4    income for the entire Company, with a 900% increase in net income for 1Q06 over

5    1Q05.[5]

6        111.    A comparison of the terms of News Corp.'s $580 million acquisition of

7    Intermix with another News Corp. acquisition, IGN Entertainment ("IGN") (an online

8    video game company), for $650 million, highlights defendants' failure to act in the

9    interest of Intermix shareholders.  Both acquisitions occurred in the summer of 2005,

10   and by any objective metric, Intermix was far more valuable:

11   • *Intermix had almost twice the revenues of IGN*.  For the six months

12       ended June 30, 2005, IGN had $28.7 million in revenue while Intermix

13       had $50.82 million in revenue;

14   • *Intermix was profitable – IGN was not*.  For the six months ended June

15       30, 2005, IGN lost $7.5 million while Intermix posted $529,000 in

16       profits; and

17   • *Intermix had substantially more internet traffic than IGN*.  Recent

18       figures showed that IGN had 28 million Unique Visitors and 600 million

19       page views per month, while Intermix had 20% more Unique Visitors

20       and 500% more page views per month.

21       112.    On July 19, 2005, the 2005 Individual Defendants announced that News

22   Corp. was buying Intermix for $580 million.  Intermix issued a release stating:

23

24

25   [5]    News Corp. later announced a multi-year search engine and advertising deal
         with search engine giant Google that provided News Corp. $900 million. News Corp.
26   President Peter Chernin said of the deal:  "We have gotten a 70 percent premium on
         our MySpace investment and are now playing with house money."  News Corp. also
27   announced plans to launch a MySpace website in China.

28

Rupert Murdoch's News Corp. agreed to buy Intermix Media Inc., owner of more than 30 marketing and entertainment Web sites, for $580 million . . . . Intermix shareholders will receive $12 a share in cash.

**Defendants Secure Material Personal Benefits Not Shared with Intermix's Public Shareholders in Connection with the Acquisition**

113.  As part of the deal with News Corp., the 2005 Individual Defendants secured more than $15 million via stock options, including more than $9.4 million for CEO Rosenblatt alone.

114.  In addition, defendants altered certain of their own contracts to provide for even greater benefits, in the form of full vesting of options, than they otherwise would have been entitled to.  For example, pursuant to a February 23, 2004, employment agreement between the Company and Rosenblatt, Rosenblatt was granted options to purchase, at an exercise price of $1.83 per share, an aggregate of 2,000,000 shares of Intermix common stock, of which 100,000 shares vested immediately, 1,200,000 shares were to vest on a monthly pro rata basis *over four years* and 700,000 shares were to vest upon the achievement of certain financial goals or, if not then vested, at the end of six years of continuous employment. Under Rosenblatt's employment agreement, upon a change of control of Intermix, Rosenblatt was to receive immediate vesting of only 50% of the unvested portion of the performance based option. Only in the event of a change of control and the simultaneous or subsequent termination of Rosenblatt's employment within six months following the change of control was Rosenblatt to receive immediate vesting of all unvested options. Yet, even though Rosenblatt continued with the Company post-Acquisition, Rosenblatt received acceleration and immediate vesting of all of his unvested stock options because, concurrently with the execution of the Merger Agreement, defendants agreed to accelerate the vesting of all the outstanding unvested stock options held by Rosenblatt to occur immediately prior to the effective time of the Acquisition.

115.  Rosenblatt also secured the additional benefit of continuing employment with News Corp. post-Acquisition.

116.  Moreover, VantagePoint and defendants Carlick and Sheehan secured preferential treatment for their preferred shares – as much as $14.60 a share, or 23% more than the Company's public shareholders.  Notably, these defendants had to negotiate specifically with News Corp. regarding these preferences to ensure that News Corp. would accord their preferred shares with preferred, heightened economic consideration.  In doing so, these defendants subverted the interests of Intermix's public shareholders to serve their own interests, by negotiating for less consideration for Intermix's common shares to ensure that their own shares were given preferred treatment. Notably, via the Acquisition, VantagePoint turned its $8 million investment into a $160 million profit.

117.  All the defendants secured the material personal benefit of indemnification for their past misconduct while in control of the Company.  Notably, the indemnification secured by defendants is not merely co-extensive with the indemnification that they were entitled to while in control of Intermix.  Intermix could only indemnify defendants for breaches of their fiduciary duties that were not taken in bad faith or disloyal to the Company and its shareholders.  As a third-party acquirer, however, News Corp. could offer indemnification to defendants that extended to all their misconduct committed against Intermix and its shareholders, including bad faith and disloyal breaches of their fiduciary duties.  By agreeing to sell the Company to News Corp., defendants could and did secure far more expansive indemnification than could be offered by Intermix.

118.  In order to ensure that the Acquisition closed and that their own interests were taken care of, the 2005 Individual Defendants rushed to consummate the Acquisition before disclosing Intermix's 1Q06 results.  For example, the 2005 Individual Defendants negotiated the Acquisition at a time when they were aware: (i) that Intermix was on track to post 1Q06 net income *900% greater than 1Q05*; and (ii)

41

1   that Intermix shareholders would not have approved the Acquisition if this were
2   disclosed to the public. In doing so, the 2005 Individual Defendants failed to disclose
3   material information concerning the Company's prospects and the sales process. The
4   2005 Individual Defendants were well aware that they could not deliver a $12 per
5   share deal to News Corp. (and receive their personal payoffs, premium payments for
6   their unvested stock options and indemnification) if Intermix's stock was trading
7   substantially above $12 per share, as it would have but for announcement of the
8   Acquisition.

9       119.   Moreover, the 2005 Defendants failed to disclose material information
10  regarding the value of MySpace, even though management was receiving monthly
11  updates that detailed the sky-rocketing value of the MySpace asset, as they were
12  aware that this was the only way they could ensure that the Acquisition would close.

13  **Defendants Relied on Conflicted Financial Advisors**

14      120.   Defendants refused to retain truly independent financial advisors to opine
15  on the fairness of the Acquisition to Intermix's common shareholders. Instead, the
16  2005 Individual Defendants incentivized Montgomery and Weisel, the investment
17  advisors they hired, to opine that the Acquisition was fair regardless of whether it
18  actually was by agreeing to pay the financial advisors a fee contingent on the
19  successful completion of the Acquisition. Pursuant to the terms of their engagement,
20  Montgomery and Weisel received $750,000 each for their fairness opinions and an
21  additional 0.425% of the total Acquisition consideration, or approximately
22  $2.5 million each. The contingent nature of the fees served as an incentive to the
23  investment bankers to opine that the Acquisition was fair because, if they opined it
24  was unfair, as it definitely was, shareholders would have voted it down and the
25  financial advisors would not have received the bulk of their multi-million dollar
26  contingency fees.

27      121.   Such contingency fee arrangements for financial advisors in business
28  combinations have come under increased media and market scrutiny recently. The

1    *New York Times* recently characterized such fairness opinions based on contingent

2    fees as "conflict-ridden fig leaves." A recent *Wall Street Journal* article also noted the

3    potential conflicts this type of arrangement raises and commented that "it is an open

4    secret on Wall Street that fairness opinions can be anything but arm's-length

5    analyses." Indeed, as one banker noted in a recent article, "Very, very occasionally,

6    the board of directors actually wakes up and says, 'You know what? Of course our

7    banker is going to say this deal is fair, because they have a huge contingency on the

8    line.'"

