1  HOGAN & HARTSON, LLP
   Richard L. Stone, Bar No. 110022
2  rlstone@hhlaw.com
   Julie Ann Shepard, Bar No. 175538
3  jashepard@hhlaw.com
   Elizabeth A. Moriarty, Bar No. 212118
4  eamoriarty@hhlaw.com
   1999 Avenue of the Stars, Suite 1400
5  Los Angeles, California  90067
   Telephone:  (310) 785-4600
6  Facsimile:  (310) 785-4601

7  Attorneys for Defendants
   Brett Brewer, Daniel Mosher, Lawrence Moreau,
8  Richard Rosenblatt, James Quandt, and William
   Woodward
9
   [Additional counsel appear on next page]
10

11              UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13

14  JIM BROWN, Individually and On        Case No.  CV-06-3731 GHK (SH)
    Behalf of All Others Similarly Situated,
15                                         CLASS ACTION
                 Plaintiff,
16                                         **1. DEFENDANTS' NOTICE OF
    v.                                     MOTION AND MOTION TO
17                                         EXCLUDE THE OPINIONS AND
    BRETT BREWER, et. al.,                 TESTIMONY OF G. WILLIAM
18                                         KENNEDY; AND**
                 Defendants.
19                                         **2. MEMORANDUM OF POINTS
                                           AND AUTHORITIES IN SUPPORT
20                                         THEREOF**

21                                         **[DECLARATIONS OF ELIZABETH
                                           A. MORIARTY AND BRADFORD
22                                         CORNELL IN SUPPORT
                                           THEREOF, REQUEST FOR
23                                         JUDICIAL NOTICE, AND
                                           [PROPOSED] ORDER FILED
24                                         CONCURRENTLY HEREWITH]**

25                                         **[F.R.E. 702]**

26                                         Date:      December 21, 2009
                                           Time:      9:30 a.m.
27                                         Dept:      650
                                           Judge:     Honorable George H. King
28

                                           MOTION TO EXCLUDE THE OPINIONS
                                           AND TESTIMONY OF KENNEDY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORRICK HERRINGTON & SUTCLIFFE LLP
Michael D. Torpey, Bar No. 79424
mtorpey@orrick.com
James N. Kramer, Bar No. 154709
jkramer@orrick.com
Stephen M. Knaster, Bar No. 146236
sknaster@orrick.com
The Orrick Building
405 Howard Street
San Francisco, CA 94105

Attorneys for Defendants
David Carlick and Andrew Sheehan

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

      PLEASE TAKE NOTICE that on December 21, 2009, at 9:30 a.m., or as soon thereafter as counsel may be heard in Courtroom 650 of the United States District Court for the Central District of California, located at the Edward R. Roybal Federal Building and Courthouse, 255 East Temple Street, Los Angeles, CA 90012, Defendants Brett Brewer, Daniel Mosher, Lawrence Moreau, Richard Rosenblatt, James Quandt, William Woodward, Andrew Sheehan and David Carlick (collectively, "Defendants") will, and do hereby, move the Court for an order prohibiting Plaintiff Jim Brown's, expert witness G. William Kennedy from offering any of the opinions set forth in his Rule 26 report at trial, and excluding the opinions he has offered in opposition to Defendants' Motion for Summary Judgment.

      This motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place on November 9, 2009.

      This motion is made pursuant to Federal Rule of Evidence 702, and is based upon this Notice of Motion and the Memorandum of Points and Authorities attached hereto; the Declarations of Elizabeth A. Moriarty and Bradford Cornell, and Request for Judicial Notice filed concurrently herewith; all pleadings, records and files herein; and such other matters as the Court deems proper.

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

1

Dated:    November 30, 2009              HOGAN & HARTSON, LLP

2

3                                        By: Richard L Stone By BJ
                                             _____
                                             Richard L. Stone

4

5                                        Attorneys for Defendants
                                         Brett Brewer, Daniel Mosher,
6                                        Lawrence Moreau, Richard
                                         Rosenblatt, James Quandt, and
                                         William Woodward
7

8

9    Dated:    November 30, 2009         ORRICK, HERRINGTON &
                                         SUTCLIFFE LLP
10

11                                       By: Stephen M Knaster w/ permission
                                             _____
12                                           Stephen M. Knaster

13                                       Attorneys for Defendants
                                         David Carlick and Andrew Sheehan
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

4                                        MOTION TO EXCLUDE THE OPINIONS
                                         AND TESTIMONY OF KENNEDY

\\LA - 025182/000005 - 452769 v2

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................1

II.    BACKGROUND ........................................................................................3

      A.     Plaintiff's Claims .........................................................................3

      B.     Plaintiff Has Failed To Obtain Any Evidence Of
           Damages Resulting From The News Corp. Acquisition ......................3

      C.     Kennedy Has Fabricated Damages Where None Exist ...........................4

          1.   MySpace "Informed Investor" Discounted Cash
              Flow Analysis ....................................................................5

          2.   Comparable Company Method Valuation ........................................6

III.   ARGUMENT ...........................................................................................7

      A.     Standard Of Admissibility for Expert Testimony ...............................7

      B.     Kennedy's Damages Opinions Are Inadmissible ...............................9

          1.   Kennedy's "Informed Investor" DCF Analysis Is
              Purely Speculative And Rests On Unsupported
              Assumptions ......................................................................9

          2.   Kennedy's Comparable Company Analysis Relies
              On Unsupported and Unreasonable Assumptions ..........................17

IV.    CONCLUSION .......................................................................................21

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

1

## <u>TABLE OF AUTHORITIES</u>

2

3 **CASES**

**Page(s)**

4

*American Booksellers Assn., Inc. v. Barnes & Noble, Inc.,*
5     135 F. Supp. 2d 1031 (N.D. Cal. 2001)..................................................8, 16, 20

6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
7     43 F.3d 1311 (9th Cir. 1995) ("*Daubert II* ").......................................7, 8, 9, 17

