E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 06-3731-GHK (SHx) | | Date | June 17, 2010 |
|---|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

**Presiding: The Honorable**      **GEORGE H. KING, U. S. DISTRICT JUDGE**

| Beatrice Herrera | N/A | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**      **(In Chambers)   Order re: Cross-Motions for Summary Judgment**; [213, 218, 244, 251, and 261]

This shareholder class action arises out of News Corporation's ("News Corp.") 2005 acquisition of Intermix Media, Inc. ("Intermix"), formerly known as eUniverse Inc. (Brewer Decl. ¶ 3), a company which owned, among other internet businesses, the social networking website MySpace. Plaintiff Jim Brown ("Plaintiff"), individually and on behalf of all members of the certified class of former Intermix shareholders,[1] claims that Defendants Brett Brewer ("Brewer"), Daniel Mosher ("Mosher"), Lawrence Moreau ("Moreau"), David Carlick ("Carlick"), Andrew Sheehan ("Sheehan"), Richard Rosenblatt ("Rosenblatt"), James Quandt ("Quandt"), and William Woodward ("Woodward") (collectively, "Defendants"), the eight Intermix directors at the time of the company's sale, breached their fiduciary duties under state law and violated Section 14(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a-9 (Counts IV and II, respectively).[2]   (Consolidated Second Amended Complaint ["CSAC"] ¶¶

---

[1] In our June 22, 2009 Order, we certified the following class: "All holders of Intermix Media, Inc. ('Intermix' or the 'Company') common stock, from July 18, 2005 through the consummation of the sale of Intermix to News Corporation ('News Corp') at the price of $12.00 per share on September 30, 2005 (the 'Acquisition'), who were harmed by defendants' improper conduct at issue in the litigation. Excluded from the Class are defendants and any person, firm, trust, corporation or other entity related to or affiliated with any defendant."  (Dkt. No. 197).

[2] In our July 14, 2008 Order on the Motion to Dismiss, we dismissed with prejudice Defendants Montgomery & Co. LLC ("Montgomery"), and Thomas Weisel Partners Group, Inc. and Thomas Weisel Partners LLC ("TWP"), the investment banks which advised the Intermix board during the 2005 transaction and completed fairness analyses on the $12 per share price offered by News Corp. in the consummated merger transaction.  (Dkt. No. 110, at 4-5).  In that same Order, we also dismissed with prejudice Count I for violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9, which was stated against the 2003 Individual Defendants, which included Brewer, Mosher, Moreau, Jeffrey Scott Edell, Bradley Ward, Carlick, Sheehan, and Lipp, and VantagePoint.  (*Id.* at 1-3).  Accordingly, Count III for

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

168-74, 179-87; Brewer Decl. ¶ 5). The only other remaining claim is Count III for "control person" liability under Section 20(a) of the 1934 Act against Defendants involved in the 2005 acquisition of Intermix. (CSAC ¶¶ 175-78). This matter is before us on the Parties' Cross-Motions for Summary Judgment. We have considered the papers filed and all of the admissible evidence, and deem this matter appropriate for resolution without oral argument. L.R. 7-15. As the Parties are familiar with the facts in this case, we will repeat them only as necessary. Accordingly, we rule as follows.

I.      **Motion for Summary Judgment Standard**

        Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, our "function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

        The moving party bears the initial responsibility to point to the absence of evidence of any genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006) (citation and quotation marks omitted). By contrast, where the non-moving party "bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex Corp.*, 477 U.S. at 322) (alteration in original). "[T]he moving party can meet its burden by pointing out the absence of evidence from the non-moving party," and it "need not disprove the other party's case." *Miller*, 454 F.3d at 987 (citation omitted). Accordingly, "[t]he nonmoving party must come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citations

---

"control person" liability was dismissed as to Edell and Ward, as it was premised on the only other claim against them, the dismissed Count I. (*Id.* at 7-8). The Parties stipulated to dismiss certain Defendants. (Dkt. Nos. 190, 204). On June 10, 2009, pursuant to the Parties' stipulation, we dismissed without prejudice Defendants VantagePoint Venture Partners, VP Alpha Holdings IV L.L.C., VantagePoint Venture Partners IV (Q) L.P., VantagePoint Venture Partners IV L.P., and VantagePoint Venture Partners IV Principals Fund L.P. (Dkt. No. 194). On August 28, 2009, pursuant to the Parties' stipulation, we dismissed without prejudice Defendant Christopher Lipp, Intermix's General Counsel. (Dkt. No. 205).

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

omitted).  However, "[i]f the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."  FED. R. CIV. P. 56(e)(2); *see also Celotex Corp.*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  The "opposing party may not rely merely on allegations or denials in its own pleading[.]"  FED. R. CIV. P. 56(e)(2).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255; *see also In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) ("The court must view all the evidence in the light most favorable to the nonmoving party.") (citations omitted).

"Only admissible evidence may be considered in deciding a motion for summary judgment."  *Miller*, 454 F.3d at 988.  Under Federal Rule of Civil Procedure 56(e)(1), "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  *See also Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001).  Conclusory and speculative affidavits that fail to set forth specific facts are insufficient to raise a genuine issue of material fact.  *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Absent a proper exception, hearsay statements are inadmissible.  *See Japan Telecom, Inc. v. Japan Telecom Am., Inc.*, 287 F.3d 866, 875 n.1 (9th Cir. 2002).  Furthermore, neither an unverified complaint nor unsworn statements made in the parties' briefs can be considered as evidence at this stage.  *See Moran v. Selig*, 447 F.3d 748, 759 & n.16 (9th Cir. 2006) (noting that unverified complaint cannot be considered as evidence on motion for summary judgment); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) ("[L]egal memoranda  . . . are not evidence[.]").

## II.    Count IV: Breach of Fiduciary Duty Claim

### A.    *Delaware Law on Corporate Fiduciary Duties Generally*

Delaware law governs Plaintiff's state law claim of breach of fiduciary duty.  Under Delaware law, all directors and officers of a corporation owe their shareholders fiduciary duties of loyalty and care.  *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).[3]

---

[3] Under Delaware law, the business judgment rule creates "a presumption that in making a business decision, the directors of a corporation act on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).  "A plaintiff challenging a board decision bears the burden to rebut the rule's presumption by providing evidence that the directors breached their fiduciary duties."  *Goodwin v. Live Entm't, Inc.*, No. Civ. A. 15765, 1999 WL 64265, at *24 (Del. Ch. Jan. 25, 1999) (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *modified by*, 636 A.2d 956 (Del. 1994) ("*Cede II*"); *Citron v. Fairchild Camera and Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989)).  "In order to overcome that presumption, a plaintiff must prove an act of bad faith by a preponderance of the evidence."  *In re*

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

### 1.      Duty of Care

"Director liability for breaching the duty of care 'is predicated upon concepts of gross negligence.'" *Binks v. DSL.net, Inc.*, C.A. No. 2823-VCN, 2010 WL 1713629, at *8 (Del. Ch. Apr. 29, 2010) (quoting *McMullin v. Beran*, 705 A.2d 910, 921 (Del. 2000)). The Delaware General Corporation Law permits a corporation to include a provision in its charter "eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director." DEL. CODE ANN. tit. 8, § 102(b)(7). While such an exculpatory provision may eliminate any liability for breaches of the duty of care, it "shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; . . . or (iv) for any transaction from which the director derived an improper personal benefit." *Id.* Intermix's charter exculpates Defendants from any duty of care claims. (J.A., Ex. 38, Certificate of Incorporation). Accordingly, Defendants assert this provision as their fifth affirmative defense: "The breach of fiduciary duty claim is barred, in whole or in part, by the exculpatory provision contained in Intermix's Certificate of Incorporation." (Dkt. No. 111, Aug. 4, 2008). In light of this provision, we conclude that the director Defendants cannot be liable for any purported breach of fiduciary duty based solely on their duty of care. Plaintiff does not argue otherwise.

Defendants also move for summary judgment on the question of whether Brewer and Rosenblatt, who doubled as officers for Intermix, may be held liable for any breaches of the duty of care, since Section 102(b)(7) only permits exculpation of duty of care claims for directors. It is undisputed that both Brewer and Rosenblatt served as directors and officers of Intermix, Brewer as President and Rosenblatt as CEO. (Brewer Decl. ¶ 1; Rosenblatt Decl. ¶ 1). The law is clear that where it is impossible to separate actions taken in fulfillment of a defendant's directorial duties from actions taken in fulfillment of that defendant's duties as a corporate officer, then any duty of care claim stated against that individual is exculpated. In *Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d 1270 (Del. 1994), the Delaware Supreme Court held that since the plaintiff "failed to highlight any specific actions [the defendant] undertook as an officer (as distinct from actions as a director) that fall within the two pertinent exceptions to Section 102(b)(7)[,]" any duty of care claim was precluded under the exculpatory clause. *Id.* at 1288 (citing R. Franklin Balotti & Jesse A. Finkelstein, Delaware Law of Corp. & Business Org. § 4.19, at 4-335 (Supp. 1992) (where a defendant is a director and officer, only those actions taken solely in the defendant's capacity as an officer are outside the purview of Section

_____

*Walt Disney Co. Derivative Litig.*, 907 A.2d 693 (Del. Ch. 2005). "If the plaintiff fails to rebut the presumption, the business judgment rule protects the decision made." *Goodwin*, 1999 WL 64265, at *4 (citation omitted). "If the rule is rebutted, the burden shifts to the defendants . . . to prove that the transaction was entirely fair to the plaintiff shareholder." *Id.* (citation omitted).

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|----------|----------------------|------|---------------|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|-------|-------------------------------------|

102(b)(7))). Plaintiffs have not identified any actions taken by Rosenblatt or Brewer solely in their capacity as officers. Accordingly, to the extent any claim for breach of the duty of care is embodied in Count IV, we **GRANT** summary judgment on that specific basis as to all director defendants, including Brewer and Rosenblatt who also served as officers.

### 2.  Duty of Loyalty

To hold a director liable for breach of the duty of loyalty, the plaintiff must establish that "a majority of the Director Defendants either [1] stood on both sides of the merger or were dominated and controlled by someone who did; or [2] failed to act in good faith, i.e., where a fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re NYMEX S'holder Litig.*, C.A. Nos. 3621-VCN, 3835-VCN, 2009 WL 3206051, at *6 (Del. Ch. Sept. 30, 2009) (internal citations and quotation marks omitted); *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 239-40 (Del. 2009) ("*Lyondell*") ("Because the trial court determined that the board was independent and was not motivated by self-interest or ill will, the sole issue is whether the directors are entitled to summary judgment on the claim that they breached their duty of loyalty by failing to act in good faith.").

With respect to the first basis for demonstrating breach of the duty of loyalty, Delaware law provides that "[w]hen directors . . . are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). "Classic examples [of this type of breach] are when a director appears on both sides of a transaction or receives a personal benefit not received by the shareholders, generally." *Oliver v. Boston Univ.*, No. Civ. A. 16570-NC, 2006 WL 1064169, at *18 (Del. Ch. Apr. 14, 2006) (citing *Cede II*, 634 A.2d at 362 (citing *Nixon v. Blackwell*, 626 A.2d 1366, 1375 (Del. 1993))) (internal quotation marks and alterations omitted). "If corporate fiduciaries stand on both sides of a challenged transaction, an instance where the directors' loyalty has been called into question, the burden shifts to the fiduciaries to demonstrate the 'entire fairness' of the transaction." *Id.* (citations omitted). A showing of "entire fairness" requires proof that the transaction is "the product of both fair dealing *and* fair price." *Cede II*, 634 A.2d at 361 (emphasis in original and citations omitted).

With respect to the second basis for demonstrating breach of the duty of loyalty, Delaware courts have noted that "the requirement to act in good faith is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty." *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006) (citation, alteration, and internal quotation marks omitted) ("[T]he fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith."). In *Stone*, the Delaware Supreme Court explained that "although good faith may be described colloquially as part of a 'triad' of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty." *Id.* at 370.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

The Delaware Supreme Court has explained what constitutes bad faith by way of a spectrum of directorial conduct. "At one end of the spectrum, [there is] a category of acts involving non-exculpable, so-called 'subjective bad faith,' that is, fiduciary conduct motivated by an actual intent to do harm." *Ryan v. Lyondell Chem. Co.*, C.A. No. 3176-VCN, 2008 WL 4174038, at *3 (Del. Ch. Aug. 29, 2008) ("*Ryan*") (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 64 (Del. 2006) ("*Disney*")) (internal quotation marks omitted). "The second category of conduct, which is at the opposite end of the spectrum, involves lack of due care—that is, fiduciary action taken solely by reason of gross negligence and without any malevolent intent." *Disney*, 906 A.2d at 64. The court observed that "grossly negligent conduct, without more, does not and cannot constitute a breach of the fiduciary duty to act in good faith." *Id.* at 65. The third category identified by the Delaware Supreme Court is the one at issue in this case: "intentional dereliction of duty or a conscious disregard for one's responsibilities." *Id.* at 66. "Such misconduct, according to the Court, is 'properly treated as a non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith.'" *Ryan*, 2008 WL 4174038, at *3 (quoting *Disney*, 906 A.2d at 66).

Accordingly, "the distinction between gross negligence and non-exculpable 'bad faith' (i.e., that elusive something 'more') has important consequences in Delaware's jurisprudence and corporate statutory scheme because, for example, director conduct amounting *only* to a violation of the duty of care, but otherwise taken in good faith, is exculpable under 8 Del. C. § 102(b)(7) or indemnifiable under 8 Del. C. § 145." *Id.* (citing *Disney*, 906 A.2d at 64-65).