9         122.    It was not surprising then that both Montgomery and Weisel opined that

10    the consideration was fair despite the fact that Weisel's Discounted Cash Flow

11    ("DCF") analysis indicated an appropriate value for the Company should be as high as

12    $19.51.

13         123.    Furthermore, in opining that the Acquisition was fair, Montgomery and

14    Weisel ignored the Company's strong recent performance before and after the

15    announcement. For instance, defendants were aware at the time they announced the

16    Acquisition that Intermix was on track to post 1Q06 net income approximately ***900%***

17    ***greater*** than 1Q05 and were aware that Intermix common shares would trade

18    substantially above $12 per share if this was disclosed to the public. In addition,

19    subsequent to the announcement of the Acquisition, Intermix, and in particular

20    MySpace, exhibited dramatic growth. MySpace enjoyed phenomenal growth as its

21    "Unique Visitors" run rate has increased by approximately 16% since the Acquisition

22    was announced according to Nielson NetRatings (comparing the week ended August

23    21, 2005 to the week ended July 10, 2005). Nielson NetRatings also indicated that

24    MySpace's "Page Views" had increased by approximately 45% in the same time

25    period. By August, MySpace became the second most visited site on the Internet

26    (ahead of Yahoo and Google) and accounted for 12.4% of all online display ads

27    shown in the United States. The benefits of these recent developments now flow to

28    News Corp. instead of Intermix because of the Acquisition.

**Defendants Impermissibly Locked-Up the Acquisition with Preclusive Deal Protection Devices**

124.   To ensure that the Acquisition would be completed and to improperly ward off other bidders, the 2005 Individual Defendants improperly tilted the playing field in favor of News Corp. by agreeing to deal protection devices which precluded defendants from taking any steps to maximize shareholder value.

125.   Specifically, §6.2(a) of the Merger Agreement precluded defendants from providing an interested third party any non-public information until after that third party had already made a superior unsolicited proposal to acquire Intermix. This "no-shop" and "no-talk" provision effectively prohibited defendants from complying with their fiduciary duty to maximize shareholder value by preventing them from ever discussing a sale of the Company or providing information about the Company to interested buyers such as Greenspan.

126.   Section 8.5 of the Merger Agreement provided for a penalty clause provision in the amount of $25 million (the "Termination Fee"), which bore no relation to any costs/expenses absorbed with News Corp.'s bid.  Rather it was designed to impede any other bids by erecting a $25 million price admission to any bidder who might otherwise wish to try to buy Intermix.  Intermix, and hence any third party interested in acquiring the Company, would have to pay News Corp. the $25 million within two business days in the event the Intermix Board terminated the agreement with News Corp. and moved forward with a superior proposal.

127.   Section 6.2(d), the "matching rights" provision of the Merger Agreement, provided News Corp. with three days to match any superior proposal submitted by a competing bidder.  The matching rights provision enable incremental bidding by News Corp., and created a further obstacle to the maximization of shareholder value.

128.   All of these provisions were designed to, and did, prohibit other serious bids from being made for the Company that, while more favorable to the Company's

44

1   public shareholders, would not provide the self-dealing benefits defendants extracted

2   for themselves via the Acquisition.

3   **Defendants Issue the False and Misleading 2005 Proxy**

4       129.   In order to secure approval of the unfair Acquisition, defendants issued

5   the false and misleading 2005 Proxy, which contained numerous material omissions

6   and misstatements as set forth below.

7       ***The Current Revenues and Profits Being Generated by MySpace***

8       130.   Defendants made a number of statements in the 2005 Proxy that were

9   rendered misleading by their failure to disclose the current revenues and profits being

10  generated by MySpace, including:

11          (a)   The following statement in the section entitled "Factors Relating to

12  the Specific Terms of the Merger Agreement with Fox Interactive Media," on page 31

13  of the 2005 Proxy, which purports to offer the conclusion that the Acquisition was

14  fair:

15          [T]he board of directors concluded that the merger consideration was

16          ***likely the highest price reasonably attainable*** for Intermix' stockholders

17          in a merger or other acquisition transaction[.]

18          (b)   The following statement contained in the introductory text of the

19  Montgomery fairness opinion, set forth on pages 34-35 of the 2005 Proxy, claiming

20  that Montgomery's analysis as based on the most up-to-date financial information:

21          In Montgomery's review and analysis, and in arriving at its

22          opinion, ***Montgomery assumed and relied upon the accuracy and***

23          ***completeness of all of the financial and other information provided to***

24          ***it*** (including information furnished to it orally or otherwise discussed

25          with Montgomery by our management) or publicly available and neither

26          attempted to verify, nor assumed responsibility for verifying, any of such

27          information.   Montgomery ***relied upon the assurances of our***

28          ***management that our management was not aware of any facts that***

45

1    *would make such information inaccurate or misleading*. Montgomery
2    also made the following assumptions . . . that with respect to the
3    financial forecasts and projections (and the assumptions and bases
4    therefor) for Intermix that Montgomery reviewed, such forecasts and
5    projections were reasonably prepared in good faith on the basis of
6    reasonable assumptions and *reflect the best currently available*
7    *estimates and judgments of our management as to the future financial*
8    *condition and performance of Intermix*, and that such projections and
9    forecasts will be realized in the amounts and in the time periods currently
10   estimated[.]

11           (c)    The following text set forth in the section of the Montgomery
12   fairness opinion entitled "Comparable Company Analysis," at pages 35-36 of the 2005
13   Proxy, which purports to assess the fair value of the Company after exercising the
14   MySpace option:

15           Based on public and other available information about comparable
16   companies, Montgomery utilized a sum of the parts analysis to *calculate*
17   *the implied equity value of Intermix*, assuming (i) no exercise and (ii)
18   exercise of the MySpace, Inc. purchase option. Montgomery performed
19   a comparable company analysis for each of our three primary businesses
20   separately (Alena, Intermix Network and our ownership interest in
21   MySpace, Inc.) because the three businesses have different economics
22   and peer groups. Montgomery then aggregated the estimated values of
23   the three primary businesses to come to a range of estimated values for
24   Intermix. In such analysis, Montgomery estimated a range of values for
25   each of the three primary businesses by multiplying the estimated
26   earnings before interest, taxes, depreciation and amortization (or,
27   EBITDA) for each business for 2005 and 2006 (excluding our corporate
28

46

overhead expenses) by a range of EBITDA multiples for 2005 and 2006 derived from companies with comparable businesses. . . .