8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
9     509 U.S. 579 (1993)..............................................................................1, 7, 8

10

*Domingo ex rel. Domingo v. T.K.,*
     289 F.3d 600 (9th Cir. 2002) ................................................................8, 16
11

12

*DSU Medical Corp. v. JMS Co., Ltd.,*
     296 F. Supp. 2d 1140 (2003) ...............................................................13
13

*General Electric Co. v. Joiner,*
14     522 U.S. 136 (1997)..............................................................................8, 16

15

*Gray v. Cytokine Pharmasciences, Inc.,*
16     2002 WL 853549 (Del. Ch. April 25, 2002) ........................................10

17

*Guidroz-Brault v. Missouri Pacific Railroad Co.,*
18     254 F.3d 825 (9th Cir. 2001) ...............................................................7, 9

19

*In re Emerging Comm'n, Inc. Shareholders Litig.,*
20     2004 WL 1305745 (Del. Ch. June 4, 2004) .........................................10, 12, 16

21

*In re Iridium Operating, LLC,*
22     373 B.R. 283 (Bank. Ct. S.D.N.Y. 2007).............................................10, 12, 15

23

*In re Radiology Associates, Inc. Litig.,*
     611 A.2d 485 (Del. Ch. 1991) ..............................................................20
24

25

*Kumho Tire Co., Ltd. v. Carmichael,*
     526 U.S. 137 (1999)..............................................................................7

26

*McGlinchy v. Shell Chemical Co.,*
27     845 F.2d 802 (9th Cir. 1988) ...............................................................8, 13, 17, 20

28

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

\\LA - 025182/000005 - 452769 v2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Prescott Group Small Cap, L.P. v. The Coleman Co., Inc.,*
   2004 WL 2059515 (Del. Ch. Sept. 8, 2004)..........................................................20

**OTHER AUTHORITIES**

Federal Rule of Evidence 702..........................................................................passim

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

\\\LA - 025182/000005 - 452769 v2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff alleges that Defendants' actions in negotiating and approving the sale of Intermix Media, Inc. ("Intermix") to News Corporation ("News Corp.") violated Defendants' fiduciary duties and the federal securities laws, and caused Intermix shareholders to suffer damages because Intermix was allegedly sold at an unfair price.  Plaintiff also alleges that Defendants omitted material information in the Proxy issued in connection with the sale.  Plaintiff, however, has no *evidence* of actual damages.  There was no higher bidder than News Corp., and Plaintiff has not established any evidence that Viacom, Inc. ("Viacom"), the only other interested company, was prevented from making a higher bid by Defendants' actions.  To the contrary, the evidence establishes that Viacom had ample information and opportunity to bid for Intermix, but simply chose not to.

Lacking any evidence of damages, Plaintiff retained G. William Kennedy, CPA ("Kennedy") to create damages, where none exist.  Unable to point to a higher bid and because News Corp. paid well in excess of Intermix's share trading price, Kennedy was instead forced to perform his own "intrinsic valuation" of Intermix, by creating an "Informed Investor" discounted cash flow analysis ("DCF") and a comparable company analysis that an "Informed Investor" supposedly would have arrived at.  Based on these analyses, Kennedy asserts that MySpace in 2005 was allegedly worth between $924 million and $1.1 billion.

Both of Kennedy's valuation analyses are based entirely on unsupported assumptions, contrary to accepted valuation methods and mathematically impossible.   His testimony cannot meet the test for reliability under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590-91 (1993).  First, in his DCF analysis, although Kennedy claims that an informed investor would have conducted his same calculations had management's raw projections for 2005

1

through 2009 been expressly disclosed in the Proxy, <u>he does not rely on</u>
<u>management's projections for his "intrinsic valuation."</u> Instead, he maintains all of
Intermix management's assumptions in the projections, but rejects management's
projected growth rates for 2008 and 2009, which he deems unreasonable, then
recasts the projections for these years, to which he applies an extremely aggressive
terminal multiple. In fact, reverse engineering Kennedy's calculations reveals that
if he performed a standard valuation, he has projected MySpace to grow at a rate
that would eventually overtake the entire U.S. economy. If Kennedy's analysis is
instead based on some undefined, but discrete period of growth, then reverse
engineering reveals that his numbers simply do not add up, proving the invalidity of
his analysis. Either way his DCF analysis is fatally flawed and must be excluded.

Kennedy also fails to provide any theoretical or empirical justification to: 1)
reject MySpace management's judgment or, 2) for any of his replacement
assumptions. Rather, Kennedy testified that his assumptions were simply what he
deemed reasonable or appropriate. As such, Kennedy's analysis is impermissibly
connected to the underlying data only by his *ipse dixit*. And, Kennedy's analysis is
contrary to what even Plaintiff concedes is the "best evidence" of value -
management's raw, contemporaneous projections - as well as the testimony of the
former CEO of MySpace, Chris DeWolfe.

In his comparable company analysis, Kennedy "cherry picks" the higher
2006 management projections for MySpace, instead of using an average of both the
2005 and 2006 projections, as standard valuation methodology would require. To
these "cherry picked," single-year, 2006 numbers, Kennedy applies multiples that
are the average of the multiples applicable to Google and Yahoo, rather than
applying multiples that represent the average of several comparable companies.
Again, contrary to accepted valuation methodology. Moreover, Google and Yahoo
were seasoned Internet companies in 2005 with established revenue models based
upon Internet advertising, and certainly not appropriate sole comparables for a start-

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

up in the new social networking arena with minimal earnings and an unproven revenue model.  Again, in this analysis, Kennedy offers nothing besides bald assertions of validity for the various assumptions and the limited comparables he uses in his valuation.