> **B.       Scope of Plaintiff's Claim of Breach of the Duty of Loyalty**

Inasmuch as the director defendants are exculpated from potential breaches of their duty of care, the success of Count IV necessarily depends on "whether any arguable shortcomings on the part of the . . . directors also implicate their duty of loyalty, a breach of which is not exculpated." *Lyondell*, 970 A.2d at 239. To that end, in order to rule on Defendants' motion for summary judgment, we must ascertain whether there are any genuine issues of material fact with respect to whether the directors breached their duty of loyalty, not merely their duty of care. In keeping with the Parties' Joint Brief, we address the two bases for breach of the duty of loyalty in the reverse order: first, Plaintiff's assertion of bad faith conduct by Defendants, and second, Plaintiff's allegation of a self-interested transaction not shown to be entirely fair.

> **1.       Bad Faith in *Revlon* Auction Context**

The obligation to act in good faith, which is a necessary component of satisfying the duty of loyalty, requires directors to act for the purpose of advancing corporate well-being. Therefore, any "intentional dereliction of duty, a conscious disregard for one's responsibilities[,]" constitutes bad faith, or the failure to act in good faith. *Disney*, 906 A.2d at 66; *Stone*, 911 A.2d at 370 ("Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."). In this case, Plaintiff and the shareholder class which he represents argue Defendants

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

consciously disregarded their responsibilities in selling Intermix to News Corp. for $12 per share, when, so they contend, a likely topping bid from Viacom was imminent.

The seminal case of *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986), regulates directorial conduct during a sale or change of control of a publicly held corporation. *Revlon* holds that directors satisfy their fiduciary duties when their conduct is geared towards "the maximization of the company's value at a sale for the stockholders' benefit." *Id*. at 182. *Revlon* is triggered in the following three scenarios: "(1) when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company; (2) where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company; or (3) when approval of a transaction results in a sale or change of control." *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1289-90 (Del. 1994) (internal citations and quotation marks omitted). More recently, the Delaware Supreme Court has stated that *Revlon* duties attach "when a company embarks on a transaction–on its own initiative or in response to an unsolicited offer–that will result in a change of control." *Lyondell*, 970 A.2d at 242. When the company's "break-up" became "inevitable," in *Revlon*, "[t]he directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." 506 A.2d at 182. In addition to its principal holding that shareholder wealth maximization must be the directors' foremost objective, the court also noted that "favoritism for a white knight to the total exclusion of a hostile bidder" was impermissible if divorced from the objective of shareholder value maximization. *Id*. at 184. "[W]hen bidders make relatively similar offers, or dissolution of the company becomes inevitable, the directors cannot fulfill their [fiduciary] duties by playing favorites with the contending factions. Market forces must be allowed to operate freely to bring the target's shareholders the best price available for their equity." *Id*.

The Delaware Supreme Court has clarified that "*Revlon* did not create any new fiduciary duties[,]" but rather "simply held that the 'board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise.'" *Lyondell*, 970 A.2d at 239 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)). Additionally, Delaware case law has time and again reaffirmed the anti-favoritism principle, *i.e.* that directors may not tilt the playing field in favor of one bidder or otherwise skew the auction unless this conduct is designed to maximize shareholder wealth. In *Barkan v. Amsted Industries*, 567 A.2d 1279 (Del. 1989), the court warned that "the board must act in a neutral manner to encourage the highest possible price for shareholders." *Id*. at 1286. To be sure, "there is no single blueprint that a board must follow to fulfill its duties," and "there are no legally prescribed steps that directors must follow to satisfy their *Revlon* duties." *Id*.; *Lyondell*, 970 A.2d at 243. Nevertheless, "[w]hen multiple bidders are competing for control, this concern for fairness forbids directors from using defensive mechanisms to thwart an auction or to favor one bidder over another." *Id*. at 1286-87 (citation omitted). More recently, in *In re Toys "R" Us, Inc., Shareholder Litigation*, 877 A.2d 975 (Del. Ch. 2005), the Delaware Chancery Court stated that "a selfish or idiosyncratic desire by the board to tilt the playing field towards a particular bidder for reasons unrelated to the stockholders' ability to get top dollar" is a violation of a director's fiduciary obligations. *Id*. at 1000-01.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

To support his claim that Defendants acted in bad faith, Plaintiff cites *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261 (Del. 1988). In that case, Macmillan, Inc.'s Chairman and Chief Executive Officer ("CEO") and its President and Chief Operating Officer ("COO") orchestrated a leveraged buyout of their own company, resulting in a lock-up agreement "between Macmillan and Kohlberg Kravis Roberts & Co. ('KKR'), an investment firm specializing in leveraged buyouts." *Id.* at 1264-65. These directors, "as participants in the leveraged buyout, had a significant self-interest in ensuring the success of a KKR bid." *Id.* at 1279. Indeed, "Macmillan senior management would receive up to 20% ownership in the newly formed company." *Id.* at 1273. So strong was the pull of that promised 20 percent ownership stake that even before KKR had communicated a bid price, these self-interested actors indicated that they would "endorse" the acquisition to the full board of directors. *Id.* To steer the process in the desired direction, they "clandestinely and impermissibly skewed" the auction in KKR's favor by, among other things, tipping KKR off as to the amount of a competing bid and then concealing this tip from the board of directors. *Id.* at 1279-81. On appeal, the Delaware Supreme Court held that "discriminatory treatment of a bidder, *without any rational benefit to the shareholders*, was unwarranted." *Id.* at 1282 (emphasis added).[4] The court found that "KKR repeatedly received significant material advantages to the exclusion and detriment of [the competing bidder] to stymie, rather than enhance, the bidding process." *Id.* at 1281. Moreover, the court concluded that "[t]he board was torpid, if not supine, in its efforts to establish a truly independent auction . . . ." *Id.* at 1280. The court added: "By placing the entire process in the hands of [the chairman], through his own chosen financial advisors, with little or no board oversight, the board materially contributed to the unprincipled conduct of those upon whom it looked with a blind eye." *Id.*

Defendants contend that *Macmillan* is distinguishable because the directors in that case were on both sides of the transaction and therefore engaged in self-dealing. However, Defendants have pointed us to no authority for the proposition that *Macmillan* is only applicable when a court reviews self-interested transactions for fairness and may not support a finding of bad faith conduct in the *Revlon* auction context.

---

[4] Favoritism and deal protection devices, such as a termination fee, are permissible so long as they are strategically designed to maximize the price paid to shareholders. *Macmillan*, 559 A.2d at 1287 ("[T]he board's primary objective, and essential purpose, must remain the enhancement of the bidding process for the benefit of the stockholders."). *Macmillan* set forth a test which tolerates only *value-enhancing* preferential treatment:

> In the face of disparate treatment, the trial court must first examine whether the directors properly perceived that shareholder interests were enhanced. In any event, the board's action must be reasonable in relation to the advantage sought to be achieved, or conversely, to the threat which a particular bid allegedly poses to stockholder interests.

559 A.2d at 1288; *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 782 (Del. Ch. 1988) ("The board may tilt the playing field if, but only if, it is in the shareholders' interest to do so.").

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

We recognize that *Wayne County Employees' Retirement System v. Corti*, Civil Action No. 3534-CC, 2009 WL 2219260 (Del. Ch. July 24, 2009), distinguishes *Macmillan* from the single-bidder merger reviewed in that case on the absence of any conflicted insiders seeking to transfer control of a company to themselves. *Id*. at *12-13 ("There is much less cause for concern where managers will continue their employment with the combined post-transaction entity, than when the conflicted managers are bidders in an auction for control of the company, and are thereby seeking to transfer control of the company to themselves personally."). But that discussion has no bearing on the prohibition on favoring a particular bidder in a *multiple*-bidder context, which this case arguably presents.[5] Defendants suggest that the directors may tilt the playing field in favor of a particular bidder, without regard to shareholder wealth maximization, so long as they are not on both sides of a transaction. We reject this argument. Simply because *Macmillan* examined "disparate treatment" through the lens of disloyalty premised on a self-interested transaction does not mean field-tilting is permissible in other contexts. *See Emerson Radio Corp. v. Int'l Jensen Inc.*, Civ. A. Nos. 15130, 14992, 1996 WL 483086, at *11-12 (Del. Ch. Aug. 20, 1996) (describing *Macmillan* as requiring fiduciaries to "treat all bidders equally and fairly in carrying out their *Revlon* duties" and identifying self-interested nature of merger transaction as an "addition[al]" or "alternative" theory for breach of duty of loyalty); *Roberts v. Gen. Instrument Corp.*, CIV. A. No. 11639, 1990 WL 118356, at *8 (Del. Ch. Aug. 13, 1990) (citing *Macmillan*, 559 A.2d at 1287-88) ("In each instance where the board is not predominantly self-interested or under the control or dominating influence of a person with a conflicting interest, the principal judicial inquiries relate to whether the board was adequately informed and acting in good faith. This court has been pointedly instructed, however, that 'where issues of corporate control are at stake' action of even a disinterested board must meet an enhanced test before they will qualify for the deference that courts ordinarily accord to good faith business judgments.").

Whatever a director's particular motivation, evidence that he skewed an auction in favor of a particular bidder can support a finding of an "intentional dereliction of duty," *Disney*, 906 A.2d at 66, *i.e.* a violation of the obligation to act in good faith. *See Nagy v. Bistricer*, 770 A.2d 43, 48, n.2 (Del. Ch. 2000) (observing that the duty of good faith may serve as a "constant reminder . . . that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest").[6]

_____

[5] Although Viacom did not actually submit a bid, we conclude that there are triable issues of fact as to whether Viacom was at least a serious potential bidder which was discouraged from actually submitting a bid by Defendants' alleged bad faith conduct.

[6] The Delaware courts have explained that favoritism, untethered to any strategy to drive up bid prices, is a breach of the fiduciary duties which *Revlon* focused through the lens of shareholder wealth maximization:

Critically, in the wake of *Revlon*, Delaware courts have made clear that the enhanced judicial review *Revlon* requires is not a license for law-trained courts to second-guess reasonable, but

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|----------|----------------------|------|---------------|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

Defendants' principal argument is that recent Delaware Supreme Court case law creates a much more stringent standard for claims of breaches of the obligation to act in good faith. To this end, they cite language in the Delaware Supreme Court's decision in *Lyondell*. In that case, Lyondell's board of directors approved the sale of their company to Basell AF, a privately held Luxembourg company, after negotiating several increases in the per share bid price up from $40 to $48, and a set of less stringent deal protection devices, including a "fiduciary out" clause in the standard no-shop provision and a reduced termination fee. 970 A.2d at 237-39. The court found no bad faith and therefore no breach of the duty of loyalty. *Id*. at 242-44. The Supreme Court rested its decision on the following facts:

> The Lyondell directors met several times to consider Basell's premium offer. They were generally aware of the value of their company and they knew the chemical company market. The directors solicited and followed the advice of their financial and legal advisors. They attempted to negotiate a higher offer even though all the evidence indicates that Basell had offered a "blowout" price. Finally, they approved the merger agreement, because "it was simply too good not to pass along [to the stockholders] for their consideration." We assume, as we must on summary judgment, that the Lyondell directors did absolutely nothing to prepare for Basell's offer, and that they did not even consider conducting a market check before agreeing to the merger. Even so, this record clearly establishes that the Lyondell directors did not breach their duty of loyalty by failing to act in good faith.

*Id*. at 244.

Contrary to Defendants' argument, *Lyondell* did not work any transformation in Delaware law on the duty of loyalty. Nothing in this case altered the standard definition of bad faith; indeed, the court reaffirmed that "bad faith will be found if a 'fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.'" *Id*. at 243 (quoting *Disney*, 906 A.2d at 67). The court continued: "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." *Id*. Despite all the references to the

---

debatable, tactical choices that directors have made *in good faith*. For example, the Supreme Court has held that the duty to take reasonable steps to secure the highest immediately available price does not invariably require a board to conduct an auction process or even a targeted market canvass in the first instance, emphasizing that there is "no single blue-print" for fulfilling the duty to maximize value. Nor does a board's decision to sell a company prevent it from offering bidders deal protections, so long as its decision to do so was reasonably directed to the objective of getting the highest price, *and not by a selfish or idiosyncratic desire by the board to tilt the playing field towards a particular bidder for reasons unrelated to the stockholders' ability to get top dollar.*

*Toys "R" Us*, 877 A.2d at 1000-01 (emphasis added; citations omitted).

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

"conscious disregard" standard, Defendants nevertheless cherry-pick certain language to argue that a more stringent standard applies, including the following lines: (1) "Only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty"; and (2) "[T]he inquiry should have been whether those directors *utterly failed* to obtain the best sale price." *Id.* at 243-44 (emphasis added); (Joint Br. 5-7, 16). Defendants' citation of this language is out of context and misleading. A comprehensive review of the *Lyondell* opinion reveals that the court intended that language to be synonymous and coterminous with the "conscious disregard" standard. The court did not suggest that the "utter failure" standard would supplant the definition of bad faith set forth in *Disney*. Nor did it suggest any unprecedented diminishment of *Revlon* duties, as suggested by the minimalist standard Defendants advance. If such a radical departure were intended, we think the court would have taken the pains to say as much. Divorced from the surrounding text, the "utter failure" language could be said to require that directors simply do anything in the auction process, no matter how feckless, ineffectual, or at odds with the goal of maximizing shareholder wealth.

The "utter failure" language derives from the *Stone* and *In re Caremark* decisions, which the court cited. 911 A.2d 362 (Del. 2006); 698 A.2d 959, 971 (Del. Ch. 1996). Both of those decisions concerned claims that directors failed to engage in the necessary oversight to ensure compliance with laws such as the federal Bank Secrecy Act in *Stone*. That vital factual context helps explain why *In re Caremark* defined bad faith as follows: "Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, . . . only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." 698 A.2d at 971 ("Such a test of liability—lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight—is quite high."). Nevertheless, the Delaware Supreme Court explained in *Stone* and reaffirmed in *Lyondell* that: "the *Caremark* standard is fully consistent with the *Disney* definition of bad faith." *Lyondell*, 970 A.2d at 240 (citing *Stone*, 911 A.2d at 370). We cannot second-guess that determination as Defendants wish.