Projected 2005 and 2006 information for Intermix was based on projections of our management . . .:

| | Enterprise Value/EBITDA 2005E | Enterprise Value/EBITDA 2006E |
|---|---|---|
| Alena | 8.5x-12.0x | 7.0x-8.0x |
| Intermix Network | 16.0x-20.0x | 12.0x-14.0x |
| MySpace, Inc. | 22.0x-28.0x | 15.0x-19.0x |
| Corporate Overhead | 17.5x | 13.0x |
| Implied Intermix Common Stock Value Per Share (no exercise of MySpace, Inc. purchase option) | $1.77-$3.88 | $7.62-$9.96 |
| Implied Intermix Common Stock Value Per Share (exercise of MySpace, Inc. purchase option) | $2.66-$5.41 | $10.72-$14.28 |

131. The omission from the 2005 Proxy of the current revenues and profits being generated by MySpace rendered the foregoing sections of the 2005 Proxy materially misleading because, absent disclosure of the updated revenue figures for MySpace in these sections, Intermix shareholders were misled into believing that the Board's recommendation, and the basis thereof, that the Acquisition was the best price attainable for shareholders, and Montgomery's assessment of the Implied Intermix Common Stock Value Per Share with exercise of the MySpace option, reflected the most current and up-to-date information about the revenues being generated by MySpace. They did not.

132. In order to render the foregoing not misleading, defendants should have expressly disclosed in the 2005 Proxy, at a minimum: (i) that the Board's

recommendation and conclusion "that the merger consideration was likely the highest price reasonably attainable for Intermix stockholders in a merger or other acquisition transaction" did *not* factor in the most currently available information about the revenues being generated by MySpace; (ii) that Montgomery's asset valuation of Intermix after exercise of the MySpace option did not factor in the most currently available information about the revenues being generated by MySpace; and (iii) the current revenues and profits being generated by MySpace, which Company management was receiving on a monthly basis no later than February 2005, which demonstrated much higher revenues than were used and disclosed.

133.  The foregoing information was material because between the time the Acquisition was announced on July 18, 2005, and the time shareholder approval of the sale was obtained on September 30, 2005, MySpace revenues were dramatically increasing because MySpace "page views" escalated by approximately 45% and its "Unique Visitors" run rate increased by approximately 16%, according to Nielsen NetRatings.  In addition, by September 30, 2005, MySpace had become the most popular site on the internet in page views, and accounted for 12.4% of all online display ads shown in the United States.  These escalating results led to known increases in revenues that were not used and/or disclosed as a basis for claims that the Acquisition was fairly priced.

### The Updated Projections for Intermix that Included the Recent Growth of MySpace and the Company's Other Assets

134.  Defendants made a number of statements in the 2005 Proxy that were rendered misleading by their failure to disclose updated projections for Intermix that included the recent growth of MySpace and the Company's other assets, including:

(a)  The following statement contained in the introductory text of the Montgomery fairness opinion, set forth on pages 34-35 of the 2005 Proxy, claiming that Montgomery's analysis is based on the most up-to-date financial information:

48

1    In Montgomery's review and analysis, and in arriving at its
2    opinion, *Montgomery assumed and relied upon the accuracy and*
3    *completeness of all of the financial and other information provided to*
4    *it* (including information furnished to it orally or otherwise discussed
5    with Montgomery by our management) or publicly available and neither
6    attempted to verify, nor assumed responsibility for verifying, any of such
7    information.   *Montgomery relied upon the assurances of our*
8    *management that our management was not aware of any facts that*
9    *would make such information inaccurate or misleading.* Montgomery
10   also made the following assumptions . . . that with respect to the
11   financial forecasts and projections (and the assumptions and bases
12   therefor) for Intermix that Montgomery reviewed, such forecasts and
13   projections were reasonably prepared in good faith on the basis of
14   reasonable assumptions and *reflect the best currently available*
15   *estimates and judgments of our management as to the future financial*
16   *condition and performance of Intermix,* and that such projections and
17   forecasts will be realized in the amounts and in the time periods currently
18   estimated[.]

19         (b)    The following text set forth in connection with Montgomery's
20   Comparable Company Analysis, on page 36 of the 2005 Proxy:

21         Projected 2005 and 2006 information for Intermix was based on
22         projections of our management. . . .

23         (c)    The following text set forth in connection with Montgomery's
24   DCF Analysis, on page 39 of the 2005 Proxy:

25         Montgomery used cash flow forecasts of Intermix for calendar
26         years 2005 through 2009, as projected by our management, to perform a
27         discounted cash flow analysis. . . .

28

49

1         (d)    The following text set forth in connection with Montgomery's

2    Selected Transactions Analysis, on pages 36-37 of the 2005 Proxy:

3              Based on public and other available information about comparable

4         companies, Montgomery utilized a sum of the parts analysis to calculate

5         the implied equity value of Intermix, assuming (i) no exercise and

6         (ii) exercise of the MySpace, Inc. purchase option.    Montgomery

7         performed a selected transactions analysis separately for each of our

8         three primary businesses and then aggregated the results together.   In

9         such analysis, Montgomery estimated a range of values for each of the

10        three primary businesses by multiplying the revenue or EBITDA for

11        each business for selected periods by a range of revenue or EBITDA

12        multiples for comparable companies based upon precedent transactions

13        for those companies.  The implied enterprise value of Intermix Network

14        and our ownership interest in MySpace, Inc. was calculated as a multiple

15        of EBITDA for those businesses for the last twelve months (LTM) and

16        the next twelve months (NTM), and the implied enterprise value of

17        Alena was calculated as a multiple of revenue for that business for the

18        LTM and NTM, each based on selected acquisitions of companies in the

19        online advertising, online content and networking, online direct

20        marketing and offline direct marketing industries that have been

21        announced since January 2, 2002. Montgomery used a revenue multiple

22        for Alena because no meaningful EBITDA data was available with

23        respect to precedent transactions for that line of business.   After

24        calculating the aggregate implied enterprise value of all of our

25        businesses, Montgomery arrived at a sum of the parts range of values for

26        our common stock by subtracting (i) the aggregate preferred stock

27        liquidation preference that would be payable to holders of our preferred

28        stock in the merger and (ii) an implied reduction in value associated with

                                         50

1    our projected corporate overhead expenses (which had been excluded

2    from the valuation of each separate business), and by adding back our

3    net cash on hand at June 30, 2005.

4         (e)    The outcomes of Montgomery's Comparable Companies, Selected

5    Transactions and DCF Analyses, as set forth on pages 35-39 of the 2005 Proxy, which

6    purport to assess the fair value of the Company.

7         (f)    The following statement contained in the introductory text to

8    Weisel's fairness opinion, set forth on pages 41-42 of the 2005 Proxy, claiming that

9    Weisel's analysis is based on the most up-to-date financial information:

10        In preparing its opinion, Thomas Weisel Partners . . . . also made

11        the following assumptions:  with respect to our financial forecasts

12        provided to Thomas Weisel Partners by our management, upon the

13        advice of such management and with our consent, Thomas Weisel

14        Partners assumed for purposes of its opinion that the *forecasts had been*

15        *reasonably prepared on bases reflecting the best available estimates*

16        *and judgments of our management at the time of preparation* as to the

17        future financial performance of Intermix, and that such forecasts

18        provided a reasonable basis upon which Thomas Weisel Partners could

19        form its opinion . . . .

20    that there have been no material changes in the assets, financial

21    condition, results of operations, business or prospects of Intermix since

22    the respective dates of our last financial statements made available to

23    Thomas Weisel Partners.

24        (g)    The following text set forth in connection with Weisel's DCF

25    analysis, on page 42 of the 2005 Proxy:

26        Thomas Weisel Partners used cash flow forecasts of Intermix for

27        calendar years 2005 through 2009, as projected by our management, to

28        perform a discounted cash flow analysis. In conducting this analysis,

51

1    Thomas Weisel Partners assumed that we would perform in accordance

2    with these forecasts.