## II.   BACKGROUND

### A.   Plaintiff's Claims

As this Court is well-aware, this action for breach of fiduciary duty and for violations of Section 14(a) of the Securities Exchange Act of 1934 ("1934 Act") arises from the News Corp. acquisition of Intermix.[1]  Plaintiff generally alleges that Defendants engaged in an unfair sale process, which Plaintiff claims resulted in the sale of Intermix to News Corp. at an unfair price.  *See* Consolidated Second Amended Complaint, ("CSAC"), ¶¶ 181-187.  Plaintiff further claims that shareholder approval for the sale of Intermix was obtained through the dissemination of a false and misleading proxy statement.  CSAC, ¶¶ 130-159.  For this alleged wrongdoing, Plaintiff seeks damages in the amount of between $506,000,000 and $667,000,000 on behalf of the class of former Intermix shareholders.  *See* Declaration of Elizabeth Moriarty ("Moriarty Decl."), Ex. 1, (Kennedy Report, p. 1).

### B.   Plaintiff Has Failed To Obtain Any Evidence Of Damages Resulting From The News Corp. Acquisition

After months of discovery, including depositions of the key executives of the only other interested company, Viacom, Plaintiff has not turned up any evidence of an economic loss attributable to the News Corp. transaction.  Plaintiff has not found this evidence because it does not exist.  There is simply no evidence that had the majority of the Intermix shareholders rejected a $12 per share cash-out merger with

---

[1]   Three claims remain against the Defendants in this action: 1) a claim for breach of fiduciary duty; 2) a claim for violations of Section 14(a) of the 1934 Act and Securities and Exchange Commission ("SEC") Rule 14a-9; and 3) a claim for control person liability under Section 20(a) of the 1934 Act.

\\LA - 025182/000005 - 452769 v2

1  News Corp., some other transaction would have occurred that would have resulted
2  in more favorable economic consequences.
3          The evidence has revealed, however, that after months of speaking to a
4  number of companies, the only companies that remained interested in Intermix after
5  the New York Attorney General investigation of Intermix were News Corp. and
6  Viacom.  Request for Judicial Notice ("RJN"), Ex. A, (Proxy, pp. 25-26).  And,
7  although Plaintiff asserts that Viacom was "ready, willing and able" to offer "in
8  excess of $700 million and as much as $810 million for Intermix," there is no
9  evidence to support his assertion.  *See* Moriarty Decl., Ex. 2, (Pl. Rog Rev.
10  Responses, 21:14-17).  The fact is that Viacom did not make a competing bid, and
11  the evidence from Viacom's witnesses confirms that Viacom had ample information
12  and opportunity to make a bid prior to the public announcement of the News Corp.
13  merger, but <u>chose not to</u>.[2]  Moriarty Decl., Ex. 3, (Freston Tr., 79:20-80:24, 81:12-
14  82:19); Ex. 4, (Epstein Tr., 70:14-71:24).

15          **C.    <u>Kennedy Has Fabricated Damages Where None Exist</u>**

16          Without evidence of a more favorable transaction for the Intermix
17  shareholders, Plaintiff hired Kennedy to create an "intrinsic valuation" which
18  values Intermix/MySpace at <u>two times</u> Intermix's average stock price leading up to
19  the merger.
20  //
21  //
22  //
23

24  [2]    For example, Viacom's President and Chief Operating Officer, Thomas Freston,
   testified that as of July 16, 2005, Viacom had all of the information it needed to
25  make a bid, and that Viacom could have made a bid after the announcement of the
   News Corp. merger, if Viacom's Board of Directors and Mr. Redstone decided to
26  make a bid, but that they chose not to do so.  Moriarty Decl., Ex. 3, (Freston Tr.,
   79:20-80:24, 81:12-82:19).  Similarly, Stuart Epstein of Morgan Stanley – the
27  investment bank that advised Viacom in connection with the potential Intermix
   transaction – testified that there were a number of reasons why Viacom ultimately
28  chose not to bid for Intermix (none of which involved misconduct by the
   Defendants).  Moriarty Decl., Ex. 4, (Epstein Tr., 70:14-71:24).

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

WLA - 025182/000005 - 452769 v2

1    Kennedy offers the following opinions and analyses:

2    **1.    MySpace "Informed Investor" Discounted Cash Flow**

3         **Analysis**

4         During the sale process, Intermix management worked with the investment

5    banks, Montgomery & Co. ("Montgomery") and Thomas Weisel Partners

6    ("TWP")(collectively, the "Banks") to prepare projections for MySpace and

7    Intermix for the years 2005 through 2009.  RJN, Ex. A, (Proxy at pp. 39, 42);

8    Moriarty Decl., Ex. 5, (Min Tr. 13:4-10; 35:3-17; 80:25-81:6); Ex. 8,

9    (Gopalakrishnan Tr. 51:16-23; 52:8-10; 53:4-9).   These projections are the

10   foundation for, and embedded within, the Banks' valuation analyses of

11   Intermix/MySpace set forth in the Proxy.  *Id.*  The Banks conducted several

12   valuations in connection with their fairness opinions including discounted cash flow

13   ("DCF") analyses[3] and comparable company analyses.  RJN, Ex. A, (Proxy at pp.

14   33-46).

15        Kennedy opines that a DCF analysis is the most appropriate valuation

16   methodology for a company like MySpace, and performs his own "Informed

17   Investor" DCF analysis, which he claims an investor would have performed had

18   Intermix disclosed management's raw projections in the Proxy.  Moriarty Decl., Ex.

19   6, (Kennedy Tr., 47:15-48:12); Ex. 1, (Kennedy Report, pp. 1, 9).   In this analysis,

20   Kennedy agrees with and adopts most of the Banks' methodology, but, rather than

21   using management's growth projections for 2008 and 2009, he creates his own.