Instead of placing "utter failure" between "subjective bad faith" (*i.e.* "actual intent to do harm") and "conscious disregard" on the *Disney* "bad faith" spectrum, *Lyondell equated* the "utter failure" and "conscious disregard" standards. 970 A.2d at 240. This reasoning was fully in keeping with the Supreme Court's prior decision in *Stone*, where it noted that the duty of loyalty could be breached by two specific kinds of conduct rising to the level of bad faith: "(a) the directors *utterly failed* to implement any reporting or information system or controls; or (b) having implemented such a system or controls, *consciously failed to monitor or oversee* its operations thus disabling themselves from being informed of risks or problems requiring their attention." 911 A.2d at 370. Crucially, though bad faith could be demonstrated with either of these alternatives, the court emphasized, citing *Disney*, 906 A.2d at 67, that these were coterminous legal standards:

In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. *Where directors fail to act in the face of a known*

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

*duty to act, thereby demonstrating a conscious disregard for their responsibilities*, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

911 A.2d at 370 (emphasis added). Delaware courts generally seem to read *Lyondell* in this way. *See, e.g.*, *Robotti & Co., LLC v. Liddell*, C.A. No. 3128-VCN, 2010 WL 157474, at *11 (Del. Ch. Jan. 14, 2010) (characterizing *Lyondell* as holding that "[b]ad faith, and thus a breach of the duty of loyalty, can arise only when a fiduciary consciously disregards his or her responsibilities").[7]

In addition, we do not read *Lyondell* as diminishing the prohibition on tilting the playing field in favor of a particular bidder for any reason other than maximizing shareholder wealth. The lack of an actual or even potential second bidder was a key undisputed fact on which that court relied, noting: "[The directors] had reason to believe that no other bidders would emerge, given the price Basell had offered and the limited universe of companies that might be interested in acquiring Lyondell's unique assets. . . . Finally, no other acquiror [*sic*] expressed interest during the four months between the merger announcement and the stockholder vote." 970 A.2d at 241. Other cases have distinguished between single-bidder and multiple-bidder contexts as well. *See, e.g.*, *Barkan*, 567 A.2d at 1286-87; *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 466 n.14 (D. Del. 2004) ("In [*Macmillan*], the claim was that the directors approved the use of a lock-up that stopped rival bidders from winning the auction for the company so that fellow directors could purchase the company through a leveraged buy-out. Here, however, *there were no other bidders for Star*, the Company was on the verge of bankruptcy, and the Gotel financing was, by the Plaintiff's own admission, the only financing option presented to the Board.") (emphasis added and citations omitted). Since *Lyondell* only reviewed a merger with a lone bidder, even if we were to read its "utter failure" language as more lenient on Defendants, it is of severely diminished relevance in the multiple-bidder scenario we arguably confront here.

In short, *Revlon* and *Macmillan* are not displaced in any way by *Stone* or *Lyondell*. Accordingly, we must ask whether there is a genuine issue of material fact as to whether Defendants consciously disregarded their duties, *i.e.* "fail[ed] to act in the face of a known duty to act." *Stone*, 911 A.2d at 370. There is nothing in the case law to warrant granting judgment as a matter of law for Defendants, simply because they engaged in some bargaining.

Having considered all of the admissible evidence before us and viewing it in the light most favorable to Plaintiff as we must under Rule 56, we conclude that there are genuine, triable issues of material fact sufficient to defeat Defendants' Motion for Summary Judgment on this *Revlon* claim.

---

[7] "A failure to act in good faith may be shown . . . where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d at 755.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

These issues fall into three categories: (1) whether Intermix CEO Rosenblatt impermissibly tilted the playing field in favor of News Corp.; (2) whether the remaining board members consciously disregarded their duties; and (3) whether the purported risk of a direct bid for MySpace, which would have frozen the MySpace Option, precludes a finding that Defendants consciously disregard their duties.

          a.      **Rosenblatt**

      Plaintiff proffers evidence tending to show that during the crucial week leading up to the July 18, 2005 merger, Rosenblatt evaded Viacom's advances, even though Viacom's representatives were communicating that a competing bid was imminent. Plaintiff raises at least two interrelated triable issues: (1) whether Rosenblatt was self-interested in the merger transaction;[8] and (2) whether he impermissibly steered the auction in News Corp.'s favor.

      As to Rosenblatt's purported self-interest, there is evidence of Rosenblatt's motivation for the alleged bidder favoritism, namely his anticipation of future employment with News Corp. In one particularly revealing email sent on July 15, Rosenblatt excitedly endorses News Corp.'s Ross Levinsohn's vision: "So, we create the Fox Internet group, all our units (myspace, alena, grab) fall under it, plus all new acquisitions, and you are CEO Fox Internet and I am Fox Internet grand Puba!!!!" (J.A., Ex. 184). Rosenblatt continues: "I would like to discuss my specific role and structure whenever you are ready. It is no rush unless Peter and Rupert want me to sign an employment agreement by Sunday [July 17, 2005] . . . ." (*Id.*). In an earlier email in that same chain, Rosenblatt wrote: "[I] am burning some real equity with every major media company by getting [the deal] done. . . . u [*sic*] have no idea the pain I will suffer on Monday. U [*sic*] better have a good job for me cause I ain't [*sic*] gonna work in this town again. . . ." (*Id.*). On July 13, Rosenblatt wrote: "tell Thom Murdoch and I cut the deal in 30 mins [*sic*] and I got 100% of what we wanted. Deal closing by Monday." (*Id.*, Ex. 154). This evidence at least raises the inference that Rosenblatt had a strong interest in seeing a merger transaction with News Corp. completed and had made up his mind that Intermix would be sold to News Corp. as of July 13.

      Moreover, Plaintiff points to several key pieces of documentary evidence and witness testimony which tend to support his contention that (1) Rosenblatt, in representing the Intermix board through the Transaction Committee ("TC"), (2) Sheehan, who also sat on the TC, and (3) their agents, deliberately dodged, if not frustrated, an arguably imminent bid from Viacom:

---

      [8] Although analytically we are reviewing the evidence on the bad faith prong of the duty of loyalty component of the breach of fiduciary duty claim at this juncture, we consider Rosenblatt's alleged self-interest to the extent that it bears on whether Plaintiff has raised a triable issue of material fact as to whether Rosenblatt acted in conscious disregard of his duties by impermissibly tilting the field in favor of News Corp.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

*First*, on July 6, Montgomery responded to an email announcing "Viacom coming in hard" by telling Rosenblatt: "You need to dance with [Viacom] . . . slow them down.  I know you can do it."  (*Id.*, Ex. 117).

*Second*, TWP, specifically Robert Kitts ("Kitts"), was aware that Epstein was trying to reach them to talk about a potential Viacom bid.  (Kitts Tr. at 125:4-7, 126:4-13).  Epstein noted on July 16 that Kitts never called him back as promised.  (J.A., Ex. 191 ("We exchanged subsequent emails and he indicated he would call me, but he never did.")).

*Third*, on July 15, Mosher wrote Rosenblatt following one of Rosenblatt's updates to the full board, saying "Viacom sounds like a pipedream."  (*Id.*, Ex. 182).

*Fourth*, on July 15, Judy McGrath of MTV[9] wrote Rosenblatt to inform him that Viacom was "coming with a bid early next week."  (*Id.*, Ex. 183).  She added: "We really want to be with you on this, and hope to get in the ring for it . . . ."  (*Id.*).  Rosenblatt replied evasively, failing to correct her mistaken impression that the auction would still be ongoing after Monday: "I am on a call but thanks so much for the email . . . . I will call you back soon . . . ."  (*Id.*).  Rosenblatt could not recall precisely whether he had returned her call: "I may have tried.  I think, actually, I do think I tried and I couldn't get a hold of her."  (Rosenblatt Tr. at 108:21-24).

*Fifth*, Viacom's CEO Thomas Freston ("Freston"), who reiterated Viacom's interest in purchasing Intermix to Rosenblatt, has testified that he was only told that the process with the competing bidder was "moving quickly."  (Freston Tr. at 17:12-20, 19:8-11, 22:4-14).[10]  He testified that he could not "recall if [Rosenblatt] said that they were going to do a deal by Sunday."  (*Id.* at 22:21-24).  When asked whether Rosenblatt had communicated that a deal would be completed by Sunday, he stated that he did not believe so.  (Freston Tr. at 19:8-11).

---

[9] Viacom owns MTV Networks.

[10] The Parties initially sought to file Freston's deposition transcript under seal because it contained information subject to the governing protective order.  On November 13, 2009, the Parties filed a joint stipulation to withdraw their application to file under seal unredacted versions of the Joint Brief, the Joint Statement of Uncontroverted Facts, and Volumes 2-3 and 5-9 of the Joint Evidentiary Appendix, as well as several full deposition transcripts, including Freston's testimony.  (Dkt. No. 234).  In that document, the Parties stated that: "WHEREAS the Parties have contacted all non-parties that produced documents and/or gave deposition testimony which was the subject of the application to file under seal, and obtained their permission for the documents to be publicly filed, and therefore withdraw the Application to File Under Seal[.]"  (*Id.* at 3).  Our November 17, 2009 Order regarding the joint stipulation was not clear as to whether the deposition transcripts were also being filed in the public record.  (Dkt. No. 236).  We now clarify that all of the deposition transcripts labeled "Confidential Pursuant to Protective Order" and submitted to the Court along with the Cross-Motions for Summary Judgment **SHALL** also be filed in the public record pursuant to the Parties' joint stipulation.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

Kitts of TWP also confirmed that he failed to give Viacom any hard deadline by which to submit a bid. (Kitts Tr. at 88:21-89:16, 90:11-22, 136:11-14).[11]

*Sixth*, on July 17, Jason Hirschhorn emailed Chris DeWolfe, MySpace's CEO, to document his difficulties in staying in the auction process: "chris, quick concerns . . . Intermix management did not show up on Friday as promised during our time there . . . Intermix legal cancels their time with our legal today at the last minute . . . Heard you guys got called off the ad sales call abruptly . . . In short, I have had a team of 20+ people here working for 72 hours straight on a significant bid, is there anything I need to know?" (J.A., Ex. 200).

*Seventh*, on July 17, Van Toffler of MTV also emailed Rosenblatt directly to complain politely about the perceived run-around: "They are in the office working round [*sic*] the clock so we can put forth a number to you this week. They mentioned a couple of calls were cancelled at the end of the day Friday, and seemed a bit concerned. Is there anything I can do to help the process for both of us as this is clearly on the fast track?" (*Id.*, Ex. 202). Again, Rosenblatt replied in such a way that a reasonable jury could infer an intent to evade an arguably imminent competing bid: "We like you and your guys a ton also. Chris called back or will your GC today. Have a great weekend[.]" (*Id.*).[12]

*Eighth*, on July 17, Kitts of TWP, pursuant to the Intermix board's instructions, informed Viacom that it would be "in their best interest" to make a bid that evening.[13] (Kitts Tr. at 69:13-70:14, 88:21-89:16). Kitts admitted that he did not give Viacom a hard and fast deadline (*see id.* at 88:21-89:16, 90:11-22; Epstein Tr. at 53:21-55:5), but that he "relied upon the message [he]

---

[11] Rosenblatt, on the other hand, has testified that he actually told Freston that a deal would "likely be over by Sunday," or (stated with more certainty) that the deal was "going to be done by Sunday." (Rosenblatt Tr. at 64:5-22, 65:22-25, 92:5-8). For purposes of summary judgment, this conflicting evidence further supports the existence of a triable issue of fact as to Viacom's relative awareness of the impending consummation of the merger with News Corp. Moreover, Jason Hirschhorn ("Hirschhorn"), Viacom's top manager for Internet business, wrote in an internal email on Saturday July 16 that News Corp. "will deliver [its bid] anywhere from today-monday." (J.A., Ex. 192). Freston also states that Rosenblatt told him "a specific deal was imminent." (Freston Tr. at 29:11-16). Though the actual meaning of that statement is obscure as to whether a deal or a bid would have been imminent (particularly given Freston's other testimony), this ambiguity likewise buttresses our conclusion that there are genuine issues for trial.

[12] A reasonable jury could infer from this email that Rosenblatt intended to evade an arguably imminent competing bid, and that the "[h]ave a great weekend" line at the end of the email was dismissive, given the fact that the email was sent at nearly 6 p.m. on a Sunday night.

[13] We do not read the deposition to suggest that these were his actual words; Kitts was merely paraphrasing what he recalls saying to Viacom.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

delivered as code that [Epstein] should get a bid in this evening." (Kitts Tr. at 90:20-22). Furthermore, Kitts admitted in the deposition that he had been instructed to ask for a bid on a timetable that he knew was infeasible. (*Id*. at 144:1-145:7). Kitts testified that he was aware of an upcoming Viacom board meeting, "at which [a potential bid] was going to be discussed." (*Id*. at 69:13-70:14). The Viacom board was not scheduled to meet until the evening of Tuesday July 19, 2005. (Rosenblatt Decl. ¶ 42; Brewer Decl. ¶ 29).