3          (h)    The following text set forth in connection with Weisel's Selected

4    Public Companies Analysis, on page 43 of the 2005 Proxy:

5    Projected 2005 and 2006 information for Intermix was based on

6    projections of our management.

7          (i)    The outcomes of Weisel's Selected Public Company and DCF

8    analyses, as set forth on pages 42-43 of the 2005 Proxy.

9        135.    The omission from the 2005 Proxy of the updated projections for

10    Intermix that included the recent growth of MySpace and the Company's other assets

11    rendered the foregoing sections of the 2005 Proxy materially misleading because,

12    absent disclosure of the updated projections for Intermix in these sections,

13    shareholders were mislead into believing that Montgomery's and Weisel's various

14    analyses actually reflected the most up-to-date financial information for Intermix, and

15    management's best estimates for the future of Intermix based on the recent growth of

16    MySpace and the Company's other assets.    Company management, including

17    Rosenblatt, was aware that the future growth of the Company was not accurately

18    reflected in the projections used as demonstrated by his stated belief that the Company

19    would be worth $20 billion in the future.

20        136.    In order to render the foregoing not misleading, defendants should have

21    expressly disclosed in the 2005 Proxy, at a minimum: (i) that the financial valuation

22    performed by Montgomery and Weisel relied on management projections that were

23    not the most recent or up-to-date management projections, and did not factor in the

24    recent growth of MySpace and the Company's other assets; and (ii) the most recent

25    Company projections that factored in the recent growth of MySpace and the

26    Company's other assets.

27        137.    The foregoing information was material because between the time the

28    Acquisition was announced on July 18, 2005, and the time shareholder approval of the

52

1  sale was obtained on September 30, 2005, MySpace revenues were dramatically

2  increasing because MySpace "page views" escalated by approximately 45% and its

3  "Unique Visitors" run rate increased by approximately 16%, according to Nielsen

4  NetRatings.  In addition, by September 30, 2005, MySpace had become the most

5  popular site on the internet in page views, and accounted for 12.4% of all online

6  display ads shown in the United States.  These results reflected growth that was likely

7  to continue for a substantial period and growth that was not reflected in the projections

8  used by defendants to assert that the Acquisition was fairly priced.

9      ***The Management Projections from 2005 to 2009***

10      138.  Certain of the financial analyses conducted by Montgomery and Weisel

11  that relied on management projections from 2005 to 2009, set forth in the 2005 Proxy,

12  were rendered misleading by defendants' failure to disclose these projections,

13  including:

14      (a)  Montgomery's Comparable Company analysis, including the

15  results of this analysis as set forth on pages 35-36 of the 2005 Proxy, *see supra*

16  ¶130(c).

17      (b)  Montgomery's DCF Analysis, including the results of this analysis

18  as set forth on page 39 of the 2005 Proxy:

19      Montgomery used cash flow forecasts of Intermix for calendar

20      years 2005 through 2009, as projected by our management, to perform a

21      discounted cash flow analysis.  In conducting this analysis, Montgomery

22      assumed that Intermix would perform in accordance with these forecasts.

23      Montgomery estimated the discounted value of the projected cash flows

24      using discount rates ranging from 19% to 25%, which range of discount

25      rates were selected based upon a weighted average cost of capital

26      analysis for Intermix and the other companies used in the comparable

27      company analysis.  Montgomery then estimated the terminal value by

28      applying exit multiples to our estimated 2009 EBITDA, which multiples

53

ranged from 8.0x to 12.0x. Montgomery then discounted the terminal value to present values using discount rates ranging from 19.0% to 25.0%. This analysis implied a common stock per share value ranging from $5.70 to $10.40 per share based on a 53% ownership interest in MySpace, Inc., and an implied per share value ranging from $7.10 to $12.70 per share based on a 100% ownership interest in MySpace, Inc.

(c)   Weisel's DCF analysis, including the results of this analysis set forth on page 42 of the 2005 Proxy:

Thomas Weisel Partners used cash flow forecasts of Intermix for calendar years 2005 through 2009, as projected by our management, to perform a discounted cash flow analysis. In conducting this analysis, Thomas Weisel Partners assumed that we would perform in accordance with these forecasts. Thomas Weisel Partners first estimated the discounted value of the projected cash flows using discount rates ranging from 17% to 23%, which range of discount rates were selected based upon a weighted average cost of capital analysis for Intermix and the other companies used in the selected public companies analysis. Thomas Weisel Partners then estimated the terminal value by applying exit multiples to Intermix's estimated 2010 EBITDA, calculated by annualizing Intermix's fourth quarter 2009 EBITDA, which multiples ranged from 8.0x to 12.0x. Thomas Weisel Partners then discounted the terminal value to present values using discount rates ranging from 17.0% to 23.0%. This analysis indicated a range of enterprise values, to which total cash, cash equivalents and marketable securities were added, and total debt, preferred stock liquidation preference and the cost to Intermix to complete the MySpace, Inc. purchase option were subtracted to calculate a range of equity values. This analysis implied per share values ranging from $10.50 to $19.51.

54

139. The omission from the 2005 Proxy of the management projections for 2005 to 2009, rendered the foregoing sections of the 2005 Proxy materially misleading because, absent disclosure of the projections themselves, Intermix shareholders were unable to adequately gauge the accuracy or competency of these analyses or determine if these analyses were an accurate determination of the Company's value as a going concern, and/or determine for themselves whether the analyses actually supported the fairness of the consideration.

(a)   Specifically as to Montgomery's Comparable Company analysis, the explanation of the analysis as set forth in the 2005 Proxy states that the analysis is based in part on an estimation of 2005 and 2006 EBITDA for each of Intermix's lines of business, including MySpace, but the 2005 Proxy does not disclose the EBITDA numbers relied on. The 2005 Proxy states that the analyses are performed by applying a range of multiples derived from comparable companies to Intermix's 2005 and 2006 EBITDA, but the 2005 Proxy does not disclose the actual multiples derived. Without the underlying data from the Company's projections, these analyses were materially misleading because they did not provide shareholders with sufficient disclosure of the data and inputs relied on in the analyses to determine if the analyses represented an accurate estimation of the Company's value as a going concern.

(b)   Specifically as to Montgomery's and Weisel's DCF analyses, the explanations of the respective DCF analyses disclose only the range of discount rates and terminal multiples applied to the Company free cash flows and EBITDA estimates. Without the underlying projections, however, shareholders who disagreed with Montgomery's and Weisel's choice of discount ranges and terminal multiples could not recreate their own DCF analyses to determine if the consideration offered in the Acquisition adequately valued the Company as a stand alone, thus rendering the DCF analyses materially misleading.

140.   In order to render the foregoing not misleading, defendants should have expressly disclosed the management projections from 2005 to 2009 that these analyses were based on.

141.   The foregoing information was material because the projections represented management's best estimate of the Company's future cash flows, and thus was information of primary importance to Intermix shareholders' decision whether to vote in favor of the Acquisition or seek appraisal.