22

---

[3]   A discounted cash flow analysis estimates the cash flows a company will
generate in future years to determine a "terminal value" of those accumulated cash
flows and then applies a discount rate to the "terminal value" to derive a present
value for those future cash flows. *See* RJN, Ex. G, (Stephen M. Penman, *Financial
Statement Analysis and Security Valuation*, 4th Ed., McGraw-Hill Irwin 2010 at p.
119.)  This terminal value may be estimated by using a multiple of a metric such as
EBITDA or earnings. *See* RJN, Ex. D, (Tim Koller, Marc Goedhart, and David
Wessels, *Valuation: Measuring and Managing the Value of Companies,* 4th Ed.,
Wiley 2005 at 275-76.)  This multiple is referred to as a terminal multiple.  The
higher the terminal multiple, the higher the terminal value.  To the terminal value, a
discount rate is applied to determine the present value. *See* RJN Ex. G, (Penman, at
p. 119).   The higher the discount rate, the lower the present value.

MOTION TO EXCLUDE THE OPINIONS
                                          AND TESTIMONY OF KENNEDY

WLA - 025182/000005 - 452769 v2

Moriarty Decl., Ex. 1, (Kennedy Report, pp. 11-12).  Kennedy claims that this analysis could and would have been conducted by Intermix shareholders if management's growth forecasts for MySpace had been provided in the Proxy. *Id.* at pp. 1, 8, 11-14.

Specifically, in this "Informed Investor" analysis, Kennedy relies upon the same management forecasts for the years 2005 through 2007 that were used by the Banks, but then applies management's 2006 to 2007 growth deceleration rate to years 2008 and 2009 instead of the growth rate actually used by Intermix's management to arrive at new revenue projections for MySpace for 2008 and 2009. *Id.* at 11-12.  Next, Kennedy applies management's 2007 EBITDA margin to his recasted 2008 and 2009 revenue projections to arrive at new projected 2008 and 2009 EBITDA for MySpace. *Id.* at 12; Moriarty Decl., Ex. 6, (Kennedy Tr., 102:14-18).  Then, Kennedy estimates 2010 EBITDA by annualizing his projected fourth quarter 2009 revenues (and applying an EBITDA margin of 55%), and next applies an 18x terminal multiple to this projected 2010 EBITDA, which he discounts to present value with a 19% discount rate.  Moriarty Decl., Ex. 1, (Kennedy Report, p. 12).  Under this DCF analysis, Kennedy arrives at a $962.4 million valuation for MySpace in 2005.

## 2.   Comparable Company Method Valuation

In addition to his DCF analysis, Kennedy performs a comparable company analysis. *Id.* at pp. 15-23.  Unlike the Banks, Kennedy does not use two years worth of projected earnings - MySpace's projected 2005 and 2006 revenue and EBITDA- in his calculation, instead he uses only MySpace's projected 2006 numbers. *Id.* at p. 21.  To these 2006 projections, Kennedy then applies multiples that were the average of the multiples applicable to Google and Yahoo, the highest multiples of all the comparable companies, rather than an average of between 12 and 14 comparable companies as was used by the Banks. *Id.* at p. 22.  Through these calculations, Kennedy comes to a valuation range of between $772 million

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

and \$883 million for MySpace, and then adds a 35% control premium to reach an ultimate range of between \$973 million and \$1.1 billion for MySpace. *Id.* at p. 23.

## III.   ARGUMENT

### A.   Standard Of Admissibility for Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," a qualified expert can offer an opinion if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The Ninth Circuit has articulated a two-part test for the admissibility of expert testimony that focuses on reliability and relevance:

> First, we must determine nothing less than whether the experts' testimony reflects "scientific knowledge," whether their findings are "derived by the scientific method," and whether their work product amounts to "good science." … Second, we must ensure that the proposed expert testimony is "relevant to the task at hand," … i.e., that it logically advances a material aspect of the proposing party's case.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II* ") (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590-91 (1993)). The party offering the expert opinion bears the burden of showing that both prongs of the test are satisfied. *Daubert II*, 43 F.3d at 1315-16, 18, n. 10. Although the *Daubert* factors were originally developed to guide the admissibility of scientific expert testimony, the trial court's role as gatekeeper applies with equal force to non-scientific expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). *See also Guidroz-Brault v. Missouri Pacific Railroad Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (stating that Rule 702 requires that expert evidence be reliable and relevant, i.e. "assist the trier of fact").

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

\\\LA - 025182/000005 - 452769 v2

Courts need not admit an expert opinion that is connected to the underlying data "only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Id. See also Daubert II*, 43 F.3d at 1316 ("expert's bald assurance of validity is not enough").

The Ninth Circuit has adopted the same reasoning and excluded expert opinions supported only by the *ipse dixit* of the expert. *See Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002). In *Domingo*, a medical malpractice case, the Ninth Circuit affirmed summary judgment for defendants and the exclusion of the *ipse dixit* testimony of plaintiff's expert that was not based upon objective, verifiable evidence: "The reasoning between steps in a theory must be based on objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in the field."

Similarly, in *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir. 1988), the Ninth Circuit affirmed summary judgment and found that the district court properly excluded "hopelessly flawed" damages studies that rested on "unsupported assumptions." *Id.* at 807-808. One expert's "speculation about the amount of appellants 'lost profits' had no basis in the record" and "[h]is study rest[ed] on unsupported assumptions and ignore[d] distinctions crucial to arriving at a valid conclusion." *Id.* at 807. The other damages expert's opinion lacked "any sound foundation," had "scant basis in the record," and rested on "unsupported assumptions and unsound extrapolation." *Id. See also American Booksellers Assn., Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041-42 (N.D. Cal. 2001) (excluding model showing damages in antitrust case that contained "entirely too many assumptions and simplifications that are not supported by real-world evidence.")

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

WLA - 025182/000005 - 452769 v2

In short, "Rule 702 requires that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault*, 254 F.3d at 829 (emphasis added) (excluding speculative, unreliable, and unfounded expert testimony).  As discussed below, Kennedy's opinions come nowhere close to meeting these exacting standards of reliability, and should therefore be excluded. *See Daubert II*, 43 F.3d at 1316 ("the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology").