On the other hand, Defendants present the following evidence of events leading up to the July 18th merger, which they argue demonstrates the board members' good faith. News Corp. initially signaled that it would be willing to purchase Intermix in the $8-10 per share price range. (Rosenblatt Decl. ¶ 18). During the Tuesday July 12, 2005 meeting between Rosenblatt, Rupert Murdoch, and Peter Chernin,[14] News Corp. indicated that it would pay $12 per share, as long as the MySpace Option was exercised and a merger agreement was executed by no later than Sunday, July 17, 2005. (*Id*. ¶ 24 (describing the "handshake deal")). At the 2 p.m. meeting on July 15, the Intermix board of directors rejected News Corp.'s proposal to enter exclusive negotiations as premature. (*Id*. ¶¶ 29-30). At the 8 p.m. meeting on July 15, the Intermix board rejected the non-binding term sheet including a variety of deal protection provisions as "too strong a deterrent to other potential bidders." (*Id*. ¶ 33; J.A., Ex. 14). At the 8 p.m. meeting on July 16, TWP advised the board that it would be reasonable to approve a merger with News Corp. rather than waiting for Viacom to present an offer. (Brewer Decl. ¶ 27; Rosenblatt Decl. ¶ 37). At the 7:30 p.m. TC meeting on July 17, the committee directed TWP to contact Viacom and/or its representative, Morgan Stanley, to ascertain whether Viacom would be making an offer before the opening of the market the next morning. (Rosenblatt Decl. ¶ 41; Sheehan Decl. ¶ 36; J.A., Ex. 18). At the 10 p.m. Intermix board meeting on July 17, TWP advised that Viacom was not prepared to make any offer until its board met on Tuesday July 19 and approved a bid. (Rosenblatt Decl. ¶ 42; J.A., Ex. 19). At the 3:45 a.m. board meeting on July 18, both Montgomery and TWP presented their valuation analyses, explaining that $12 per share was a fair price for Intermix, and the Board voted to approve the merger. (Rosenblatt Decl. ¶ 44). On July 18, Intermix entered into a merger agreement with News Corp.'s Fox Interactive Media. (Rosenblatt Decl. ¶ 45; J.A., Ex. 4, at 319). Defendants contend, and the record reflects, that throughout this process the board met repeatedly, authorized ongoing discussions with both competing bidders, and consulted legal and financial advisers. (J.A., Exs. 8-12, 14-19).

Viewing the evidence as a whole and in the light most favorable to Plaintiff, we conclude that there are at least triable issues of fact as to whether Rosenblatt acted in good faith, whether he impermissibly skewed the auction in favor of News Corp. for a purpose other than maximizing shareholder value, knowing that a Viacom bid was likely and imminent, and whether this arguably disparate treatment of Viacom and News Corp. had any effect on Viacom's appreciation of the arguable need to make an offer by the evening of July 17, 2005.

---

[14] Rupert Murdoch is the Chairman and CEO of News Corp. Peter Chernin was the then-President and COO of News Corp.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

### b.    The Other Directors

#### i.    Sheehan

In addition to Rosenblatt, there are also triable issues of fact as to whether Sheehan consciously disregarded his fiduciary duties. On Friday July 15, Stuart Epstein ("Epstein"), the Morgan Stanley investment banker representing Viacom, tried to reach Sheehan but was unsuccessful. (Sheehan Tr. at 83:12-18; J.A. Ex. 175). Sheehan instructed his secretary as follows: "Do not tell [Epstein] anything about what I am doing or where I am[.]" (J.A., Ex. 175). In reply to his email, Sheehan's secretary informed him that she told Epstein that he was "unavailable." (*Id.*). A reasonable jury could conclude that this email chain evinces Sheehan's intent to avoid Viacom's representatives.

#### ii.    The Other Six Directors

In *Gesoff v. IIC Industries, Inc.*, 902 A.2d 1130 (Del. Ch. 2006), the court stated that bad faith may be found where directors have "acted with conscious disregard *or made decisions with knowledge that they lacked material information.*" *Id.* at 1165 (emphasis added). Few Delaware cases attempt to define precisely what conduct reaches the level of actionable bad faith, but there is at least agreement that "adopting a 'we don't care about the risks' attitude concerning a material corporate decision" constitutes bad faith. *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003) (finding bad faith claim properly alleged where factual allegations, if true, implied that "the defendant directors *knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss") (emphasis in original).

Having reviewed the record in full, we conclude that there is sufficient admissible evidence to create a triable question of fact as to whether the rest of the board, as in *Macmillan*, "plac[ed] the entire process in the hands of" Rosenblatt and to a lesser extent Sheehan and thereby "materially contributed to the [allegedly] unprincipled conduct of those upon whom it looked with a blind eye." 559 A.2d at 1281.

On February 9, 2005, the Intermix board of directors formed a Transaction Committee comprised of Rosenblatt, Sheehan, and Quandt. (Rosenblatt Decl. ¶ 6). From that point until July 18, 2005 when the merger was announced, it is undisputed that the Board received most of its information about the negotiations from its self-interested CEO, Rosenblatt. Indeed, it is undisputed that Rosenblatt was the only board member who had some first-hand information as to the circumstances of Viacom's efforts to put in a bid. (*See, e.g.*, Joint Statement of Uncontroverted Facts P347 ("Rosenblatt was the only person from the Intermix Board who negotiated with Viacom.")). Crucially, one of the board members testified that Rosenblatt had led him to believe "[t]hat Viacom was less urgent about the deal and hadn't taken the time or done the same level of work as Fox Network" and that Viacom was a "pipedream." (J.A., Ex. 182; Mosher Tr. at 25:24-26:1). This phrase is admittedly not indicative of *conscious* wrongdoing. However, there is a triable question as to whether the other board members

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|----------|----------------------|------|---------------|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|-------|-------------------------------------|

consciously abdicated their responsibilities as corporate fiduciaries in allegedly swallowing Rosenblatt's version of events and utterly failing to assess the situation for themselves.

More generally, a reasonable fact-finder could conclude that the other board members acted in bad faith by making "decisions with knowledge that they lacked material information." *Gesoff*, 902 A.2d at 1165. With respect to their knowledge of the relative likelihood of a Viacom bid, Mosher stated that he could not recall if he or any other board member had "asked any questions regarding Viacom or its status." (Mosher Tr. at 26:14-21). Additionally, he could not recall whether he had "any knowledge of whether anyone from management was providing equal information to Viacom and Fox News Corp about the time line" for submitting a bid for Intermix. (*Id.* at 43:17-21).

With respect to their knowledge of bidder favoritism, though Mosher testified that he could not recall the board ever instructing Rosenblatt to favor one bidder over another, he also could not definitively represent that the board had *not* so instructed Rosenblatt. (*Id.* at 41:10-21). Other board members besides Rosenblatt have also testified that they were unaware that any due diligence meetings with Viacom had been cancelled. (Brewer Tr. at 119:11-15; Sheehan Tr. at 98:1-20). Furthermore, Brewer testified that he was simply unaware that Viacom was conducting due diligence over the July 16-17, 2005 weekend. (Brewer Tr. at 26:5-24).

With respect to their knowledge of the fairness of the merger price, Rosenblatt did not inform Brewer that he was requesting $12 per share from News Corp. until the day of the "handshake deal" with Rupert Murdoch; it is unclear when the rest of the board learned this information. (*Id.* at 122:2-9). He also did not explain how that requested price was derived. (*Id.* at 122:10-14). Brewer testified that the board did not ask, and Mosher could not recall whether any board member sought an explanation. (*Id.*; Mosher Tr. at 53:6-9). Moreover, Brewer testified that the board as a whole never conducted any independent analysis to determine what "an appropriate price per share" would be. (Brewer Tr. at 122:15-18; *see also* Mosher Tr. at 49:24-50:4 (testifying that he himself did not perform any independent analysis)). Additionally, Mosher confirmed that the board had not "directed the management team to go get the specific valuation work done prior to the acquisition." (Mosher Tr. at 52:4-18). Finally, Brewer has testified that he could not even recall whether any of the directors had asked "any questions about [Montgomery and TWP's] fairness presentations." (Brewer Tr. at 104:2-10). Though Brewer's failure to recall what everyone had specifically asked back in 2005 would be understandable, a reasonable jury might draw a negative inference from his representation that he could not recall any discussion as to the investment banks' analyses.

Construing all of the above testimony in the light most favorable to Plaintiff as we must on Defendants' motion for summary judgment, we conclude that it is at least triable as to whether the remaining six board members consciously disregarded their duties and acted in bad faith. There is evidence in the record suggesting that no one on the board asked any questions about the requested per share price, the treatment of the competing bidders, the fairness valuations, or the relative likelihood of a Viacom bid. A reasonable jury could infer that this evidence demonstrates the other six directors consciously abdicated their roles as corporate fiduciaries required by law to do their utmost to maximize

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

shareholder wealth. Of course, we remain mindful that even gross negligence, premised on "simple inattention or failure to be informed of all facts material to the decision[,]" violates only the duty of care and is not actionable as bad faith. *Disney*, 906 A.2d at 66. Nevertheless, we think a reasonable jury could find that the other six directors exceeded the bounds of negligent conduct, willfully proceeded to their decisions knowing they lacked material information, *Gesoff*, 902 A.2d at 1165, and thereby consciously disregarded their fiduciary duties. *Disney*, 906 A.2d at 66 ("Cases have arisen where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision. To protect the interests of the corporation and its shareholders, fiduciary conduct of this kind, which does not involve disloyalty (as traditionally defined) but is qualitatively more culpable than gross negligence, should be proscribed.").

### c.    The MySpace Option

The MySpace, Inc. Stockholders Agreement ("MSA") (J.A., Ex. 2), executed on February 11, 2005, was the culmination of negotiations between MySpace, Inc., MySpace Ventures, LLC, Redpoint Ventures I, L.P., Redpoint Associates I, LLC, Redpoint Ventures II, L.P., Redpoint Associates II, LLC, Redpoint Technology Partners Q-1, L.P., and/or Redpoint Technology Partners A-1, L.P. (collectively, "the Redpoint Entities"). (Brewer Decl. ¶ 6; Rosenblatt Decl. ¶ 7). Under the agreement, the Redpoint Entities purchased a 47 percent minority interest in Intermix, and at the same time, the 53 percent majority stockholders acquired an option ("the MySpace Option") to buy back that minority interest if a third party made a "bona fide . . . offer" for 50 percent or more of Intermix's shares:

> So long as Intermix (together with its Affiliates) directly or indirectly holds at least 1,000,000 shares of Common Stock . . . , in the event Intermix receives a bona fide third-party offer with respect to a Change of Control of Intermix . . . within the twelve (12) month-period commencing on the date hereof . . . , then, following receipt of such offer (and provided discussions relating to such offer are then-ongoing), Intermix shall have the right to purchase . . . up to 100% of Common Stock and Common Stock Equivalents of the Corporation held by the other Stockholders, whether now owned or hereafter acquired . . . .

(J.A., Ex. 2 § 7.1.1; Brewer Decl. ¶¶ 6-7; Rosenblatt ¶¶ 7-8). Section 7.1.5 of the MSA precluded the majority from exercising the MySpace Option if a third party made a direct bid for MySpace of over $125 million: "Intermix may not exercise the Purchase Option if (a) the Corporation [MySpace, Inc.] has previously received a bona fide third party offer to purchase the Corporation's capital stock or assets for a purchase price greater than $125.0 million and discussions regarding such acquisition between the Corporation and such third party are ongoing . . . ." (J.A., Ex. 2 § 7.1.5). The two provisions are mutually exclusive: (1) a bid for 50 percent or more of Intermix's shares precludes any subsequent direct bid for MySpace (while discussions for the Intermix control share are ongoing); and (2) any direct bid for MySpace precludes any subsequent bid for 50 percent or more of Intermix's shares (while discussions for the acquisition of MySpace are ongoing).

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

Defendants contend their conduct was not in bad faith in light of the risk of a direct third-party bid for MySpace, which would have precluded the 53 percent Intermix majority interest from exercising the MySpace Option under the MSA to purchase the minority 47 percent interest. Accordingly, we must consider whether the purported risk of a direct bid for MySpace, which would have frozen the MySpace Option, dictates a conclusion that Defendants did not consciously disregard their duties as a matter of law.

Defendants claim that the risk of such a freezing bid was real and that any delay in consummating the merger with News Corp. threatened the loss of an opportunity to capture the value of Intermix's crown jewel, MySpace, for their shareholders. (Joint Br. 11-15). At the July 15th board meeting at 2 p.m., the directors discussed the status of conversations with News Corp. and Viacom and considered the possibility that if either company "viewed itself as unlikely to prevail in acquiring [Intermix], it might submit an offer to acquire only MySpace in order to potentially suspend, at least temporarily, [Intermix's] ability to exercise the MySpace option, thereby potentially jeopardizing economically attractive transactions involving the Company including the potential News Corp. transaction then under consideration." (Rosenblatt Decl. ¶ 31; J.A., Ex. 12). Rosenblatt and the other directors have declared that they "believed that the deadline provided by News Corp. by which to execute the Merger Agreement was firm and that News Corp. was prepared to walk away if the deal was not consummated by the opening of the stock market on July 18, 2005." (Rosenblatt Decl. ¶ 46).

To substantiate their purported concern over a potential freeze-out bid, Defendants suggest that a "bona fide third-party offer" can only mean a fully executed agreement, as in the written merger agreement executed on July 18, 2005. (Joint Br. 93-97). We reject Defendants' assertion that this proposed construction of "bona fide third-party offer" is compelled as a matter of law. Under Sections 7.1.1 and 7.1.5 of the MSA, a subsequent bid for MySpace or the Intermix control share, respectively, will only be precluded if discussions regarding the "bona fide third-party offer" are "ongoing." This language in the agreement suggests that the term "bona fide offer" does not contemplate the final execution of an agreement, at which point discussions would no longer be "ongoing."