### Defendants' Outstanding Liability in Derivative Lawsuits

142.   Defendants made a number of statements in the 2005 Proxy that were rendered misleading by their failure to disclose their outstanding liability in derivative lawsuits, including:

(a)   The statements in the sections entitled "Interests of Our Directors and Executive Officers in the Merger," as set forth on pages 11 and 48 of the 2005 Proxy.

(b)   The statements in the section entitled "Litigation Related to the Merger," as set forth on pages 13 and 52 of the 2005 Proxy.

(c)   The statements in the section "Reasons for the Merger," as set forth on pages 30-32 of the 2005 Proxy.

143.   The omission from the 2005 Proxy of statements regarding defendants' outstanding liability in derivative lawsuits rendered the foregoing sections of the 2005 Proxy misleading because, absent, disclosure of this information, Intermix shareholders were not informed about the full extent of defendants' interest in the Acquisition, their motives for undertaking the Acquisition, and the value of the Company's assets being transferred to News Corp.

144.   In order to render the foregoing not misleading, defendants should have expressly disclosed in the 2005 Proxy, at a minimum, (i) that defendants were subject to liability in outstanding derivative lawsuits; (ii) the substance of the allegations in these lawsuits; (iii) that the Acquisition, if consummated, would extinguish this

1  outstanding liability; (iv) that the Acquisition was undertaken, in part, to distinguish

2  defendants' derivative liability; and (v) that the outstanding derivative lawsuits were

3  an asset of the Company that would pass to News Corp. upon consummation of the

4  Acquisition.

5      145.  The foregoing was material because Intermix shareholders were entitled

6  to know the full extent of the interests of Intermix's officers and directors in the

7  Acquisition, defendants' reasons for undertaking the Acquisition, and the extent of the

8  Company's assets being transferred to News Corp. via the Acquisition.

9      *Viacom's Continued Interest in Acquiring Intermix*

10     146.  Defendants made a number of material misstatements in the 2005 Proxy

11  about Viacom's continued interest in acquiring Intermix, including;

12         (a)  The following statements regarding Viacom's alleged failure to

13  make a formal or informal proposal for Intermix, at 27 and 29 of the 2005 Proxy:

14         Our senior executive team and numerous representatives of

15         Company D conducted numerous financial and operational due diligence

16         meetings between July 14 and July 15 at the offices of Latham &

17         Watkins.  During and following these meetings representatives of

18         Company D expressed continuing interest in pursuing a transaction with

19         us but Company D did not, at that time or thereafter, submit to us or our

20         representatives a formal or informal proposal regarding such a

21         transaction or indicate any valuation at which Company D might be

22         interested in completing a transaction.

23                        *        *        *

24         Representatives of Thomas Weisel Partners informed the board of

25         directors that, pursuant to the board's direction, they had contacted

26         Company D's financial advisor to determine whether Company D would

27         be in a position to offer an acquisition proposal with respect to us.  Those

28         representatives advised the board that Company D remained interested

1   and had indicated that it would move forward in an expeditious manner,

2   however Company D was not then in a position to make a proposal but

3   had scheduled a board meeting later that week to consider whether a

4   proposal could be made.

5       147.   This statement was materially misleading because defendants failed to

6   disclose that: (i) in the days leading up to defendants' agreement to the Acquisition,

7   Viacom executives made several attempts to contact Rosenblatt to make the offer that

8   defendants state in the 2005 Proxy was never received, and Rosenblatt purposely

9   dodged calls and/or contacts from Viacom; and (ii) Viacom was extremely unsatisfied

10  with the amount and quality of the due diligence it was provided with by defendants

11  and defendants withheld critical due diligence necessary to allow Viacom to make the

12  offer that defendants' continually pointed out was not received and even considered

13  filing a lawsuit against the Company in an attempt to secure a level playing field in the

14  so-called sales process.

15      148.   The foregoing information was material because, without this additional

16  material information, the 2005 Proxy left shareholders with the false impression that

17  Viacom was given a full and fair opportunity to bid for the Company.   Had

18  shareholders known the truth, they may have voted against the Acquisition in

19  preference of a fair sales process for the Company.

20  *The Ability of News Corp. and/or Viacom to "Block"*
    *a Competing Proposal by Making an Offer for MySpace*

21

22      149.   Defendants made a number of material misrepresentations in the 2005

23  Proxy about the ability of News Corp. and/or Viacom to block a competing proposal

    by making an offer for MySpace, including:

24

25      (a)    The following description of the MySpace option set forth in the

26  "Background of the Merger" section of the 2005 Proxy at page 24 regarding the

    potential that a bona fide offer for MySpace would "suspend" the MySpace option:

27

28

58

1        In February of 2005, we restructured our MySpace business by
2    contributing our 67% interest in the MySpace.com website and related
3    assets into a newly formed subsidiary, MySpace, Inc.  Following the
4    restructuring and a capital investment by third parties, we owned
5    approximately 53% of MySpace, Inc.  Pursuant to the stockholders
6    agreement governing MySpace, Inc. and its operations, we also received
7    an option to acquire all of the minority equity interests in MySpace, Inc.
8    for an aggregate exercise price of approximately $69 million.  The
9    MySpace, Inc. purchase option had an expiration date of February 11,
10    2006 and we could only exercise the option if a third party made us a
11    bona fide offer with respect to a change of control of our company prior
12    to that date.  *The MySpace, Inc. stockholders agreement also provided*
13    *that the exercisability of the MySpace, Inc. purchase option would be*
14    *suspended if MySpace, Inc. itself received a bona fide acquisition*
15    *proposal at a stated minimum price, for so long as discussions with*
16    *respect to that proposal were continuing.*

17        (b)    The following discussion of the Board's purported concerns that
18    either News Corp. or Viacom could block a competing proposal by making an offer
19    for MySpace and thereby potentially suspending the MySpace option, set forth in the
20    "Background of the Merger" section of the 2005 Proxy, at page 28:

21        Our board of directors met four times, and the transaction
22    committee met twice, during the July 16-17, 2005 period.  At these
23    meetings, our negotiating teams briefed our board members regarding
24    the issues arising in the discussions, and received advice from its
25    financial and legal advisors with respect to the negotiations. Our board
26    of directors evaluated the advisability of soliciting an alternative
27    acquisition proposal from Company D, weighing the possibility of
28    securing a more attractive offer from Company D against the risk of

1   jeopardizing the News Corporation negotiations, particularly in light of

2   the lack of an offer from Company D at that time. *Our board of*

3   *directors also considered the possibility that if either News Corporation*

4   *or Company D viewed itself as unlikely to prevail in acquiring us, it*

5   *might submit an offer to acquire only MySpace, Inc. in order to*

6   *potentially suspend (at least temporarily) our ability to exercise the*

7   *MySpace, Inc. purchase option, which could prospectively jeopardize*

8   *other economically attractive transactions involving us*. Our board

9   accordingly authorized our financial and other representatives to remain

10  in negotiations with News Corporation, while at the same time

11  continuing due diligence and other discussions with representatives of

12  Company D. Our board also directed representatives of Thomas Weisel

13  Partners to contact Company D to determine whether Company D was

14  prepared to make a formal offer to acquire us.