**B.    Kennedy's Damages Opinions Are Inadmissible**

**1.    Kennedy's "Informed Investor" DCF Analysis Is Purely Speculative And Rests On Unsupported Assumptions**

Kennedy's only support for each step of his "Informed Investor" DCF analysis is "*ipse dixit*", and it is, therefore, fatally flawed.

First, although Kennedy claims an informed shareholder would use the undisclosed raw management projections to perform this calculation, <u>he himself does not rely upon those projections</u>.  Instead, Kennedy recalculates the 2008 and 2009 revenue and EBITDA by using the growth deceleration rate that management forecasted for the period from 2006 to 2007, <u>not the rate that management forecasted for the period from 2008 to 2009</u>.  Moriarty Decl., Ex. 6, (Kennedy Tr., 110:15-111:6); Ex. 1, (Kennedy Report, pp. 11-12).

Kennedy provides absolutely no justification for accepting all of management's other assumptions, but rejecting the growth deceleration rate for 2008 and 2009 and recasting revenue and EBITDA projections for those years.  Moriarty Decl., Ex. 6, (Kennedy Tr., 110:15-112:3).  In his deposition, Kennedy testified that he had no understanding of why management projected that the rate of growth for MySpace's revenues and EBITDA would be lower in 2008 and 2009 than management projected for the period from 2006 to 2007, and that he simply

\\LA - 025182/000005 - 452769 v2

1   decided that the 2008 and 2009 revenues and EBITDA for MySpace should be

2   recalculated using the growth deceleration rate that management forecasted for the

3   period from 2006 to 2007. *Id.* at 102:14-18; 110:15-111:6; 137:7-20.

4        Courts have rejected similar unsupported decisions by an expert to modify or

5   disregard management's projections in a company valuation. *See In re Iridium

6   Operating, LLC*, 373 B.R. 283, 352 (Bank. Ct. S.D.N.Y. 2007)(finding expert's

7   testimony regarding insolvency of company unreliable where expert discarded

8   management's projections, and created his own projections for a DCF analysis:

9   "analysis lacks credibility when an expert uses projections that 'fly in the face of

10  what everyone believed at the time'."); *In re Emerging Comm'n, Inc. Shareholders

11  Litig.*, 2004 WL 1305745, at *14-15 (Del. Ch. June 4, 2004)(in an appraisal action

12  following a "going private" transaction, court rejected expert's DCF analysis where

13  expert made "large adjustments to critical inputs," concluding that the adjustments

14  amounted to the expert "substituting his personal judgment … for the non-litigation

15  business judgment of [the company's] management.") *See also Gray v. Cytokine

16  Pharmasciences, Inc.*, 2002 WL 853549, *8 (Del. Ch. April 25, 2002)(rejecting

17  expert's DCF analysis in an appraisal action that disregarded management's

18  projections: "I cannot accept that [the expert], with his limited experience with the

19  Company, was better equipped to make future financial projections than

20  [Company's] management.  Consequently, I find [the expert's] litigation-driven

21  projections to be unreliable and, thus, disregard his DCF analysis.")

22       Courts recognize that valuations should be based upon "contemporaneous

23  management forecasts unless there are compelling reasons to the contrary."

24  *Emerging Comm'n*, 2004 WL 1305745, *12, *15 (unmodified management

25  projections are the most reliable inputs in "stark contrast" to "posthoc litigation-

26  driven forecasts" with "an 'untenably high' probability of containing hindsight bias

27  and other cognitive distortions"). *See also Iridium*, 373 B.R. at 351 ("Where

28  alternative projections 'are no better supported by the evidence than are those in

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

[management's] business plan,' the projections in management's business plan should be used in the DCF.")  Here, Plaintiff has offered no "compelling reasons" to reject management's projections.  There is no evidence that Intermix/MySpace management distorted the projections, and Plaintiff has, in fact, argued that management's projections are the "best evidence" of the value of MySpace. *See* Joint Brief re Parties Cross Motions for Summary Judgment, 86:17-19.

Kennedy's sole attempt to support his recast of the 2008 and 2009 projections, provided in his supplemental declaration, only confirms that he has no legitimate basis for this decision.  He merely states that the Banks' analyses "were unreasonably low and not consistent with the very rapid rates of growth *currently observed* at the time of the Proxy and expected in the social networking sector at the time."  Moriarty Decl., Ex. 7, (Kennedy Supp. Decl., ¶ 6) (emphasis added).  Further, Kennedy claims that his "DCF analysis uses more reasonable rates of growth for the 2008 and 2009 forecasted revenue" based upon "company and industry dynamics" and "my experience with the market and 'first mover' (start-up) companies like MySpace."  *Id.* at ¶ 7.

The "very rapid rates of growth," however, were "observed" by none other than MySpace/Intermix management, and incorporated into their contemporaneous projections that Kennedy has decided to recast.  *See* Moriarty Decl., Ex. 5, (Min Tr. 35:3-21); Ex. 8, (Gopalakrishnan Tr. 49:19-24; 52:5-10).  Contrary to Kennedy's assertions, management's projections for MySpace were quite aggressive including revenue growth rates of approximately 107% for 2005 to 2006, 67% for 2006 to 2007, 20% for 2007 to 2008, and 15% for 2008 to 2009.[4]  *See* Moriarty Decl., Ex. 1, (Kennedy Report,  p. 11, Tables 4 and 5).  Although Kennedy may be correct that, in 2005, some observers were expecting "very rapid growth" in the social networking sector, he offers no support for the assertion that anyone was projecting

---

[4]   TWP's DCF projections provide a slightly lower growth rate for 2008 to 2009 of 10%.  Moriarty Decl., Ex. 1, (Kennedy Report, p. 11, Table 5).

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

growth <u>more rapid than projected by Intermix/MySpace's management</u>.