Even though we reject Defendants' construction of the phrase "bona fide third-party offer" in the MSA, we also reject Plaintiff's request that we rule as a matter of law on the purely legal question of what constitutes a "bona fide third-party offer" under Sections 7.1.1 and 7.1.5 of the MSA. In our view, Plaintiff's request misses the point. We are not here to construe the terms of the MSA, as such. Rather, the question is whether there is a triable issue that Defendants, reasonably fearing being frozen out of the MySpace Option, tilted the field in News Corp.'s favor for the permissible purpose of maximizing shareholder wealth, or whether Defendants had no such reasonable fear, but merely used the MySpace Option as a rationalization for a selfish or idiosyncratic desire to favor News Corp. unrelated to securing top dollar for the shareholders. We think the evidence fairly presents such triable issues as to Defendants' purported conscious disregard of their duties. In any event, our *post hoc* legal determination cannot dictate the result of the question of the propriety of Defendants' conduct that indisputably occurred without the benefit of our construction of the MSA.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

Accordingly, we hereby **DENY** Plaintiff's Motion for Summary Judgment on this question of contractual interpretation.

In light of all the reasons set forth above, we hereby **DENY** Defendants' Motion for Summary Judgment on the fiduciary duty claim with respect to Plaintiff's bad faith theory in the *Revlon* auction context.

### 2.    Self-Interested Transaction

In the alternative, Defendants move for summary judgment on the second theory supporting the breach of fiduciary duty claim, arguing that five of the eight Defendants (a majority) were not self-interested or controlled by someone who was.  The Delaware Supreme Court summarized the governing law in *Cinerama, Inc. v. Technicolor, Inc.*:

> A board of which a majority of directors is interested is not a "neutral decision-making body." *See, e.g., Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 42 n. 9 (1994) ("[w]here actual self-interest is present and affects a majority of the directors approving a transaction, a court will apply [the entire fairness test]"); *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984).  A majority of disinterested directors is not "independent" if that majority was dominated by an interested director.  *See Heineman v. Datapoint Corp.*, Del.Supr., 611 A.2d 950, 955 (1992).  Similarly, the manipulation of the disinterested majority by an interested director vitiates the majority's ability to act as a neutral decision-making body.  *See Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261, 1279 (1989).

663 A.2d 1156, 1170 n.25 (Del. 1995).  Accordingly, Plaintiff must make two showings.  "First, the plaintiff must proffer evidence showing that those members of the board had a material self-interest in the challenged transaction[,]" and this must be "evidence of a substantial self-interest suggesting disloyalty, such as evidence of entrenchment motives, vote selling, or fraud."  *Goodwin*, 1999 WL 64265, at *25 (citing *Cede II*, 634 A.2d at 362-63; *Cinerama*, 663 A.2d at 1169).  "Second, the plaintiff must show that those materially self-interested members either: a) constituted a majority of the board; b) controlled and dominated the board as a whole; or c) i) failed to disclose their interests in the transaction to the board; ii) and a reasonable board member would have regarded the existence of their material interests as a significant fact in the evaluation of the proposed transaction."  *Id.* (citing *Cinerama*, 663 A.2d at 1168).

There were eight directors on the Intermix board at the time of the merger: Rosenblatt, Sheehan, Mosher, Quandt, Brewer, Carlick, Moreau, and Woodward.  Rosenblatt was conflicted due to his interest in becoming the head of Fox Interactive Media.  He aimed to "receiv[e] a personal benefit from a transaction not received by the shareholders generally."  *Cede II*, 634 A.2d at 362; *McGowan*, 2002 WL 77712, at *2 (deeming contracts for post-merger employment in acquiring entity a "disabling conflict of interest"); *Goodwin*, 1999 WL 64265, at *25 (finding "a triable issue of fact regarding whether [directors'] expectations constituted a material interest in the merger not shared by the

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

stockholders" but granting summary judgment on lack of evidence that any material interest infected deliberative process); *Oliver*, 2006 WL 1064169, at *19 ("[A]s a consequence of their personal interest in the negotiation of the Accord Agreement, in light of its potential impact on their rights under their employment agreements, they also were self-interested."). Rosenblatt did not simply seek to retain his current position, but sought to secure a coveted position at the top of a division at News Corp. Accordingly, read in conjunction with other admissible evidence we have cited previously, this self-interested motivation is suggestive of disloyalty.

Defendants argue that Rosenblatt's interests were coterminous with the shareholders' interests because every additional dollar increase in the price paid per share would yield roughly an additional $2 million for Rosenblatt, a significant shareholder in Intermix. (Rosenblatt ¶ 51; Joint Statement of Uncontroverted Facts D89). This argument, however, misses the point that Rosenblatt arguably stood to gain more money and prestige by becoming the "grand Puba" of Fox Interactive Media. If Chris DeWolfe, the former CEO of MySpace, stood to make a $30 million salary over two years if retained by the merged entity (the Parties appear to agree on this point) (*see* Joint Br. 37 n.42, 41-42), a reasonable jury could infer that Rosenblatt, as head of Fox Interactive Media, would have been offered an even higher salary. As such, a per share price of well above $20 would be needed to offset Rosenblatt's conflicting interest in a $30 million (or higher) salary. (*Id.* at 41-42). Defendants only reiterate that Rosenblatt stood to gain a greater benefit from each incremental increase in the per share price.

It is undisputed that no director instructed any other director on how to vote or was influenced by how other board members voted. (Joint Statement of Uncontroverted Facts D95-96; Brewer Decl. ¶ 36; Carlick Decl. ¶ 38; Mosher Decl. ¶ 34; Moreau Decl. ¶ 36; Quandt Decl. ¶ 42; Rosenblatt Decl. ¶ 49; Sheehan Decl. ¶ 44; Woodward Decl. ¶ 34). The real question is whether each board member acted independently and free of any manipulation by the interested members, principally Rosenblatt, *i.e.* whether "[e]ach Board Member exercised his independent judgment and consideration in deciding how to vote." (Joint Statement of Uncontroverted Facts D97). In virtually identical declarations, the directors claim they were not so manipulated. (Brewer Decl. ¶ 36; Carlick Decl. ¶ 38; Mosher Decl. ¶ 34; Moreau Decl. ¶ 36; Quandt Decl. ¶ 42; Rosenblatt Decl. ¶ 49; Sheehan Decl. ¶ 44; Woodward Decl. ¶ 34). On the other hand, Plaintiff argues that Rosenblatt deliberately misled the other board members regarding the viability of the Viacom bid, steering them into approving the merger without waiting even a couple more days to see if Viacom would top News Corp.'s offer. (Joint Br. 26-27). Plaintiff cites an email Mosher sent to Rosenblatt after one of the July 15th meetings, stating: "We need to honor our commitment to Fox and get this done. Viacom sounds like a pipedream. Fox sounds dead serious and not screwing around." (J.A., Ex. 182). When asked about this email during his deposition, Mosher testified that Rosenblatt's periodic updates to the board had led him to believe "[t]hat Viacom was less urgent about the deal and hadn't taken the time or done the same level of work as Fox Network." (Mosher Tr. at 25:24-26:1, 26:5-13). He also noted that: "The discussion around Viacom that the management team had led indicated that Viacom did not seem as willing to come to the table with an offer for the company." (*Id.* at 25:1-4). This evidence is sufficient to raise an inference that Rosenblatt's presentation to the board may have been misleading as to Viacom's seriousness. According to Mosher's description of the board meetings, "from the management team estimation

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

standpoint [*sic*], they were not inclined to make an offer for the company on the time line that we were looking at." (*Id.* at 25:18-21). Viewing the evidence as a whole in the light most favorable to Plaintiff, including the contrary evidence that Viacom was indeed very seriously interested in bidding on Intermix,[15] there are at least triable issues of fact as to whether Mosher was manipulated by a self-interested director, Rosenblatt.

Moreover, based on Mosher's description of the content of Rosenblatt's presentations to the board, the issue of manipulation is triable with respect to all of the other board members. Accordingly, as a reasonable jury could potentially conclude that a majority of the directors was interested or manipulated by someone who was, we hereby **DENY** Defendants' Motion for Summary Judgment on this second basis for Plaintiff's claim of breach of the duty of loyalty.

**III.    Count II: Violation of Section 14(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a-9**

On August 25, 2005, Intermix issued a proxy statement ("Proxy") concerning the News Corp. merger. (Rosenblatt Decl. ¶ 53). On September 30, 2005, a majority of Intermix shareholders voted to adopt the Merger Agreement. (*Id.* ¶ 55). Plaintiff alleges that there were five material omissions in the Proxy. (J.A., Ex. 4). To succeed on "a claim under § 14(a) and Rule 14a-9, a plaintiff must establish that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *New York City Employees' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010) (citation and internal quotation marks omitted); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.14a-9(a) ("No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.").

---

[15] Van Toffler of MTV emailed Rosenblatt on July 17 to note that his people were "in the office working around the clock so [Viacom could] put forth a number to [him that] week." (J.A., Ex. 202). On the same day, Jason Hirschhorn of Viacom informed Chris DeWolfe that he has "had a team of 20+ people . . . working for 72 hours straight on a significant bid[.]" (*Id.*, Ex. 200).

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

    **A.**    ***Alleged Material Omissions***

       **1.**    **MySpace's Then-Current Revenue and Profits**

       Defendants first argue that Plaintiff failed to identify the alleged material omission of MySpace's then-current revenue and profits as a basis for this Section 14(a) claim in its responses to their interrogatories, thereby waiving this ground for his Section 14(a) claim. (Joint Br. 45 n.49). We disagree. First, the CSAC clearly alleges that Defendants omitted "the current revenues and profits being generated by MySpace." (CSAC ¶¶ 130-33). Second, our July 14, 2008 Order clearly identified this purported material omission as one of the five surviving bases for the Section 14(a) claim. (Dkt. No. 110, at 5). Third, whether Plaintiff actually identified this alleged material omission in his Revised Objections and Responses to Defendant VP Alpha Holdings IV, L.L.C.'s First Set of Interrogatories is unclear. (J.A., Ex. 28). Most of the response to Interrogatory No. 1 focused on the conspicuous absence of internal projections for MySpace's prospective growth, not the company's then-current revenue and profits. (*Id*. at 513-15). Plaintiff did not use the phrase "current revenue and profits," but rather, stated the following:

       [S]hareholders . . . *were never made aware of MySpace's true value* or its true growth potential, and had no way of comparing the information that was publicly available to management's projections and growth assumptions. *Thus, even though certain metrics that were used to track MySpace's growth were available from some hard to find public sources (and were not made available by the Company directly to its shareholders), shareholders and other members of the investing public could not compare this data to the Company's internal data* to determine if the Investment Banks' fairness opinions accurately reflected the explosive growth of MySpace.

(*Id*. at 515 (emphasis added)). Although somewhat opaque, we think the highlighted text above can fairly be read to embrace internal data on MySpace's then-current financial position. Fourth, during the Parties' Local Rule 7-3 meet and confer, according to Defendants, Plaintiff did not identify this alleged omission. (Joint Br. 45 n.49). Sheehan and Carlick's counsel has also declared that Plaintiff was asked at the meeting whether they were pursuing "any other misstatements or omissions," but he does not declare that Plaintiff's counsel answered the question in the negative, thereby waiving this basis. (J.A., Ex. 30, Knaster Decl. ¶¶ 8-9). Fifth, Plaintiff's counsel also circulated a letter outlining the issues discussed at the meet and confer, which did not list this purported material omission. (J.A., Ex. 35). However, since this document purports to be an outline of the summary judgment arguments Defendants identified, we decline to conclude that this document contemplated a waiver of the "current revenue and profits" omission, which was so clearly identified in the CSAC (if not so clearly in the interrogatory responses). Accordingly, as this argument was not waived, and Defendants have not made any threshold showing entitling them to summary judgment on this basis, we **DENY** the Motion for Summary Judgment as to this alleged material omission under Count II.

       **2.**    **Intermix Management's 2005-2009 Financial Projections**

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

Plaintiff also alleges that Defendants failed to disclose Intermix management's internal financial projections, and that this information was material. The Supreme Court set forth the materiality standard for Section 14(a) claims in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976): "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id*. at 449. The Court added that "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id*.

While federal courts generally agree that financial projections, "forward-looking statements," "puffing," or other soft financial information need not be disclosed, this case is distinguishable. *See, e.g., Walker v. Action Indus., Inc.*, 802 F.2d 703, 707-08 (4th Cir. 1986); *Flynn v. Bass Bros. Enters., Inc.*, 744 F.2d 978, 985 (3d Cir. 1984) (noting SEC policy favoring nondisclosure of financial projections due to their unreliability and potential to mislead voting stockholders). In this case, the Proxy disclosed Montgomery and TWP's fairness analyses but did not disclose the underlying 2005-2009 Intermix management projections used in formulating those opinions. In *Zemel Family Trust v. Philips International Realty Corp.*, No. 00 CIV. 7438 MGC, 2000 WL 1772608 (S.D.N.Y. Nov. 30, 2000), the court honed in on this distinction:

> A company has no duty to include "speculative financial predictions" in a proxy. However, if a Proxy discloses valuation information, it must be complete and accurate. Both the proxy and the [financial valuation] opinion address the value of the Third Avenue property and so [the defendant] has a duty to fully and accurately disclose information related to the valuation.

*Id*. at *6.