15      150.   These statements were materially misleading because the statements

16  misrepresent the practical effect of the provisions of the Stockholders Agreement

17  regarding the MySpace option. Indeed, the truth was that, as a practical matter, if

18  either News Corp. or Viacom did make an offer for MySpace, defendants would have

19  been able to direct that the MySpace board discontinue any discussion of such a

20  proposal, and thus ensure that the MySpace option would not be suspended as

21  defendants stated in the 2005 Proxy. This is true because Rosenblatt and Sheehan

22  exercised control over the MySpace board by virtue of holding two of MySpace's

23  existing four board seats, and controlling the contractual right to appoint a fifth

24  director. By exercising this control, the 2005 Defendants could ensure that an offer

25  for MySpace, if made, could never be consummated. Indeed, both News Corp. and

26  Viacom were aware of this fact, which is the reason neither bidder made an offer

27  directly for MySpace and instead made offers for the entire Company, as an

28  acquisition of Intermix was the only possible method for acquiring MySpace.

151.   The foregoing information was material because, without this additional information, Intermix shareholders were left with the mistaken impression that the Board was justified in failing to pursue the Viacom proposal because Viacom could have blocked News Corp's bid for the Company by making an offer for MySpace, thus preventing shareholders from receiving an offer for their Intermix shares.

152.   Defendants were aware of their duty to disclose and/or not materially misrepresent this material information in the 2005 Proxy, and acted with at least negligence in failing to ensure that this material information was disclosed and/or not materially misrepresented the 2005 Proxy.

153.   The 2005 Defendants' failure to disclose this information in the 2005 Proxy enabled defendants to consummate the Acquisition and procure personal benefits worth hundreds of millions of dollars, including: (i) the expectation that the Acquisition would extinguish their personal liability in existing shareholder derivative suits seeking millions of dollars; (ii) indemnification for defendants' prior violations of law as well as those arising out of the sale of Intermix to NewsCorp.; (iii) monetization of their illiquid Intermix stock holdings; (iv) guaranteed continuing employment with News Corp.; and/or (v) preferential financial treatment for their own shares *vis-à-vis* plaintiff and Intermix's other public shareholders.

154.   Plaintiff and the class of the Company's shareholders would not have voted to approve the sale of the Company to News Corp. had this material information regarding the Company's economic prospects, the true value the Company's crown jewel asset, MySpace, and the unfairness of the price and process of the proposed merger, been disclosed, which information was material information that a reasonable shareholder would consider important in deciding how to vote on whether to approve the sale of the Company to News Corp.  Had defendants disclosed this material information in the 2005 Proxy, as they were required to do, Intermix's shareholders would not have voted to approve the sale of the Company. Defendants' dissemination to the Company's shareholders of the false and materially misleading 2005 Proxy was

an essential link in defendants' accomplishment of the sale of the Company to News Corp.

**The Investment Banks' False and Misleading Fairness Opinions**

155.    Attached to the 2005 Proxy as Annex B was Montgomery's "fairness opinion" which stated that the merger consideration "is fair to the holders of Company Common Stock . . . from a financial point of view" based upon Montgomery's consideration of various factors, including the fact that Montgomery had:

- "reviewed certain internal financial statements and other financial and operating data, including certain financial forecasts and other forward looking information concerning the Company, prepared by the management of the Company";

- "held discussions with the management of the Company concerning the . . . future prospects of the Company";

- "compared the financial terms of the Merger applicable to holders of Company Common Stock with stock price multiples of certain other publicly traded companies with businesses comparable to the Company's businesses";

- "compared the financial terms of the Merger applicable to holders of Company Common Stock and with the financial terms, to the extent publicly available, of other transactions that we deemed relevant"; [and]

- "prepared a discounted cash flow analysis of the Company[.]"

156.    Attached to the 2005 Proxy as Annex C was Weisel's "fairness opinion" which also concluded that the merger consideration was "fair to [Intermix] stockholders from a financial point of view" based upon Weisel's consideration of various factors, including the fact that Weisel had:

- "reviewed certain publicly available financial and other data with respect to [Intermix], including the consolidated financial statements for recent years and certain other relevant financial and operating data relating to

62

[Intermix] made available to us from published sources and from the internal records of [Intermix]";

- "reviewed the financial terms and conditions of the Merger Agreement";

- "reviewed certain publicly available information concerning the trading of, and the trading market for, [Intermix] Common Stock";

- "compared [Intermix] from a financial point of view with certain other companies in the internet industry which we deemed to be relevant";

- "considered the financial terms, to the extent publicly available, of selected recent business combinations of companies in the internet industry which we deemed to be comparable, in whole or in part, to the [Acquisition]";

- "reviewed and discussed with representatives of the management of [Intermix] certain information of a business and financial nature regarding [Intermix], furnished to us by [Intermix], including financial forecasts and related assumptions of [Intermix]";

- "made inquiries regarding and discussed the [Acquisition] and the Merger Agreement and other matters related thereto with [Intermix's] counsel"; and

- "performed such other analyses and examinations as they deemed appropriate."

157. The 2005 Proxy incorporated the fairness opinion prepared by Montgomery as well as a summary thereof. Montgomery was aware that its opinion – that the merger consideration to be received by the common stockholders of Intermix was "fair" from a financial standpoint – would be incorporated into the 2005 Proxy.

158. The 2005 Proxy also incorporated the fairness opinion prepared by Weisel as well as a summary thereof. Weisel was aware that its opinion – that merger consideration to be received by the common stockholders of Intermix was "fair" from a financial standpoint – would be incorporated into the 2005 Proxy.

159.   At the time Montgomery and Weisel knowingly consented to the inclusion of the fairness opinions in the 2005 Proxy for the purpose of convincing shareholders to approve the merger, the Investment Banks were aware that the merger price was not a fair price based on the non-public MySpace financial information and projections and other information they had in their possession at the time of the issuance of their opinion.   The Investment Banks were given updated financial information in July, August and September 2005 that further demonstrated that the price offered to Intermix shareholders was not fair from a financial point of view.

160.   The Investment Banks agreed to support the merger in order to receive the financial windfall due to them under the incentive-based pay structure they had agreed to with the 2005 Defendants.

**The 2005 Defendants Consummate the Acquisition**

161.   On September 23, 2005, Greenspan publicly announced an offer for 50% of the shares at $13.50 per share.   This proposal, if consummated, would have provided shareholders $1.50 more per share than the Acquisition with News Corp. while permitting shareholders to retain an interest in the Company.   Intermix's stock price rose significantly in response to the announcement of Greenspan's offer, to $12.30 per share, an increase of $0.39.   However, the 2005 Individual Defendants did not give good faith consideration to the Greenspan offer.   Rather, the 2005 Individual Defendants dismissed it out of hand.   On September 26, 2005, the 2005 Individual Defendants rejected the offer and reiterated their support for the News Corp. offer.   When Intermix filed its Form 8-K on the morning of September 26, 2005 rejecting Greenspan's offer, the stock price dropped back to its lower level.

162.   Because the 2005 Proxy omitted material information, Intermix shareholders were precluded from casting an informed vote in favor of the Acquisition.   Accordingly, on September 30, 2005, Intermix shareholders voted in favor of the Acquisition, which closed the same day.