Most importantly, Kennedy's vague assertions of the reasonableness of his projections, and his alleged experience in the "market" and with "first mover" start up companies, is not a sufficient basis for rejecting the "non litigation business judgment" of Intermix/MySpace management in creating the projections for 2008 and 2009. "The expert's attempts to arrive at more 'realistic' results with a hindsight valuation that .. completely ignores the closest insiders' projections, and results in a strikingly [higher] number. This is simply inexcusable." *Emerging Comm'n*, 2004 WL 1305745, * 15 (internal citations omitted).   Further, as Kennedy's recast of management's projections is only tied to the evidence by his *ipse dixit,* it renders his entire DCF analysis unreliable. *See Iridium*, 373 B.R. 283, 350 ("A court should reject an expert's conclusions when there is 'an analytical gap between the data and the opinion proffered' … Similarly, a court should exclude expert valuation testimony if the expert bases his analysis on an inappropriate set of cash flow projections, did not consider market values, and cannot explain the unreasonable implications of his analysis.") *See also* Fed. R. Evid. 702, Advisory Committee Notes ("The amendment specifically provides that the trial court must scrutinize not only the principles and methods used by the experts, but also whether those principles and methods have been properly applied to the facts of the case.")

Next, Kennedy uses his re-forecasted 2009 EBITDA number to postulate the 2010 earnings for MySpace to which he applies his terminal multiple.  Moriarty Decl., Ex. 6, (Kennedy Tr., 73:18-23).  Kennedy then applies an extremely aggressive <u>18 times</u> terminal multiple to his postulated 2010 earnings for MySpace to arrive at a "terminal value," accounting for over 90% of his ultimate valuation, which he then discounts to present value at a 19% discount rate. *See* Cornell Decl., ¶ 5; Ex. 2; Moriarty Decl., Ex. 1, (Kennedy Report, 13, Table 7).

Kennedy provides no theoretical or empirical justification for applying this incredibly aggressive 18x terminal multiple, except his statement that it is based on

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

"forward EBITDA multiples observed in comparable publicly traded guideline companies discussed later in this report." Moriarty Decl., Ex. 1, (Kennedy Report, p. 12). Kennedy, however, does not consider a range of comparable companies, but instead only considers the most profitable of the 14 comparable companies relied upon by the Banks as comparables, ultimately only Google, Yahoo, and Bankrate. *Id.* at 22. In his supplemental declaration, he merely asserts that the terminal multiple, "was based on reference to multiples of comparable publicly traded companies, and considered appropriate given MySpace's popularity, expected profitability, growth prospects, and market position." Moriarty Decl., Ex. 7, (Kennedy Supp. Decl., ¶ 9). In his deposition, however, Kennedy could not name another company valuation in which he applied a 18x terminal multiple, nor name any public company that has ever grown at the rate that he projected with his recasted projections and terminal value. Moriarty Decl., Ex. 6, (Kennedy Tr., 112:4-24). Kennedy's application of an 18x terminal multiple "rests on unsupported assumptions and unsound extrapolation" about the growth of MySpace. *See McGlinchy*, 845 F.2d at 807. *See also DSU Medical Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1158 (2003)(excluding damages expert's opinion in patent infringement action where the expert failed to supply economic data that would support his high hypothetical contract rates, and instead lapsed "into speculation").

    Another fatal flaw in Kennedy's DCF analysis is revealed by reverse engineering his work. One can determine, by taking Kennedy's terminal value and his 19% discount rate together with the growth rates in Kennedy's projected revenue and EBITDA for MySpace for 2006 through 2010, that he is forecasting an average growth rate into perpetuity for MySpace of 12.74%. Cornell Decl., at ¶ 5; Ex. 2. At this growth rate, Kennedy is projecting that MySpace would ultimately overtake the entire U.S. economy. *Id.,* ¶ 6. This, of course, violates the basic precepts of any valuation study: "The fact that a stable growth rate is sustained

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

forever, however, puts strong constraints on how high it can be.  Since no firm can grow forever at a rate higher than the growth rate of the economy in which it operates, the constant growth rate cannot be greater than the overall growth rate of the economy."  RJN, Ex. B, (Aswath Damodaran, *Damodaran on Valuation: Security Analysis for Investment and Corporate Finance*,  p. 145 (Wiley Finance, 2nd ed. 2006)).[5]

Kennedy may argue that the 12.74% growth rate resulting from his 18x multiple is not a long-term growth rate into perpetuity as in a standard valuation, but that it instead is for some finite period, which he has not defined, of increased revenue and EBITDA growth that would eventually level off to a lower, sustainable growth rate.  But, given his recasted projections for MySpace through 2010, Kennedy cannot explain how MySpace's revenues would level off to a steady state of growth that does not exceed the growth rate of the U.S. economy, within even fifteen years after 2010!   Kennedy cannot explain it because it is not mathematically possible, as shown below.  Perhaps for this reason, Kennedy has not supplied the finite period for his valuation that he argues avoids the trap of his projections exceeding the growth rate of the entire U.S economy.

The flaws in Kennedy's application of this high terminal multiple can be discovered by examining his DCF analysis in greater detail.  In his "Informed Investor" DCF analysis, Kennedy slows MySpace's revenue growth rate to 13.78% for 2010, and, for the same year, applies an EBITDA margin of 55% of revenues. Moriarty Decl., Ex. 1, (Kennedy Report, p. 12); Cornell Decl., Ex. 1.  If one assumes that MySpace's revenues decline by ½ a percent for 2011 and every year after to finally reach a steady state growth rate of 6.5% (the historical growth rate of the economy) in 2025, MySpace's revenues for 2025 would be projected to be

---

[5]   Aswath Damodaran is a well-respected Professor of Finance at the Stern School of Business at New York University.  Kennedy even testified to having two or three of Damodaran's books, and testified that Damodaran is "popular within the AICPA business valuation crowd."  Moriarty Decl., Ex. 6, (Kennedy Tr., 33:13-21).