Here, the "total mix" of information before the shareholders did not include any of the projected growth rates. *See SEC v. Mozilo*, No. CV 09-3994-JFW, 2009 WL 3807124, at *10 (C.D. Cal. Nov. 3, 2009) ("[T]he 'total mix' of information only includes information that is 'readily' or 'reasonably' available to an investor."); *Koppel v. 4987 Corp.*, 167 F.3d 125, 132 (2d Cir. 1999) (same). A reasonable shareholder would have wanted to independently evaluate management's internal financial projections to see if the company was being fairly valued. "[T]here is a substantial likelihood that a reasonable shareholder would consider it important" in making his decision. *TSC Indus., Inc.*, 426 U.S. at 449. As we previously noted in our July 14, 2008 Order, the Ninth Circuit has observed that: "investors are concerned, perhaps above all else, with the future cash flows of the companies in which they invest. Surely, the average investor's interest would be piqued by a company's internal projections . . . ." *United States v. Smith*, 155 F.3d 1051, 1064 n.20 (9th Cir. 1998). Delaware courts concur. In a case that also considered a discounted cash flow ("DCF") analysis in a proxy statement, the same technique utilized by Montgomery and TWP, the court held that the underlying projections informing a DCF analysis completed for a fairness opinion were clearly material. *See In re Netsmart Techs. S'holders Litig.*, 924 A.2d 171, 203 (Del. Ch. 2007) ("[P]rojections of this sort are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or . . . market multiples. What they cannot hope to do is replicate management's inside

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

view of the company's prospects.").[16]   Here, we conclude that there is at least a triable issue as to the materiality of the omission of Intermix's internal financial projections.

Accordingly, Defendants' Motion for Summary Judgment is **DENIED** as to this alleged material omission.

### 3.      Outstanding Derivative Lawsuits

Plaintiff also argues that Defendants failed to disclose one pending derivative lawsuit, *LeBoyer v. Greenspan, et al.*, No. CV 03-5603-GHK (JTLx), and the fact that shareholder derivative standing would be extinguished as to both *LeBoyer* and *Greenspan v. Salzman*, the two derivative lawsuits pending at the time the Proxy was issued.   The Proxy merely stated: "Following the effective time of the merger, Fox Interactive Media will use commercially reasonable efforts to take such actions as are within its control so as to obtain the dismissal of Greenspan v. Salzman, et al., LASC No. BC328558; provided that it will not be required to make any payments to any of the plaintiffs (or their counsel) in such litigation to do so."   (J.A., Ex. 4, at 332).

Defendants concede that they did not disclose the existence of the pending *LeBoyer* action. (Joint Br. 56 n.67).   However, Defendants maintain that this lawsuit had been disclosed in Intermix's prior public filings (*see* J.A., Exs. 47 (Form 10-Q), 3 (Form 10-K)), which they argue were incorporated by reference in the Proxy.   A document "may be incorporated into proxy materials by reference, at the least, in circumstances where 'no reasonable shareholder can be misled.'"   *Federated Bond Fund v. Shopko Stores, Inc.*, No. 05 CV 9923(RO), 2006 WL 3378696, at *2 (S.D.N.Y. Nov. 17, 2006) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 777 (2d Cir. 1991)).   We do not think this is a case where "no reasonable shareholder can be misled."   *Id.*   Moreover, "[c]orporate documents that have not been distributed to the shareholders entitled to vote on the proposal should rarely be considered part of the total mix of information reasonably available to those shareholders."   *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199-1200 (2d Cir. 1993) (rejecting notion that public reports and 10-K Report submitted to SEC were part of "total mix").   Accordingly, whether the undisclosed derivative lawsuit constituted material information which was not part of the "total mix" of information is at the very least a triable question.

With respect to the disclosed *Greenspan v. Salzman* action, Defendants argue they had no obligation to further announce the extinguishment of derivative standing.   In Delaware, with only two exceptions not applicable here, a cash-out merger extinguishes the standing of shareholder plaintiffs to maintain a derivative suit.   *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del. 2008) (citing *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984)).   This is so because a plaintiff must be a stockholder at the time of the alleged wrongdoing and throughout the litigation.   *Lewis*, 477 A.2d at 1046.   The failure to

---

[16] Even though this decision concerned a state law duty of disclosure claim, the materiality standard is the same as set forth in *TSC Industries*.   *In re Netsmart Techs.*, 924 A.2d at 199-200.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

disclose the potential extinguishment of a derivative lawsuit is material. *See Lichtenberg v. Besicorp Group Inc.*, 43 F. Supp. 2d 376, 387 (S.D.N.Y. 1999). In *Lichtenberg*, the court noted that the proxy stated that the shareholder plaintiffs "may" not be able to maintain their derivative suits following the merger. *Id.* The court found the word "may" to be "affirmatively misleading," because it "implie[d] a possibility that the plaintiffs will be able to continue the actions as shareholder derivative suits," when that was in fact foreclosed as a matter of New York law. *Id.* Here too, the disclosure above is arguably misleading as well, as it did not affirmatively disclose that the *Greenspan v. Salzman* plaintiffs' derivative standing would be extinguished under Delaware law. (J.A., Ex. 4, at 332). Instead, it only stated that Fox Interactive Media would seek the dismissal of the action and would do so only if it was not required to pay the plaintiffs or their counsel. (*Id.*). Accordingly, it is at least triable whether the above language was misleading as to the extinguishment of derivative standing, which was material information.

Accordingly, we also hereby **DENY** Defendants' Motion for Summary Judgment as to this alleged material omission.

### 4. Alleged Material Omissions Concerning Viacom and the MySpace Option

Plaintiff has also argued that the directors made two other material omissions concerning: (1) Viacom's ability to make an offer for Intermix or its ability to conduct due diligence; and (2) the likelihood of a direct bid for MySpace, which would freeze the MySpace Option. This subpart of the Section 14(a) claim essentially seeks to penalize Defendants for their failure to disclose that Viacom was allegedly stonewalled or otherwise prevented from making a bid during the auction. It also seeks to hold Defendants liable for purportedly exaggerating the threat of a direct bid for Intermix's crown jewel, MySpace.

However, these purported material omissions are nothing more than the building blocks of Plaintiff's fiduciary duty claim. Mandating the disclosure of the above allegations would compel Defendants to essentially accuse themselves of breaching their fiduciary duties. In *Koppel v. 4987 Corp.*, the court dismissed Rule 14a-9 claims based on its conclusion that "these allegations constitute no more than state law breach of fiduciary duty claims under a thin coat of federal paint." 167 F.3d at 133. The court explained:

We have long recognized that no general cause of action lies under § 14(a) to remedy a simple breach of fiduciary duty. *See Field v. Trump*, 850 F.2d 938, 947 (2d Cir. 1988) (quoting *Maldonado v. Flynn*, 597 F.2d 789, 796 (2d Cir. 1979)), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); *cf. Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (refusing to construe § 10(b) to prohibit "instances of corporate mismanagement . . . in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary"). Although the Supreme Court has explained that explicit, conclusory statements concerning the wisdom of a proposed action are actionable, *see generally Virginia Bankshares*, 501 U.S. 1083, 111 S.Ct. 2749, there is no § 14(a) violation for merely failing to

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | | Date | June 17, 2010 |
|---|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | | |

inform shareholders that a proposed action is not subjectively the most beneficial to an entity's shareholders: "Subjection to liability for misleading others does not raise a duty of self-accusation; [rather] it enforces a duty to refrain from misleading." *Id.* at 1098 n. 7, 111 S.Ct. 2749. The securities laws do not "effectively require [an issuer] to accuse [it]sel[f] of breach of fiduciary duty." *Id.*

*Id.* at 133-34. The D.C. Circuit has arrived at the same conclusion: "Though *Santa Fe* does not bar a claim related to a breach of fiduciary duty if there has been a material misrepresentation or omission, a plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty." *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986) (citations omitted).

In this case, the Proxy unambiguously disclosed Rosenblatt's self-interested motivations, anticipated future employment with News Corp., and the immediate vesting of all his unvested options. (J.A., Ex. 4, at 272, 310, 312). The Proxy also disclosed that Viacom ("Company D") conducted due diligence and remained interested in making a bid for Intermix, but was "not then in a position to make a proposal [prior to] a [Viacom] board meeting later that week . . . ." (*Id.* at 287, 289). Plaintiff claims this disclosure was misleadingly incomplete, because it did not mention Rosenblatt's alleged evasion of Viacom executives and the alleged deliberate hampering of Viacom's due diligence efforts. (CSAC ¶¶ 147-48). Plaintiff claims that these omissions "left shareholders with the false impression that Viacom was given a full and fair opportunity to bid for the Company." (*Id.* ¶ 148). Plaintiff also claims that Defendants misrepresented Viacom and News Corp.'s ability to block a competing bid by freezing the MySpace Option. (CSAC ¶¶ 149-51 (citing J.A., Ex. 4, at 284, 288)). As there is no duty of self-accusation, these proffered material omissions cannot support a Section 14(a) claim. Indeed, the allegedly omitted details are not necessarily *facts*, but rather factual *allegations*, and unless and until judgment is granted in Plaintiff's favor, their omission from the Proxy simply could not have been material. In *Brown v. Perrette*, No. CIV.A 13531, 1999 WL 342340 (Del. Ch. May 14, 1999), the court explained this distinction:

Although a flawed bidding process would be a material fact, [the plaintiff] must prevail on the substantive claim, that the process was flawed, before the alleged flaw becomes material. Once [the plaintiff] prevails on her *Revlon* claim, the alleged disclosure claim becomes superfluous because the defendants' breach of duty becomes the wrong for which an appropriate remedy must be crafted.

E-Filed

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

*Id.* at *10-11[17]; *see also Stroud v. Grace*, 606 A.2d 75, 84 n.1 (Del. 1992) ("We recognize the long-standing principle that to comport with its fiduciary duty to disclose all relevant material facts, a board is not required to engage in 'self-flagellation' and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter.") (citation omitted).

Accordingly, since "self-flagellation" omissions are not material, we hereby **GRANT** Defendants' Motion for Summary Judgment as to the purported material omissions concerning Viacom and the MySpace Option.[18]

### B.  Negligence

In *Desaigoudar v. Meyercord*, 223 F.3d 1020 (9th Cir. 2000), the Ninth Circuit stated that a "Rule 14a-9 plaintiff must demonstrate that the misstatement or omission was made with the requisite level of culpability . . . ." *Id.* at 1022 (citation omitted).  To succeed on a Section 14(a)/Rule 14a-9 claim, a plaintiff need only establish that the defendant was negligent in drafting and reviewing the proxy statement.  *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1300-01 (2d Cir. 1973) (holding that negligence suffices for claim based on misleading proxy statement and that plaintiffs "are not required to establish any evil motive or even reckless disregard of the facts").  This holding was reaffirmed in the oft-cited case of *Wilson v. Great American Industries, Inc.*, 855 F.2d 987 (2d Cir. 1988): "Liability can be imposed for negligently drafting a proxy statement." *Id.* at 995 (citing *Gerstle*, 478 F.2d at 1301 n.20).  "As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the *Gerstle* negligence standard." *Id.*  Accordingly, a director may be found negligent under Section 14(a) for a failure to notice material omissions upon reading a proxy statement.  *See, e.g.*, *Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 697, 703 (M.D.N.C. 1992) ("Mr. Eagle [a senior in-house lawyer] is not the only negligent party in this action.  Each of the directors who reviewed the proxy statement is equally as negligent for failing to notice the use of the word 'restricted' ten times in the document.").

Here, each of the Defendants has declared that he was "involved in the process of preparing, reviewing, and disseminating the Proxy Statement to Intermix shareholders."  (Sheehan Decl. ¶ 53 (internal citation omitted); Carlick Decl. ¶ 46; Brewer Decl. ¶ 39; Mosher Decl. ¶ 37; Moreau Decl. ¶ 39; Quandt Decl. ¶ 45; Rosenblatt Decl. ¶ 53; Woodward Decl. ¶ 37).  Construing this sworn statement in the light most favorable to Plaintiff, we read it to mean each director personally reviewed the Proxy

---

[17] Even though *Brown* analyzes the relationship between a state law fiduciary duty claim and a state law duty of disclosure claim, brought on the same grounds, the principles articulated are equally applicable to a Section 14(a) claim premised on the same allegations supporting a breach of fiduciary duty claim.

[18] Notwithstanding our ruling, nothing in the above discussion precludes Plaintiff from introducing evidence of these omissions in the course of his breach of fiduciary duty claim.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|----------|----------------------|------|---------------|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|-------|-------------------------------------|

before it was disseminated to the Intermix shareholders.  Since we have denied summary judgment with respect to three of the proffered material omissions in the Proxy, and Defendants have admitted to participating in "the process of preparing, reviewing, and disseminating" that Proxy, we must also **DENY** summary judgment with respect to the element of negligence.  If Plaintiff can persuade a jury as to both materiality and Defendants' participation in the preparation and/or review of the Proxy at trial, then a finding of negligence will flow from those findings.

    *C.*    ***Damages***

        **1.**    **Benefit-of-the-Bargain Damages**

        This theory of damages is wholly inapposite to this case.  A request for "benefit-of-the-bargain damages" seeks the "value that was represented as coming to" the shareholder under a particular transaction, such as a merger.  *In re Real Estate Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1142, 1152 (C.D. Cal. 2002).  "[B]enefit-of-the-bargain damages are available in the limited instance where a misrepresentation is made in the proxy solicitations as to the consideration to be forthcoming upon an intended merger."  *Id.* (citation omitted).  As the Ninth Circuit has stated, "[t]he benefit-of-the-bargain measure of damages allows a plaintiff to recover 'the difference between what the plaintiff *expected* he would receive . . . and the amount [the plaintiff] *actually received* . . . .'"  *DCD Programs, Ltd. v. Leighton*, 90 F.3d 1442, 1449 (9th Cir. 1996) (quoting *Cunha v. Ward Foods, Inc.*, 804 F.2d 1418, 1426 (9th Cir. 1986) (emphasis in original)).  Here, the Proxy made no misrepresentation as to the per share price offered to and ultimately received by the class members.  The Proxy stated the class members would receive $12 cash for each common share, and it is undisputed that they received $12 cash for each common share.  (J.A., Ex. 4, at 319; Joint Statement of Uncontroverted Facts D128).  Accordingly, this damages theory is not viable.  We **GRANT** summary judgment with respect to this damages theory.