64

**COUNT I**

**Against Defendants Brewer, Mosher, Moreau, Edell, Ward, Carlick, Sheehan, Lipp and VantagePoint for Violations of §14(a) of the 1934 Act and SEC Rule 14a-9 Promulgated Thereunder**

163.   Plaintiff repeats and realleges the allegations contained above in ¶¶1-74, as if fully set forth herein.

164.   During the Relevant Period, the 2003 Defendants named in this claim disseminated the false and misleading 2003 Proxy specified above which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

165.   The 2003 Proxy was prepared, reviewed and/or disseminated by the defendants named in this claim.  It misrepresented and/or omitted material facts, including the impact that the revised VantagePoint financing would have on the Company's ability to use tens of millions of dollars in NOLs.  In so doing, they made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions with the Company, defendants were aware of this information and of their duty to disclose this information in the 2003 Proxy.

166.   In preparing, reviewing and disseminating the 2003 Proxy, defendants engaged in fraud, deceit, manipulation and/or contrivance.

167.   As a result of the 2003 Defendants' misconduct, Intermix's shareholders have suffered damages because the 2003 Defendants were able to secure their own reelection and obtain approval of VantagePoint transaction, which was made on terms extremely disadvantageous to Intermix's public shareholder.  Absent the false and misleading statements in the relevant proxy statements, the majority of the shareholders who were unaware of untruths and relied thereon would not have voted as they did.  As such, Intermix's public shareholders' damages were directly and proximately caused by the 2003 Defendants' wrongful conduct.  By reason of such

65

misconduct, the 2003 Defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

**Against Defendants Brewer, Mosher, Moreau, Carlick, Sheehan, Lipp, Rosenblatt, Quandt, Woodward, VantagePoint, Weisel and Montgomery for Violations of §14(a) of the 1934 Act and SEC Rule 14a-9 Promulgated Thereunder**

168.   Plaintiff repeats and realleges the allegations contained above in ¶¶1-42, 75-162, as if fully set forth herein.  For the purposes of this Count II, plaintiffs specifically disclaim any allegations that the 2005 Defendants acted fraudulently.

169.   During the Relevant Period, the 2005 Individual Defendants named in this claim, along with defendants VantagePoint, Weisel and Montgomery, disseminated the false and misleading 2005 Proxy which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

170.   The 2005 Proxy was prepared and disseminated by the 2005 Individual Defendants, VantagePoint, Montgomery and Weisel.  It misrepresented and/or omitted material information about the true value of the Company and the unfairness of the sales process.

171.   In so doing, the 2005 Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company, defendants were aware of this information and of their duty to disclose this information in the 2005 Proxy.

172.   In addition, the fairness opinions issued by Weisel and Montgomery, and incorporated in the 2005 Proxy, were false and misleading because they opined that the consideration to be received by the common shareholders in their merger was fair from a financial point of view.  The merger consideration was not, in fact, fair.

66

1  Moreover, Weisel and Montgomery knew that the merger price was not a fair price
2  based on the non-public MySpace financial information and projections and other
3  information they received.   Therefore, Weisel and Montgomery made untrue
4  statements of material facts and omitted to state material facts necessary to make the
5  statements that were made not misleading in violation of §14(a) of the 1934 Act and
6  SEC Rule 14a-9 promulgated thereunder.

7      173.   The 2005 Individual Defendants, VantagePoint, Weisel and Montgomery
8  also failed to correct the 2005 Proxy as it became even more clear that MySpace was
9  generating revenues far in excess of what was being projected at the time the merger
10  agreement was signed.   This failure to update and correct as knowingly false
11  statements is also a violation of §14(a) of the 1934 Act and SEC Rule 14a-9
12  promulgated thereunder.   By virtue of their positions within the Company, the 2005
13  Defendants were aware of this information and of their duty to disclose this
14  information in the 2005 Proxy.

15      174.   As a result of VantagePoint's, Weisel's, Montgomery's and the 2005
16  Individual Defendants' misconduct, Intermix's shareholders have suffered damages
17  because VantagePoint, Weisel, Montgomery and the 2005 Individual Defendants were
18  able to secure personal material benefits as a result of the approval of the Acquisition,
19  including the extinguishment of liability in derivative suits, indemnification for prior
20  and contemporaneous misconduct, the monetization of illiquid holdings in the
21  Company, continuing employment with News Corp., and/or preferential financial
22  treatment for their shares as compared to Intermix's public shareholders, and direct
23  payments.   Absent the false and misleading statements in the relevant proxy
24  statements, the majority of the shareholders who were unaware of untruths and relied
25  thereon would not have voted as they did.   As such, Intermix's public shareholders'
26  damages were directly and proximately caused by Weisel's, Montgomery's and the
27  2005 Individual Defendants' wrongful conduct because they have been deprived of
28  the ability to share in the billions of dollars in profits generated by MySpace after the

Acquisition was consummated. By reason of such misconduct, VantagePoint, Weisel, Montgomery and the 2005 Individual Defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

### COUNT III

**For Violation of §20(a) of the 1934 Act Against the 2003 Defendants, the 2005 Individual Defendants and VantagePoint**

175.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

176.   The 2003 Defendants and the 2005 Individual Defendants acted as controlling persons of Intermix within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Intermix, and their ownership of Intermix stock, these defendants had the power and authority to cause Intermix to engage in the wrongful conduct complained of herein. Intermix controlled each of the defendants and all of its employees. By reason of such conduct, the 2003 Defendants and the 2005 Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

177.   Defendant VantagePoint acted as a controlling person of Intermix within the meaning of §20(a) of the 1934 Act. Defendant VantagePoint owned more than 22% of Intermix's voting shares, was the Company's largest shareholder and possessed and exercised significant control and dominion over Intermix by virtue of contractual provisions agreed to as part of VantagePoint's investments in Intermix. Moreover, all strategic decisions for Intermix were made by or required the approval of VantagePoint and its two representatives on the Intermix Board, defendants Carlick and Sheehan.

178.   By reason of such wrongful conduct, the 2003 Defendants, the 2005 Individual Defendants and VantagePoint are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchase of Intermix stock during the Class Period.

**COUNT IV**

**For Breach of Fiduciary Duty Against the 2005 Individual Defendants**

179.  Plaintiff repeats and realleges each allegation as though fully set forth herein.

180.  This claim is brought on behalf of former Intermix shareholders who were harmed by the 2005 Individual Defendants' abdication of their fiduciary duties in connection with the sale of Intermix.

181.  The 2005 Individual Defendants violated fiduciary duties of care, loyalty, good faith, fair dealing, candor and independence owed to the public shareholders of Intermix, engaged in unlawful self-dealing, acted to put their personal interests and/or the interests of News Corp. ahead of the interests of Intermix shareholders, and/or aided and abetted others in doing so.

182.  By the acts, transactions and courses of conduct alleged herein, the 2005 Individual Defendants, individually and acting as part of a common plan, unfairly deprived plaintiff and other members of the Class of the true value of their investment in Intermix.

183.  The 2005 Individual Defendants violated their fiduciary duties by entering into the Acquisition with News Corp. without regard to the fairness of the Acquisition to Intermix's shareholders.