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

1    $860.41 million. *See* Cornell Decl., ¶ 10; Ex. 5. Then, applying Kennedy's 55%

2    EBITDA margin, the EBITDA would be projected to be $473.22 million in 2025.

3    *Id.* Using the well accepted Gordon Growth Model to determine the terminal value,

4    the terminal value as of 2010 would be $695.34 million, based upon a 6.5%

5    terminal growth rate and 19% discount rate, <u>not</u> the $2.102 billion as in Kennedy's

6    analysis. *Id.,* ¶¶ 13-16, 19; Ex. 7.

7         If the 2010 terminal value is discounted back to mid-2005, by applying a

8    19% discount rate, then the mid-2005 terminal value would be $317.7 million, not

9    the $961 million estimated by Kennedy. *Id.,* ¶ 20; Ex. 8. Further, if the Gordon

10   Growth Model is then used to solve for the terminal multiple, it would be

11   approximately 6 times MySpace's projected 2010 EBITDA, <u>not</u> 18 times

12   MySpace's projected 2010 EBIDTA as in Kennedy's analysis. *See Id.,* ¶ 19.

13        This example shows that even if one allows MySpace to grow above the rate

14   of the economy until the year 2025 that Kennedy's aggressive terminal multiple

15   simply does not add up with his projections through 2010. As a matter of

16   mathematics, Kennedy simply "cannot explain the unreasonable implications of his

17   analysis." *Iridium*, 373 B.R. at 350.

18        Further, even if Kennedy's terminal multiple worked out mathematically

19   with his projections, there is no evidence that supports MySpace growing at such an

20   extreme rate as 12.74%. In fact, all the evidence, including management's

21   projections and testimony, points to the contrary. Even MySpace's former CEO,

22   Chris DeWolfe, who described himself as "bullish" on MySpace, stated that he

23   expected MySpace to level off to a steady state of growth within a few years: "[W]e

24   believed that there was opportunity for significant growth, whatever that meant, for

25   a couple of year time period and then continued growth but, obviously, not at the

26   same rate. ... It wouldn't be growing as fast in the later years as it would be in

27   2005-2006." *See* Moriarty Decl., Ex. 9, (DeWolfe Tr., 67:24-68:13).

28        There is "simply too great an analytical gap" between the facts and

15

\\\LA - 025182/000005 - 452769 v2

Kennedy's application of this aggressive terminal multiple for the analysis to be reliable. *See General Electric*, 522 U.S. at 147. *See also* Fed. R. Evid. 702, Advisory Committee Notes ("[A]ny step that renders the analysis unreliable … renders the expert's testimony inadmissible.")(internal citation omitted).

Finally, Kennedy's assertions that, if management's projections for MySpace had been disclosed, an "informed shareholder" would have conducted the same calculations as Kennedy, then decided to reject the News Corp. offer, and then somehow have reaped the benefit of this "intrinsic valuation" that bears no relation to the market value of the company, are similarly unsupported. *See* Moriarty Decl., Ex. 1, (Kennedy Report, pp. 1-2, 11-12). As there is <u>no evidence</u> that a shareholder would have conducted Kennedy's revision of management projections and applied Kennedy's aggressive calculations based on the revised projections, much less reaped the benefit of this "intrinsic valuation" without another bid, Kennedy is relying on "entirely too many assumptions and simplifications that are not supported by real-world evidence" for his opinion to be reliable. *American Booksellers*, 135 F. Supp. 2d at 1041-42.

None of the critical steps in Kennedy's DCF analysis are based upon "objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in the field." *Domingo,* 289 F.3d at 607. Instead, Kennedy manipulates the data and applies growth assumptions that are not supported in his field, "substituting his personal judgment for the non-litigation business judgment" of Intermix management. *See Emerging Comm'n*, 2004 WL 1305745, * 15. These manipulations and assumptions result in a growth rate that would have MySpace overtake the entire U.S. economy. It is, therefore, not surprising that Kennedy's hypothetical valuation is more than double the trading price of Intermix stock for the month leading up to the announcement of the News Corp. acquisition. *See* RJN, Ex. C, (stock price list). Kennedy's analysis simply "rests on unsupported assumptions and unsound extrapolation," and therefore is not reliable, and should

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

be excluded.  *McGlinchy*, 845 F.2d at 807.

## 2.  Kennedy's Comparable Company Analysis Relies On Unsupported and Unreasonable Assumptions

Kennedy's comparable company analysis is as unreliable and speculative as his "Informed Investor" DCF analysis, and should also be excluded.

First, without any justification, Kennedy does not use projected revenue and EBITDA for 2005 and 2006, but rather only uses the projected numbers for 2006, which are significantly higher.  Moriarty Decl., Ex. 1, (Kennedy Report, p. 21).  MySpace's revenue and EBITDA were projected to grow by over 107% and over 186%, respectively, for 2006.  *Id.* at p. 6.  These 2006 projections include extremely high year over year growth rates, which had not been achieved yet.  In comparison, the 2005 projections included two quarters of actual results.  Moriarty Decl., Ex. 6, (Kennedy Tr., 128:16-19).  Had Kennedy conducted a range of analyses including both the 2005 and 2006 revenue and EBITDA numbers, the mid point would have been approximately $600 million [Kennedy Tr., 133:24-134:5], placing News Corp.'s $12 per share well within the range of values under this method.

When questioned at his deposition about his decision to use only 2006 numbers, Kennedy testified as follows:

> Q- Is there something wrong with 2005?  Was 2005 an aberrant year for MySpace?
>
> A- No, but it wasn't who the company was expected to be.
>
> …
>
> Q- Why didn't you do a bracketed range of 2005 and 2006 for your guideline analysis?
>
> A- I didn't think it was appropriate.