        **2.**    **Out-of-Pocket Losses**

        *a.*    ***Legal Framework***

        "'Out-of-pocket' losses are the standard measure of damages for Rule 10b-5 and Section 14(a) claims."  *In re DaimlerChrysler AG Secs. Litig.*, 294 F. Supp. 2d 616, 626 (D. Del. 2003) (citing *Tse v. Ventana Med. Sys., Inc.*, 123 F. Supp. 2d 213, 222 (D. Del. 2000) ("*Tse II*")).  Out-of-pocket losses constitute "the difference between the fair value of all that the seller received and the fair value of what he would have received had there been no fraudulent conduct."  *Tse II*, 123 F. Supp. 2d at 222 (quoting *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 155 (1972)) (quotation marks omitted).  The Ninth Circuit concurs: "The out-of-pocket rule fixes recoverable damages as 'the difference between the purchase price and the value of the stock at the date of purchase.'"  *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1437 (9th Cir. 1987), *impliedly overruled in part on other grounds by Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577-78 (9th Cir. 1990) (*en banc*) (citation omitted).  "The guiding philosophy of the out-of-pocket theory of damages . . . is to award not what the plaintiff might have

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|----------|----------------------|------|---------------|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|-------|-------------------------------------|

gained, but what he has lost by being deceived into the purchase." *Id.* at 1437 n.2 (citation and internal quotation marks omitted). Since this theory of damages is premised on an intrinsic valuation of the company as it existed at the time of the merger, Plaintiff has produced expert witness testimony consisting of two different financial valuations of Intermix/MySpace. Defendants have moved to exclude that testimony as inadmissible.

> **b.      *Defendants' Motion to Exclude; Plaintiff's Motions to Strike***

Defendants move to exclude Plaintiff's proffered expert testimony by Dr. G. William Kennedy as inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Plaintiff has moved to strike both this Motion to Exclude and Defendants' Motion for Summary Judgment, arguing that this *Daubert* challenge was not included in the joint brief on the Cross-Motions for Summary Judgment and therefore violates our Order Re: Summary Judgment Motions. (Dkt. No. 123, Oct. 30, 2008). We reject this argument. First, Defendants included virtually the same arguments attacking Dr. Kennedy's testimony in the Joint Brief. (Mot. 77-80). Second, the Motion to Exclude is a challenge to the admissibility of evidence crucial to one of Plaintiffs' damages theories. As we may only consider *admissible* evidence in ruling on the Parties' Cross-Motions, nothing in the Order Re: Summary Judgment Motions precludes a party from filing a separate motion to exclude certain evidence from the Court's consideration. Third, it is common for litigants to move for the exclusion of certain evidence at the summary judgment stage. *See, e.g.*, *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1131 (9th Cir. 2002) ("Defendants linked their summary judgment motion to dozens of in limine motions challenging the admissibility of plaintiffs' expert witnesses, commonly known as '*Daubert* motions.'") (citation omitted); *O'Hanlon v. Matrixx Initiatives*, No. CV 04-10391-AHM (JTLx), 2007 WL 2446496, at *1, 4 (C.D. Cal. Jan. 3, 2007) (considering motions *in limine* concurrently with motion for summary judgment). Accordingly, we hereby **DENY** Plaintiff's Motions to Strike the Motion to Exclude and the Motion for Summary Judgment.

We now consider the merits of the Motion to Exclude. Defendants attack the reliability of Dr. Kennedy's application of his chosen methodologies for estimating the value of MySpace: (1) discounted cash flow ("DCF") analysis; and (2) comparable public company analysis. Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert*, the Supreme Court construed Rule 702 to require district courts to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The Court noted that "[p]ertinent evidence based on scientifically valid principles will satisfy those

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

demands" but cautioned that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.*; *id.* at 595. To assist courts in assessing whether the proffered testimony is scientifically valid, the Supreme Court set forth a non-exhaustive list of factors, including: "whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*") (citing *Daubert*, 509 U.S. at 593-94).

The "gatekeeping obligation" *Daubert* requires us to fulfill "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting Fed. R. Evid. 702). "Because there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies, trial judges are given broad discretion to determine whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case." *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (citing *Kumho*, 526 U.S. at 153) (internal citations and quotation marks omitted). Courts have stated that "[i]n such instances, other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations." *Id.* Though perhaps not to the same degree as psychology or social psychology, financial valuation is not an exact scientific methodology. Estimations, predictions, and inferences based on professional judgment and experience are key ingredients in any valuation. In a variety of contexts, the circuit courts have noted that economic valuation is less than an "exact science." *See, e.g.*, *In re Arnold & Baker Farms*, 85 F.3d 1415, 1421 (9th Cir. 1996) ("Experience has taught us that determining the value of real property at any given time is not an exact science. Because each parcel of real property is unique, the precise value of land is difficult, if not impossible, to determine until it is actually sold."); *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 830, 835 (7th Cir. 1985) (noting that "[t]he process of valuation is inexact" and that DCF analyses "are highly sensitive to assumptions about the firm's costs and rate of growth, and about the discount rate").

With respect to the DCF analysis, the principal difference from Montgomery and TWP's DCF fairness analyses is Dr. Kennedy's MySpace growth rate projections for 2007-2008 and 2008-2009. (Baron Decl., Ex. 3, Expert Report of Dr. G. William Kennedy ["Kennedy Report"], May 20, 2009). Intermix management projected the following revenue growth rates for the company: 107 percent for 2005-2006; 67 percent for 2006-2007; 20 percent for 2007-2008; and 15 percent for 2008-2009. (J.A., Ex. 242). Montgomery used these projections for its analysis without any modification. (Baron Decl., Ex. 3, at 39). TWP's projections differed slightly from management's projections: 107 percent for 2005-2006; 67 percent for 2006-2007; 21 percent for 2007-2008; and 10 percent for 2008-2009. (*Id.*). Kennedy adopted management's growth rate projections for 2005-2006 and 2006-2007, derived a deceleration rate of 62.06 percent from those figures, and then used that same deceleration rate to calculate different revenue growth rates for 2007-2008 and 2008-2009, 41.36 percent and 25.67 percent, respectively. (*Id.* at 39-40). Based on these new figures, Kennedy calculated new Earnings Before

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* | | |

Interest, Taxes, Depreciation and Amortization ("EBITDA") figures for 2008 and 2009 for MySpace. (*Id*. at 40). Finally, "[u]sing a discount rate of 19% and a terminal EBITDA multiple of 18[,]" Dr. Kennedy calculated "a value of $962.4 million after subtracting the $69 million option exercise price from the present value of MySpace's Cash Flows." (*Id*.). The 19 percent discount rate was chosen based on the discount rates used in the Montgomery and TWP fairness opinions, which ranged from 17 percent up to 25 percent. (*Id*. at 41).

Defendants make several arguments against the reliability of this procedure. They argue first that Dr. Kennedy has insufficiently justified his use of a uniform deceleration rate from 2005 to 2009 and the 18x terminal multiple. (Mot. 9-13). Defendants claim that Dr. Kennedy has offered no coherent reason for his rejection of management's projections for 2007-2008 and 2008-2009. (*Id*. at 11). They note that he has merely declared that Montgomery and TWP's projections "were unreasonably low and not consistent with the very rapid rates of growth currently observed at the time of the Proxy and expected in the social networking sector at the time." (*Id*. at 11 (quoting Moriarty Decl., Ex. 7, Kennedy Supplemental Decl. ¶ 6) (emphasis omitted)). Yet, Defendants neglect to mention that Dr. Kennedy explained his use of higher growth rates for 2007-2008 and 2008-2009 by noting that "MySpace revenues consistently outperformed Intermix management's own projections in each of the first four months of 2005." (Baron Decl., Ex. 3, Kennedy Report, at 35). This is at least one reasoned basis for his adjustments to what he viewed as demonstrably "conservative" forecasts. (*Id*.). After all, the entire endeavor is forecasting, not hard science. Projections themselves cannot be tested for accuracy; they "represent hopes rather than the results of scientific analysis." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005); *see also In re Orchards Village Invs., LLC*, No. 09-30893-rldll, 2010 WL 143706, at *11 (Bankr. D. Or. Jan. 8, 2010) ("[P]rojecting future financial results from the operations of a business is not an exact science.").

Additionally, Defendants argue that: "Kennedy provides no theoretical or empirical justification for applying this incredibly aggressive 18x terminal multiple, except his statement that it is based on forward EBITDA multiples observed in comparable publicly traded guideline companies" referenced in the comparable public company analysis below. (Mot. 12-13 (quoting Moriarty Decl., Ex. 1, Kennedy Report, at 15) (quotation marks omitted)). They assert that Dr. Kennedy only relied on "the most profitable of the 14 comparable companies relied upon by" Montgomery and TWP, including Google and Yahoo!, and could not summon a single company that had grown at the rate projected with his revenue growth rates and terminal value. (*Id*. at 13 (citing Moriarty Decl., Ex. 1, Kennedy Report, at 25; *id*., Ex. 6, Kennedy Tr. at 123:4-24)).

While these two challenges may be objections to Kennedy's *conclusions* on his DCF analysis, they do not render his methodology unreliable. Rather, the deviation from management's projections, the use of an arguably aggressive terminal multiple, and the alleged selection of the most profitable guideline companies are proper subjects for cross-examination. Defendants do not take issue with the

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

widely accepted DCF methodology;[19] nor do they attack any input that is identical to those used in the Montgomery and TWP projections (for instance, the 2005-2006 and 2006-2007 projections or the discount rate which fell within the same range in the investment banks' fairness analyses). Even in light of Dr. Kennedy's less than fully reasoned explanations for his choices, given the inherent element of judgment in these financial valuation analyses, we cannot say that he failed to identify any "reliable principles and methods" or to apply those "principles and methods reliably to the facts of [this] case." FED. R. EVID. 702. "A court may admit somewhat questionable testimony if it falls within 'the range where experts might reasonably differ, and where the jury must decide among the conflicting views.'" *S.M. v. J.K.*, 262 F.3d 914, 921 (9th Cir. 2001) (quoting *Kumho*, 526 U.S. at 153).

Defendants also argue that there is a fundamental flaw in Dr. Kennedy's DCF analysis, since it allegedly yields an average growth rate into perpetuity above that of the U.S. economy as a whole (12.74 percent versus a historical average of 6.5 percent). (Mot. 13-16; Cornell Decl. in Supp. of Mot. to Exclude ¶ 5). Arguing that this outcome violates a key tenet of financial valuation, Defendants cite to Professor Aswath Damodaran's treatise, which states: "The fact that a stable growth rate is sustained forever, however, puts strong constraints on how high it can be. Since no firm can grow forever at a rate higher than the growth rate of the economy in which it operates, the constant growth rate cannot be greater than the overall growth rate of the economy." (Defs.' Request for Judicial Notice ["RJN"], Ex. B, ASWATH DAMODARAN, DAMODARAN ON VALUATION: SECURITY ANALYSIS FOR INVESTMENT AND CORPORATE FINANCE 145 (John Wiley & Sons, Inc. 2d ed. 2006)). We have reviewed Defendants' expert Dr. Bradford Cornell's declaration in support of this Motion to Exclude, in which he argues that "Dr. Kennedy's use of an 18x EBITDA forward multiple is unreasonable . . . ." (Cornell Decl. in Supp. of Mot. to Exclude ¶ 5). To cross-check the outcome of Dr. Kennedy's DCF analysis, Dr. Cornell used three hypothetical scenarios, in which MySpace's revenue growth rate declines by 2 percent, 1 percent, and 0.5 percent, respectively, each year until it reaches 6.5 percent, the average annual growth rate in nominal Gross Domestic Product between 1928 and 2008. (*Id.* ¶¶ 8-10 (citing Defs.' RJN, Ex. F, Bureau of Economic Analysis News Release, July 31, 2009)). Using Dr. Kennedy's assumptions and the Gordon Growth Model (*id.* ¶¶ 11-13), Dr. Cornell calculated the following total present values as of January 1, 2010 and implied EBITDA multiples for each scenario: (1) for the 2 percent annual reduction, $549.13 million and a 4.7x multiple; (2) for the 1 percent annual reduction, $606.18 million and a 5.2x multiple; and (3) for the 0.5 percent annual reduction (what he calls the "most aggressive scenario"), $695.34 million and a 6.0x multiple. (*Id.* ¶¶ 14-19; *see also id.*, Exs. 5, 6). Applying the 19 percent discount rate used by Dr. Kennedy, Dr. Cornell calculates discounted values as of mid-2005 for each scenario, including: (1) $251.02 million; (2) $277.10 million; and (3) $317.8 million. (Cornell Decl. in Supp. of Mot. to Exclude ¶ 20). Finally, Dr. Cornell concludes that "even assuming an instance where MySpace's revenues grow at a rate exceeding that of the economy as a whole for fifteen years

---

[19] *Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (S.D.N.Y. 2003) ("Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow ('DCF') method.") (citations omitted); *see also Children's Broad. Corp. v. The Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir. 2001) (describing DCF analysis as "an uncontroversial accounting method").

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

after 2010, *i.e.*, until 2025, Dr. Kennedy's implied EBITDA multiple of 18x is *three times too high* when compared with even [Dr. Cornell's] most aggressive implied EBITDA multiple of 6.0x to give a reasonable estimate of MySpace's value as of mid-2005." (*Id.* ¶ 21 (emphasis original)).