184.  As demonstrated by the allegations above, the 2005 Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, fair dealing, candor and independence owed to the shareholders of Intermix, because, among other reasons:

(a)   they failed to take steps to maximize the value of Intermix to its public shareholders and they took steps to avoid competitive bidding, to cap the price of Intermix's stock and to give the 2005 Individual Defendants an unfair advantage, by, among other things, failing to solicit other potential acquirors or alternative transactions;

69

1      (b)    they ignored or did not protect against the numerous conflicts of

2  interest resulting from the 2005 Individual Defendants' own inter-relationships and/or

3  self-dealing in connection with the Acquisition;

4      (c)    they engaged in self-dealing using their control of the sales process

5  to divert millions of dollars in personal benefits to themselves and those associated

6  with the defendants in derogation of their fiduciary responsibilities to plaintiff and the

7  Class; and

8      (d)    they failed to disclose material information and/or made material

9  misrepresentations to shareholders regarding among other things, the true value of the

10  Company and the true reason for entering into the Acquisition, as set forth in ¶¶129-

11  54.

12      185.   By reason of the foregoing acts, practices and course of conduct, the

13  2005 Individual Defendants breached their fiduciary obligations toward plaintiff and

14  the other members of the Class.

15      186.   The foregoing breaches of fiduciary duty implicate the 2005 Individual

16  Defendants' duties to Intermix shareholders of loyalty and good faith, and thus are not

17  subject to ratification.

18      187.   As a result of the actions of the 2005 Individual Defendants, plaintiff and

19  the Class have been damaged in that they have not received their fair portion of the

20  value of Intermix's assets and businesses and have been prevented from obtaining a

21  fair price for their shares.

**COUNT V**

22

**For Aiding and Abetting Breach of Fiduciary Duty**
**Against VantagePoint**

23

24      188.   Plaintiff repeats and realleges each allegation as though fully set forth

25  herein.

26      189.   VantagePoint actively aided and abetted the other defendants' breaches

27  of their fiduciary duties owed to the plaintiff and the Class by knowingly participating

28

70

1   in the breaches of duties of loyalty, candor and care by, among other things, assisting

2   in consummation of the Acquisition, all of which have damaged Intermix's

3   shareholders.

### COUNT VI

#### For Unjust Enrichment Against Defendants Carlick and Sheehan

6      190.   Plaintiff incorporates by reference and realleges each and every

7   allegation set forth above as though fully set forth herein.

8      191.   By their wrongful acts and omissions, certain of the defendants were

9   unjustly enriched at the expense of and to the detriment of Intermix's public

10  shareholders.

11     192.   In particular, Carlick and Sheehan, through their association with

12  VantagePoint were unjustly enriched via the receipt of the premium for their preferred

13  shares, which they procured in connection with the VantagePoint Transactions, which

14  transactions were put in place only as a result of uninformed shareholder approval, as

15  set forth in ¶¶43-73.  Carlick and Sheehan were only able to secure a premium for

16  their preferred shares in connection with the Acquisition because they specifically

17  bargained for such a premium at the expense of Intermix common stockholders, as set

18  forth in ¶¶74-119.

19     193.   As a result of the foregoing misconduct, Intermix common stockholders

20  were impoverished, in that:

21             (a)    the VantagePoint Transactions resulted in a dilution of the equity

22  of Intermix common stockholders via issuance of the preferred shares to Carlick and

23  Sheehan and the effect of the VantagePoint Transactions on the ability of the

24  Company to utilize its federal and state NOLs; and

25             (b)    the premium Carlick and Sheehan secured for their preferred

26  shares in the Acquisition resulted in a commensurate reduction in the amount of

27  consideration that Intermix common stockholders received in the Acquisition.

28

71

194. The enrichment secured by Carlick and Sheehan as a result of the preferred shares procured in connection with the VantagePoint Transactions resulted in a commensurate impoverishment to Intermix common stockholders, as set forth above.

195. Carlick and Sheehan procured their enrichment without justification, in that, among other things, Carlick and Sheehan were corporate fiduciaries who were required to act in furtherance of the interests of the Company's stockholders collectively, instead of looking exclusively to their own interests.

196. Plaintiff has no remedy for the misconduct set forth above except for any remedy as may be directed via the equitable powers of this Court.

197. Plaintiff, as a shareholder and representative of Intermix, seeks restitution from these defendants, and each of them, and an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class;

B.    Awarding plaintiff and the member of the Class compensatory and/or rescissory damages;

C.    Awarding plaintiff and the member of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

E.    Awarding such other relief as this Court may deem just and proper.

1

**JURY DEMAND**

2      Plaintiff demands a trial by jury.

3   DATED: February 8, 2008                COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
4                                          DARREN J. ROBBINS
                                           RANDALL J. BARON
5                                          STEPHEN J. ODDO
                                           DAVID T. WISSBROECKER
6

7

8                                          DAVID T. WISSBROECKER

9                                          655 West Broadway, Suite 1900
                                           San Diego, CA 92101
10                                         Telephone: 619/231-1058
                                           619/231-7423 (fax)
11
                                           Lead Counsel for Plaintiff
12
                                           GOODMAN SHERIDAN & ROFF LLP
13                                         MOLLY BARBARA ROFF
                                           CHRISTY W. GOODMAN
14                                         1010 Second Avenue, Suite 1350
                                           San Diego, CA 92101
15                                         Telephone: 619/241-4860
                                           619/236-9240 (fax)
16
                                           Attorneys for Plaintiff
17   S:\CasesSD\Intermix Media\2nd Amd Cons Cpt.doc

18

19

20

21

22

23

24

25

26

27

28

73

## DECLARATION OF SERVICE BY UPS DELIVERY

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.     That on February 8, 2008, declarant served by UPS, next day delivery, the **CONSOLIDATED SECOND AMENDED COMPLAINT** to the parties listed on the attached Service List.  Declarant also served the parties by facsimile.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of February, 2008, at San Diego, California.

ALISON K. SLOAN

1

INTERMIX MEDIA (FEDERAL)
Service List - 2/8/2008    (05-0183F)
Page 1 of  1

### Counsel For Defendant(s)

Richard L. Stone
Julie A. Shepard
Elizabeth A. Moriarty
Hogan & Hartson LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067
    310/785-4600
    310/785-4601 (Fax)


Michael D. Torpey
James N. Kramer
Steven M. Knaster
Orrick, Herrington & Sutcliffe LLP
The Orrick Building, 405 Howard Street
San Francisco, CA  94105
    415/773-5700
    415/773-5759 (Fax)

Pamela S. Palmer
Latham & Watkins LLP
633 West Fifth St., Suite 4000
Los Angeles, CA  90071-2007
    213/485-1234
    213/891-8763 (Fax)


Eric S. Waxman
Skadden, Arps, Slate, Meagher & Flom LLP
300 S. Grand Ave., Suite 3400
Los Angeles, CA  90071
    213/687-5000
    213/687-5600 (Fax)


### Counsel For Plaintiff(s)

Darren J. Robbins
Randall J. Baron
David T. Wissbroecker
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
    619/231-1058
    619/231-7423 (Fax)

Christy W. Goodman
Molly Barbara Roff
Goodman Sheridan & Roff LLP
3327 Dumas Street
San Diego, CA  92106
    619/241-4860
    619/236-9240 (Fax)