*Id.* at 129:19-130:6.  Kennedy again relies only on *ipse dixit* for his decision to use just the 2006 projections in this analysis, and "an expert's bald assurance of validity is not enough."  *Daubert II*, 43 F.3d at 1316, 1319 ("the experts must explain

---

17

WLA - 025182/000005 - 452769 v2

precisely how they went about reaching their conclusions and point to some objective source – a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like – to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field.").

After taking just MySpace's projections for 2006, Kennedy does not apply multiples that are averages of the multiples applicable to several comparable companies, rather he applies multiples that are the average of the multiples applicable to Google and Yahoo. Moriarty Decl., Ex. 1, (Kennedy Report at p. 22). Yahoo's enterprise value to 2006 projected revenue multiple was 10.6, and it's enterprise value to projected EBITDA multiple was 22.8. *See id.*, p. 22, Table 12. Google's enterprise value to projected revenue multiple was 17.1, and it's enterprise value to EBITDA multiple was 27.4. *Id.* Even within the narrower subset of comparable companies that Kennedy considered, these multiples are significantly higher than those of the other comparable companies. *Id.* For example, the other four companies had enterprise value to projected revenue multiples ranging from 2.9 to 6.5, and enterprise value to EBITDA multiples from 11.9 to 20.2. *Id.* Kennedy's only explanation for selecting the two highest multiples to take an average from was: 1) "guideline companies with higher profitability have correspondingly higher enterprise value to revenue multiples… [b]ased on this relationship, we selected a multiple of 14 times 2006 revenue;" and 2) "Given that MySpace's growth is about 5x the growth of the guideline companies, a multiple at the high end of the range is appropriate." *Id.* at p. 22. Guideline company multiples, however, include estimates of a subject company's growth rates over the long term. *See* RJN Ex. D, (Tim Koller, Marc Goedhart, and David Wessels, *Valuation: Measuring and Managing the Value of Companies*, 4th Ed., Wiley 2005, at 373-75). Kennedy bases his assessment of MySpace's high growth and high profitability on only the very high 2006 projections without any

18

consideration for MySpace's long-term growth prospects.  Moriarty Decl., Ex. 1, (Kennedy Report, p. 22).

By choosing only two companies with the very highest multiples, Kennedy cherry-picks to come up with a high multiple, rather than taking an average of all the comparable companies.  Valuation texts note that it is erroneous to be overly restrictive in the selection of comparable companies:

> A problem also arises if an appraiser establishes criteria that are too restrictive.  By unnecessarily limiting the number of guideline companies considered, an appraiser may miss relevant market evidence that would have led to a different valuation. … In employing the guideline publicly traded company method, every effort should be made to select as broad a base of comparative companies as is reasonably possible, as well as to give full consideration to every possible factor in order to make the comparison more meaningful.

RJN, Ex. E, (Pratt, Reilly and Schwiehs, The Analysis and Appraisal of Closely Held Companies, 2000, p. 233)(internal citation omitted).  Here, Kennedy not only fails to select a broad range of comparative companies, but also fails to give "full consideration" to every possible factor to make the comparisons more meaningful, such as the difference between seasoned Internet companies with proven revenue models and a start-up in a new industry.

Further, by selecting only Google and Yahoo, the two companies with the highest multiples, Kennedy is not selecting the most comparable companies for the analysis.  Google and Yahoo were both seasoned Internet companies in 2005 with proven revenue models based on a validated search advertising business model.  MySpace was a startup in the new social networking arena for which there was no proven revenue model.  Even Kennedy could not claim that MySpace's projected revenues were as predictable as those of Google and Yahoo.  Moriarty Decl. Ex. 6, (Kennedy Tr., 121:14-122:20).  Delaware courts have rejected similar expert comparable company analyses that were not based on truly comparable companies, noting that "[a] comparable company analysis is only as valid as the 'comparable'

firms upon which the analysis is based, are truly comparable." *See Prescott Group Small Cap, L.P. v. The Coleman Co., Inc.*, 2004 WL 2059515, *22-23 (Del. Ch. Sept. 8, 2004)(rejecting expert's comparable company analysis as unreliable in an appraisal action, where "none of [the expert's] 'comparables' was truly comparable to [the company] in any meaningful sense, and none of them had economics similar to [the company's]…"); *In re Radiology Associates, Inc. Litig.*, 611 A.2d 485, 489-90, 498 (Del. Ch. 1991)(finding expert's comparable company analysis unreliable in appraisal action because of "noncomparability" of the selected companies: "At some point, the differences become so large that the use of the comparable company method becomes meaningless for valuation purposes.")

Kennedy's comparable company analysis "contains too many assumptions and simplifications that are not supported by the real world evidence." *See American Booksellers*, 135 F. Supp. 2d 1031, 1041-42. *See also* Fed. R. Evid. 702. Further, by using only the 2006 projections and the average of multiples applicable to Google and Yahoo, Kennedy is ignoring "distinctions crucial to arriving at a valid conclusion." *McGlinchy*, 845 F.2d at 807-08. As such, this analysis is not reliable and should be excluded.

//

//

//

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

W:LA - 025182/000005 - 452769 v2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.   CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court grant this Motion and issue an order prohibiting G. William Kennedy from offering any of the opinions in his Rule 26 report at trial, and excluding the opinions he has offered in opposition to Defendants' Motion for Summary Judgment.

Dated:    November 30, 2009          HOGAN & HARTSON, LLP

By: _Richard L. Stone By DT_
     Richard L. Stone

Attorneys for Defendants
Brett Brewer, Daniel Mosher,
Lawrence Moreau, Richard
Rosenblatt, James Quandt, and
William Woodward

ORRICK, HERRINGTON &
SUTCLIFFE LLP

Dated:    November 30, 2009

By: _Stephen M. Knaster w/ permission by /_
     Stephen M. Knaster

Attorneys for Defendants
David Carlick and Andrew Sheehan

MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF KENNEDY

\\\LA - 025182/000005 - 452769 v2