Though a jury might conclude at trial that Dr. Kennedy's selection of an 18x EBITDA multiple was overzealous, Dr. Cornell's calculations do not demonstrate that Dr. Kennedy's *methodology* is fundamentally unreliable. At base, Dr. Cornell's challenge to this DCF analysis constitutes an attack on Dr. Kennedy's projections as to MySpace's annual growth rates and as to how long those growth rates can be sustained. Since Dr. Cornell is in essence attacking the reasonableness of Dr. Kennedy's projections, the generation of which we have already noted is not an exact science, we conclude that his arguments do not render Dr. Kennedy's methodology fundamentally unreliable and therefore inadmissible. Dr. Cornell himself has testified that an adjustment in the terminal multiple based on the expert's assessment of the company's growth potential is appropriate. (Baron Decl., Ex. 2 (Cornell Tr. I at 167:19-168:3)). Additionally, Dr. Cornell rejected the proposition that "any time that the implied perpetual growth rate exceeds the growth of the economy, that the terminal value multiple used would be unreliable[.]" (*Id.*, Ex. 1 (Cornell Tr. II at 21:21-22:1)). He further explained that "it's just a question of how much [the implied perpetual growth rate] exceeds [the economy rate,]" and there is no standardized method to determine whether the difference between the two rates is "unreasonable." (*Id.* at 22:3-24:6; *id.* at 23:12-25 ("Q[:] And then do they use judgment to see whether it's reasonable to them or not reasonable to them? . . . . Is there some written scale as to how much variation there can be before, in your view, it becomes reasonable or unreasonable; or is that a judgment of the analyst? A[:] Well, there's not a written scale . . . . And these calculations Dr. Kennedy used struck me as [unreasonable].")). These statements suggest that Defendants' Motion turns on a difference of professional opinion, not some fatal methodological flaw.

Based on our review of the papers and evidence submitted, if anything is clear, it is that DCF analysis is, in not insubstantial measure, an inherently subjective and predictive methodology, which relies in part on the expert's judgment and experience. Indeed, neither Party has presented the Court with any accepted, standardized methodology for deriving the required inputs for DCF analysis. Accordingly, we are forced to conclude that DCF analysis is sufficiently pliable so that it may reasonably lead to a wide breadth of plausible conclusions. Dr. Kennedy's conclusions and the bases therefor may ultimately be subject to legitimate attacks on cross-examination, but we perceive no fundamental unreliability in his analysis that would counsel in favor of outright exclusion. We agree that our "gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury." *DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1147 (N.D. Cal. 2003) (citation, quotation marks, and alteration omitted). It is readily apparent that Defendants have thoroughly researched the case law on DCF methodology, and in all but one of the several cases they cite, the expert witness's DCF analysis was considered *at trial* and *then* rejected by the court. *Compare In re Iridium Operating, LLC*, 373 B.R. 283, 350-52 (Bankr. S.D.N.Y. 2007) (rejecting DCF analyses following trial); *In re Emerging Commc'ns, Inc. S'holders Litig.*, No. Civ.A. 16415, 2004 WL 1305745, at *14-15 (Del. Ch. June 4, 2004) (same); *Gray v. Cytokine Pharmasciences, Inc.*, No. Civ.A. 17451, 2002 WL 853549, at *8 (Del. Ch. Apr. 25, 2002) (same), *with Kipperman v. Onex Corp.*, 411 B.R. 805,

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

844-49 (Bankr. N.D. Ga. 2009) (simultaneously deciding summary judgment and granting motion to exclude an expert's testimony as unreliable under Rule 702, where the expert rejected management's projections and generated his own DCF analysis).

With respect to Dr. Kennedy's comparable public company analysis, Defendants argue that he only used the projected MySpace revenue and EBITDA figures for 2006, ignoring the 2005 numbers without explanation. (Mot. 17-18 (citing Moriarty Decl., Ex. 1, Kennedy Report, at 24)). They argue Dr. Kennedy's explanation for choosing to disregard the 2005 figures was inadequate *ipse dixit*. When asked if 2005 was "an aberrant year for MySpace," he replied: "No, but it wasn't who the company was expected to be." (Kennedy Tr. at 129:19-22). Furthermore, Defendants argue that Kennedy cherry-picked only the most profitable guideline companies referenced in Montgomery and TWP's fairness analyses, instead of applying an average of the multiples applicable to several companies. (Mot. 18). In support of this latter contention, they cite another treatise, which states: "In employing the guideline publicly traded company method, every effort should be made to select as broad a base of comparative companies as is reasonably possible, as well as to give full consideration to every possible factor in order to make the comparison more meaningful." (Defs.' RJN, Ex. E, PRATT, REILLY AND SCHWIEHS, THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 233 (2000) ("PRATT, et al.") (citation and internal quotation marks omitted)). Defendants contend that Dr. Kennedy erred in whittling down the broader base of comparable public companies identified by Montgomery and TWP to only Google and Yahoo!, "seasoned" companies with "proven revenue model[s]" that experienced explosive growth. (Mot. 19-20). Though this appears to strike Defendants as litigation-driven, we are instructed to evaluate the *methodology*, not the ultimate determination reached by the expert. Our "sole purpose is to determine the reliability of a particular expert opinion through a preliminary assessment of the methodologies underlying the opinion." *DSU Med. Corp.*, 296 F. Supp. 2d at 1147 (citing *Daubert*, 509 U.S. at 592-93). Of course, we must consider "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert II*, 43 F.3d at 1317. However, there is no evidence in the record that Dr. Kennedy deviated from his standard methodology for the purposes of testifying in this case.

Dr. Kennedy explained his method as follows. First, he analyzed the companies selected by Montgomery and TWP and restricted his selection to those comparable companies. (Moriarty Decl., Ex. 1, Kennedy Report, at 18-20). Montgomery had chosen twelve companies (Google, Yahoo!, CNET Networks, iVillage, Monster Worldwide, Aptimus, ValueClick, Vertrue, Church & Dwight Co., Herbalife Ltd., Jarden Corp., and Nature's Sunshine Products) based on the following sectors: online advertising, online content and networking, online direct marketing, and offline direct marketing. (*Id*. at 19). TWP had chosen fourteen guideline companies (Bankrate, CNET, iVillage, 1-800-FLOWERS.COM, Blue Nile, Celebrate Express, Netflix, NutriSystem, Overstock.com, Provide Commerce, Aptimus, Marchex, ValueClick, and Vertrue) based on three sector categories: content, eCommerce, and direct marketing. (*Id*.). In identifying a narrower set of comparable companies, Dr. Kennedy explained that he considered these to be "the most similar operational, financial, and growth

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

guideline publicly traded companies." (*Id*. at 20). He justified his deviation from the investment banks, beginning with TWP, as follows:

> In implementing the public guideline company method, TWP selected guideline Companies based on all of the businesses of Intermix on a combined basis. . . . Montgomery selected guideline companies based on each business within Intermix because "the three businesses have different economics and peer groups." As a result, Montgomery selected only "Online Advertising" and "Online Content and Networking" to apply to MySpace. We agree with Montgomery's approach that each Intermix business segment, and specifically MySpace has different growth and profit potential and therefore, different multiples would be appropriate to apply to MySpace and the other Intermix business segments. Within TWP's comparables, only the "Content" group is applicable.

(*Id*. at 20-21). Accordingly, Dr. Kennedy selected the following six comparable companies: Bankrate, CNET, iVillage, Google, Yahoo!, and Monster. (*Id*. at 21). Then, based on "separate MySpace financial performance information," Dr. Kennedy narrowed the field down to Google and Yahoo!, contending those were the only two companies with comparable revenue and EBITDA growth metrics. (*Id*. at 21-25). Dr. Kennedy concluded that MySpace "[fell] into the higher profitability tier" of the six guideline companies, and therefore, he could discount the 2005 figures for MySpace and utilize an "average of the multiples indicated by Google and Yahoo." (*Id*. at 24-25).

There is nothing in the record to support the proposition that selecting comparable companies based on (1) services provided, (2) revenue metrics, and (3) EBITDA metrics renders a comparable public company analysis fundamentally unreliable. We will not exclude this evidence simply because Defendants dislike Dr. Kennedy's conclusion that the only guideline companies left standing in the final analysis were Google and Yahoo!. Even Defendants' cited treatise urges the selection of "as broad a base of comparative companies *as is reasonably possible*." (Defs.' RJN, Ex. E, PRATT, et al., *supra*, at 233 (emphasis added)). Dr. Kennedy concludes, in effect, that the remaining comparable companies are as broad a base of comparable companies as is reasonably possible. Defendants' disagreement with this conclusion is properly explored on cross-examination.

Accordingly, we hereby **DENY** Defendants' Motion to Exclude Dr. Kennedy's testimony. As Dr. Kennedy's testimony is sufficient to at least raise triable issues on damages from out-of-pocket losses, we also **DENY** Defendants' Motion for Summary Judgment on this issue.

### 3. "Lost Opportunity" Damages

As a final alternative, Plaintiff seeks "lost opportunity" damages based on the allegedly impending Viacom bid. "When actual losses cannot be demonstrated," some circuit courts have recognized "an alternate theory of establishing damages," the "lost opportunity" theory. *DaimlerChrysler*, 294 F. Supp. 2d at 627 (internal quotation marks omitted). Lost opportunity damages represent "loss of a possible profit or benefit, [defined as] an addition to the value of one's investment,

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

unless the loss is wholly speculative." *Tse II*, 123 F. Supp. 2d at 223 (internal citations omitted; alteration in original). "Lost opportunity damages are not 'wholly speculative' if they are based on 'certain, fixed and demonstrable profits thwarted by a defendant's alleged fraud.'" *DaimlerChrysler*, 294 F. Supp. 2d at 627 (quoting *Rudinger v. Ins. Data Processing, Inc.*, 778 F. Supp. 1334, 1341 (E.D. Pa. 1991)). "Further, lost opportunities damages 'are not available where the fact of the loss, i.e. whether there was any lost opportunity at all, is wholly speculative.'" *Id.* (quoting *Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 220 (3d Cir. 2002) ("*Tse III*")). Finally, "'[t]he risk of uncertainty as to [the] amount of damages is cast on the wrongdoer and it is the duty of the fact finder to determine the amount of the damages as best he can from all the evidence in the case.'" *Tse III*, 297 F.3d at 220 (quoting *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781-82 (3d Cir. 1976)).

    In support of this theory of damages, Plaintiff argues that Viacom was contemplating a bid above $750 million, citing a single internal Viacom email, in which Jason Hirschhorn states: "My guess is that News [Corp.] is going to take the $12/share ask from Richard Rosenblatt and add a premium of 10-20%. $700-$750 million . . . . Don't know if offer will be binding from NEWS [Corp.]. But I belioeve [*sic*] they will deliver it anywhere from today-monday." (J.A., Ex. 192). Viacom never in fact put in a bid for Intermix. Therefore, the relevant question on this motion for summary judgment is whether there is a triable issue of material fact as to whether Viacom would have submitted a bid. This question must be answered in the negative, since it is undisputed that Viacom's board simply refused to engage in a public bidding war with its competitor News Corp. Freston, Viacom's CEO, testified that the Viacom board members were adamant on this point: "There already had been an offer and it wasn't ours and it didn't look like there was an opportunity to counter bid or if there was, we would have to do so in a public way and the board had said on the spot, no, let's not get involved in that." (Freston Tr. at 35:11-15; *see also* West Tr. at 123:22-24 ("We had some discussion and we ended up saying that it wasn't worth pursuing a counterbid strategy.")). Therefore, given this unwavering refusal to engage in a public bidding war following the July 18th merger announcement, the Proxy, including whatever alleged material omissions, issued in late August had no effect whatsoever on Viacom's willingness to place a bid for Intermix. Accordingly, the allegedly defective Proxy cannot support the notion that Intermix shareholders missed out on an opportunity with Viacom.

    While it may be theoretically possible that Viacom would have entered a subsequent bid had the Intermix shareholders not been allegedly deceived by the defective Proxy and had they rejected the merger with News Corp., we conclude that under the totality of the evidence, Plaintiff's showing is no more than speculative. Moreover, mere rejection of the News Corp. bid by the shareholders would not necessarily have eliminated the specter of a public bidding war that Viacom abhorred. Nothing prevented News Corp. from countering any Viacom bid with a counterbid. This is precisely the type of speculation and indeterminacy that is insufficient to create a triable issue on the existence of any lost opportunity.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

Accordingly, we **GRANT** Defendants' Motion for Summary Judgment as to this theory of damages.[20]  On his Section 14(a) claim, Plaintiff may **ONLY** proceed at trial on his theory of out-of-pocket losses based on an intrinsic valuation of Intermix at the time of the merger.

**IV.     Count III: Violation of Section 20(a) of the Securities and Exchange Act of 1934**

Section 20(a) of the 1934 Act provides that: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).  The Parties agree that if there is no primary liability under Section 14(a), there can be no control person liability.  (Joint Br. 87).  However, since we have denied summary judgment with respect to three of the bases for Count II, we likewise **DENY** the Motion for Summary Judgment with respect to Count III.

**V.      Conclusion**

Plaintiff's Motion for Summary Judgment is **DENIED**.  Defendants' Motion for Summary Judgment is hereby **GRANTED in part** and **DENIED in part** as set forth in this Order.  **Within thirty (30) days hereof**, counsel **SHALL** file a joint status report setting forth their views regarding further mediation in light of these rulings.

**IT IS SO ORDERED.**

|  | -- | : | -- |
|---|---|---|---|
| Initials of Deputy Clerk | | Bea | |

---

[20] We have no occasion to consider and therefore express no opinion on whether the "lost opportunity" theory of damages premised on a potential Viacom bid would be viable with respect to the breach of fiduciary duty claim which is based on evidence beyond the alleged material omissions from the Proxy.  The Parties have not addressed this issue in their Cross-Motions.