1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  DARREN J. ROBBINS (168593)
   RANDALL J. BARON (150796)
3  ELLEN GUSIKOFF STEWART (144892)
   DAVID T. WISSBROECKER (243867)
4  EUN JIN LEE (264208)
   655 West Broadway, Suite 1900
5  San Diego, CA  92101
   Telephone:  619/231-1058
6  619/231-7423 (fax)
   darrenr@rgrdlaw.com
7  randyb@rgrdlaw.com
   elleng@rgrdlaw.com
8  dwissbroecker@rgrdlaw.com
   elee@rgrdlaw.com
9
   Lead Counsel for Plaintiff
10

11                    UNITED STATES DISTRICT COURT

12                  CENTRAL DISTRICT OF CALIFORNIA

13                          WESTERN DIVISION

14  JIM BROWN, Individually and On      )   No. 2:06-cv-03731-GHK-SH
15  Behalf of All Others Similarly Situated, )
                                         )   CLASS ACTION
16                  Plaintiff,           )
                                         )   DECLARATION OF RANDALL J.
17       vs.                             )   BARON IN SUPPORT OF FINAL
                                         )   APPROVAL OF CLASS ACTION
18  BRETT C. BREWER, et al.,             )   SETTLEMENT AND PLAN OF
                                         )   ALLOCATION OF SETTLEMENT
19                  Defendants.          )   PROCEEDS, AND AN AWARD OF
                                         )   ATTORNEYS' FEES AND
20  _____ )   EXPENSES

21                                           DATE:      May 16, 2011
                                             TIME:      9:30 a.m.
22                                           COURTROOM:   The Honorable
                                                         George H. King
23

24

25

26

27

28

613312_1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................ 1

II.   HISTORY OF THE LITIGATION ................................................... 4

A.    Background ............................................................................ 4

B.    Robbins Geller's Experience with Related Litigation ........................... 6

      1.    The *LeBoyer* Action ................................................... 6

      2.    The State Action ........................................................ 8

C.    Filing of the Initial and Amended Complaints ................................. 10

D.    Motions for Appointment of Lead Plaintiff and Lead Counsel .......... 10

E.    Filing of the Second Amended Complaint ..................................... 10

F.    Rule 26(f) Report and Scheduling Order ...................................... 11

G.    Oppositions to Defendants' Motions to Dismiss the SAC ................ 12

H.    Transfer and Organization ...................................................... 13

I.    Filing of the Consolidated First Amended Complaint ...................... 15

J.    Oppositions to Defendants' Motion to Dismiss the CFAC ............... 15

K.    Filing of the Consolidated Second Amended Complaint .................. 19

L.    Oppositions to Defendants' Motions to Dismiss the CSAC ............. 20

M.    Second Rule 26(f) Report and Scheduling Order ............................ 23

N.    Initial Disclosures Pursuant to Rule 26(a)(1) ................................. 24

O.    Opposition to Defendants' Motion for Partial Summary Judgment ...................................................................... 24

P.    Motion for Class Certification .................................................. 25

Q.    Discovery Directed to Lead Plaintiff ........................................... 26

R.    Document Discovery .............................................................. 27

S.    Deposition Discovery ............................................................. 29

T.    Attorney-Client Privilege Issue ................................................ 31

U.    Expert Opinions and Reports ................................................... 32

613312_1

**Page**

V.  Dismissal of VantagePoint and defendant Lipp ........................ 33

W.  Early Mediation ............................................................... 34

X.  The Motions for Summary Judgment ..................................... 34

    1.  Defendants' Motion for Summary Judgment........................ 34

    2.  Lead Plaintiff's Motion for Partial Summary Adjudication ................................................................ 36

    3.  Defendants' Notice of New Authority ............................... 36

    4.  Order on Summary Judgment and Summary Adjudication ................................................................ 37

Y.  *Daubert* Motion and Motion to Strike .................................. 38

Z.  Negotiating the Settlement.................................................. 39

AA. Motion for Preliminary Approval of Class Action Settlement........... 40

III.  THE FACTORS SUPPORTING APPROVAL OF THE SETTLEMENT ........................................................................ 40

IV.  STRENGTH OF LEAD PLAINTIFF'S CASE COMPARED TO THE AMOUNT OF THE SETTLEMENT ......................................... 41

V.  THE COMPLEXITY, LENGTH, AND EXPENSE OF FURTHER LITIGATION ................................................................... 42

VI.  THE REACTION OF THE CLASS MEMBERS TO THE PROPOSED SETTLEMENT.................................................. 44

VII.  THE EXPERIENCE AND VIEWS OF COUNSEL ................... 44

VIII.  THE PRESENCE OF GOOD FAITH, ARM'S-LENGTH NEGOTIATIONS ............................................................... 44

IX.  THE EXTENT OF DISCOVERY COMPLETED AND THE STAGE OF THE PROCEEDINGS .................................................. 45

X.  THE PLAN OF ALLOCATION........................................... 45

XI.  LEAD PLAINTIFF'S COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE..................... 47

  A.  The Requested Fee of 27% of the Settlement Fund Is Fair and Reasonable ................................................................... 47

    1.  The Excellent Settlement Achieved ............................... 48

613312_1

- ii -

|  |  |  | **Page** |
|---|---|---|---|
| | 2. | The Risks as to Both Liability and Damages | 48 |
| | 3. | The Diligent Prosecution of This Case | 49 |
| | 4. | The Complexity of This Action's Factual and Legal Questions | 49 |
| | 5. | The Contingent Nature of the Case and the Financial Burden Carried by Lead Plaintiff's Counsel | 50 |
| | 6. | Standing and Expertise of Lead Counsel | 51 |
| | 7. | Standing and Caliber of Opposing Counsel | 51 |
| | 8. | Public Policy Considerations | 51 |
| | 9. | The Request for Payment of Expenses Is Reasonable | 52 |
| | 10. | Lead Plaintiff Is Entitled to a Service Award | 52 |
| XII. | CONCLUSION | | 53 |

613312_1

1    I, RANDALL J. BARON, respectfully submit this declaration in support of: (i)

2  the Court's final approval of the settlement of this stockholder class action (the

3  "Settlement") and the proposed Plan of Allocation of settlement proceeds, on the

4  terms and conditions reflected in the Amended Stipulation of Settlement dated

5  February 4, 2011 (the "Stipulation");[1] and (ii) Lead Plaintiff's counsel's application

6  for an award of attorneys' fees and expenses.

7  **I.    INTRODUCTION**

8    1.    I am a member of the law firm of Robbins Geller Rudman & Dowd LLP

9  ("Robbins Geller" or "Lead Counsel") for Lead Plaintiff Jim Brown ("Brown" or

10  "Lead Plaintiff") and the Class in the above-captioned action (the "Litigation") and

11  am admitted to practice before this Court. I have been personally involved in almost

12  all aspects of the Litigation, including motion practice, discovery, and the negotiations

13  resulting in the settlement of the Litigation. I have also been kept informed of

14  developments in the Litigation by attorneys and paraprofessionals working with me

15  and/or under my direction.

16    2.    Even a cursory glance at the history of this Litigation demonstrates the

17  extensive efforts, tenacity, and skill of Lead Counsel, who actively pursued this

18  Litigation on behalf of Lead Plaintiff and the Class for approximately seven years

19  against a capable and formidable defense. As a result of its efforts, Lead Counsel

20  obtained a significant settlement for the benefit of the Class: a recovery with the

21  certain value of $45 million, which Lead Counsel believes is one of the top ten largest

22  common fund recoveries ever achieved in a merger-related class action.

23    3.    Intermix Media, Inc. ("Intermix" or the "Company"), formerly known as

24  eUniverse Inc. ("eUniverse"), and its officers and directors have been embroiled in

25  many lawsuits in federal and state court starting from the Company's financial

26  _____

27  [1]    Unless otherwise defined, all capitalized terms have the meanings ascribed to them in the Stipulation.

28

restatement in 2003 and ending with the sale of the Company to News Corporation ("News Corp.") in 2005 (the "Acquisition"). Lead Counsel's investigation and pursuit of litigation involving Intermix began in 2003. Thereafter, Lead Counsel continued to actively monitor and pursue claims on multiple fronts against the Company, its Board of Directors ("Board"), and management, to protect the shareholders of Intermix and for the benefit of the shareholders of Intermix, up to the Acquisition and beyond.

4.    After suffering setbacks in its litigation efforts, including the inability to prevent defendants from completing the Acquisition, Lead Counsel never gave up and continued to vigorously pursue litigation on behalf of the Company's former public shareholders, devoting thousands of professional hours and hundreds of thousands of dollars in out-of-pocket costs to the cause – all on a purely contingent basis with no guarantee of any recovery.

5.    Robbins Geller filed the pending claims in this Court on behalf of Lead Plaintiff on August 24, 2006, alleging that defendants violated federal securities law in connection with a certain proxy issued by the Board of Intermix in 2003 and the proxy regarding the Acquisition in 2005. Subsequently, Robbins Geller fought for over four years to bring this Litigation to a favorable result. In that four-year period, Lead Counsel, among other things:

- Filed four complaints;
- Obtained appointment of Lead Plaintiff and Lead Counsel;
- Opposed numerous motions to dismiss filed by defendants;
- Opposed defendants' motion for partial summary judgment on the issue of loss causation and damages;
- Filed a motion for, and successfully obtained, class certification;
- Propounded and responded to written discovery;
- Reviewed and analyzed over 123,000 pages of party and non-party documents;
- Took and defended over thirty depositions all over the country, the majority of which were conducted within a three month period;

613312_1

- Opposed defendants' motion to compel responses to discovery;

- Filed a motion in the United States District Court, Southern District of New York, seeking an order compelling production of documents from News Corp.;

- Filed a motion to compel production of documents and testimony regarding defendants' invocation of the attorney-client privilege;

- Submitted six expert reports in support of Lead Plaintiff's case and/or in response to defendants' expert reports;

- Reviewed and analyzed defendants' six expert reports;

- Filed a motion for partial summary adjudication;

- Opposed defendants' motions for summary judgment;

- Filed a motion to strike defendants' *Daubert* motion;

- Filed a motion to strike defendants' summary judgment motion for failure to abide by Court-ordered procedure;

- Opposed defendants' *Daubert* motion;

- Addressed new authority pointed out by defendants that defendants argued supported dismissal of Lead Plaintiff's claims;

- Addressed novel and complex issues of federal securities law and Delaware substantive law throughout the Litigation; and

- Participated in three rounds of settlement and/or mediation sessions.

6.     Throughout the Litigation, defendants argued, among other things, that Delaware law and federal law set a high bar for Lead Plaintiff to establish liability, and that Lead Plaintiff could not demonstrate bad faith, disloyalty, materiality, scienter, and/or damages as necessary to prove his claims. Defendants maintained these positions through their briefs in support of summary judgment, and only on the brink of trial did the parties finally agree to settle the Litigation for $45 million.

7.     This recovery was by no means an easy achievement. To the contrary, it was the product of tireless dedication, zealous representation of the Class's interests, and creative legal tactics and judgments – all on a purely contingent basis with no guarantee of ever recovering the substantial fees and expenses incurred on behalf of the Class. As Lead Plaintiff was preparing to bring the Litigation to trial, the parties,

613312_1

1    upon the recommendation of a neutral mediator, agreed upon the essential terms of the
2    Settlement.  As discussed in more detail below, this high-risk class action litigation,
3    against some of the premier litigators of the corporate defense bar, obtained
4    substantial monetary relief for the Class against significant obstacles.

5          8.     As noted above, the Settlement provides for the payment of Forty-Five
6    Million Dollars ($45,000,000) in cash (the "Settlement Amount") by or on behalf of
7    the defendants.  Pursuant to the Stipulation, these funds have been placed in an
8    interest bearing escrow account and are earning interest.  Upon approval of the
9    Settlement, the claims asserted in the Litigation will be dismissed with prejudice,
10   subject to the terms of the Stipulation and the Judgment.  For the reasons set forth
11   below, I respectfully submit that the terms of the Settlement and the Plan of
12   Allocation are fair, reasonable, and adequate in all respects, and should be finally
13   approved by this Court.  I also request that the Court approve the application for an
14   award of attorneys' fees in the amount of 27% of the Settlement Amount and
15   $851,286.91 in expenses, plus the interest earned thereon.

16   **II.    HISTORY OF THE LITIGATION**

17        **A.    Background**

18         9.     On May 6, 2003, Intermix (formerly known as eUniverse) announced
19   that it would have to restate its previously reported financial results for 2003, which
20   had overstated both the Company's revenues and net income by more than $12
21   million.  NASDAQ halted trading in Intermix shares after the restatement was
22   announced and ordered trading of the Intermix shares would remain halted until the
23   Company supplied accurate financial information.  Also on May 6, 2003, the
24   Company announced that the U.S. Securities and Exchange Commission ("SEC") had
25   commenced an informal inquiry concerning the Company's accounting issues, and
26   that Intermix had been sued for violations of the federal securities laws.

27         10.    In the summer of 2003, as a result of the Company's announcement that
28   it would have to restate its financial results, numerous lawsuits were filed by Intermix

shareholders in state and federal courts, charging Intermix and certain of its officers and directors with violations of applicable law.  The lawsuits alleged, among other things, that the Company and its officers and directors had issued false and misleading statements about the Company's financial results in order to sell their own Intermix stock at artificially inflated levels.  In addition to these state and federal securities lawsuits, numerous derivative lawsuits were filed against the Company's directors, alleging that they had breached their fiduciary duties and engaged in other misconduct in causing the Company to violate securities laws.  These derivative lawsuits further alleged that the Company's directors had unjustly enriched themselves and other Company insiders by improperly profiting from Intermix's violations of securities laws.

11.    During this time period, as a result of the litigation in connection with Intermix's financial restatement, Robbins Geller became familiar with Intermix and its background, and began to closely monitor subsequent events on behalf of the shareholders of Intermix.

12.    In or around September 2003, facing excessive debt and possible bankruptcy as a result of the accounting restatement, Intermix agreed to reached an agreement with VantagePoint[2] to provide financing for eUniverse (the "VantagePoint Transactions").  On or around December 30, 2003, Intermix filed a definitive proxy statement that was filed with the SEC, as amended (the "2003 Proxy"), seeking shareholder approval of defendants' reelection to the Board and ratification of the VantagePoint Transactions.  Intermix shareholders approved the 2003 Proxy in the January 29, 2004 shareholder meeting.

---

[2]    "VantagePoint" refers to, collectively, VantagePoint Venture Partners, VP Alpha Holdings IV, L.L.C., VantagePoint Venture Partners IV (Q), L.P., VantagePoint Venture Partners IV, L.P., and VantagePoint Venture Partners IV Principals Fund, L.P.

613312_1

1    13.    On July 18, 2005, Intermix announced that it had entered into a proposed
2 merger agreement with News Corp., pursuant to which Intermix shareholders would
3 be cashed out for $12 per share.  On August 25, 2005, Intermix filed a Definitive
4 Merger Proxy Statement ("Proxy") with the SEC regarding the Acquisition and setting
5 a special meeting of Intermix shareholders for a vote on the Acquisition.   On
6 September 30, 2005, the Intermix shareholders voted to approve the merger agreement
7 between Intermix and News Corp. ("Merger Agreement") and News Corp. completed
8 the Acquisition on that date.

9         **B.      Robbins Geller's Experience with Related Litigation**

10    14.    As indicated above, Lead Counsel has investigated and pursued litigation
11 in multiple fronts involving Intermix beginning in 2003.  Though we were not able to
12 obtain favorable results for the Company's shareholders in these earlier actions, we
13 never gave up and continued to vigorously pursue litigation on behalf of the
14 Company's shareholders, and were able to incorporate our investigation and
15 experience into this Litigation where we obtained an outstanding result.

16         **1.      The *LeBoyer* Action**

17    15.    On August 6, 2003, on behalf of Karl LeBoyer and the Company
18 shareholders, Robbins Geller filed *LeBoyer v. Greenspan, et al.*, No. CV-03-5603-
19 GHK (JTLx) in the United States District Court for the Central District of California,
20 alleging that the Board had breached its fiduciary duties to the Company by causing
21 the Company to issue false financial statements.  The Court stayed the *LeBoyer* action
22 on December 9, 2003, in favor of a class action securities lawsuit, *Sands v. eUniverse,*
23 *Inc.*, No. CV-03-3272-GHK(JTLx) (C.D. Cal.), based on the same or similar
24 misconduct.   The *Sands* case settled, and following approval of the settlement,
25 Robbins Geller, on behalf of Mr. LeBoyer, amended the *LeBoyer* complaint to include
26 additional derivative claims that alleged the Board breached its fiduciary duties to the
27 Company in connection with the surreptitious implantation of spyware on certain
28 internet websites, and also that the Board violated §14(a) of the Securities and

613312_1

1   Exchange Act of 1934 ("Exchange Act") and SEC Rule 14a-9 by filing a misleading

2   proxy when asking shareholders to approve the sale of the Company to News Corp. in

3   September 2005. The *LeBoyer* complaint was also amended to include claims brought

4   by Mr. LeBoyer directly on behalf of the Company shareholders, which alleged that

5   the Board had breached its fiduciary duties in connection with the sale of the

6   Company to News Corp. Robbins Geller filed this amended complaint on behalf of

7   Mr. LeBoyer on November 17, 2005.   The Court thereafter lifted the stay, on

8   November 30, 2005.

9       16.    The *LeBoyer* defendants moved to dismiss the action and/or stay the

10  *LeBoyer* action in February 2006. On April 12, 2006, the Court ordered that the

11  parties prepare a joint brief that would include both defendants' arguments for

12  dismissal and/or stay and plaintiff's responses. This brief was submitted on July 14,

13  2006. On October 16, 2006, the Court issued an order dismissing all the derivative

14  claims brought in the *LeBoyer* action except for the derivative §14(a) claims.  The

15  remaining derivative claims were dismissed based on *res judicata*, the Court holding

16  that the issue of Mr. LeBoyer's derivative standing was controlled by a prior

17  California state court case that had alleged identical derivative claims and was

18  dismissed for failure to allege demand futility. The Court ordered the parties to submit

19  further briefing as to: (i) whether the sale of the Company to News Corp. extinguished

20  Mr. LeBoyer's standing to pursue derivative §14(a) claims; and (ii) the effect of Judge

21  Kuhl's decision in the *Intermix* state case (discussed below) on Mr. LeBoyer's claims

22  that the Board breached its fiduciary duties in connection with the sale of the

23  Company to News Corp.

24      17.    After briefing by the parties, on May 22, 2007, the Court found that Mr.

25  LeBoyer lacked standing and dismissed the derivative §14(a) claims.  The Court did

26  not address the effect of Judge Kuhl's decision as her decision was not final at the

27  time.  On June 11, 2007, the Court ordered that the *LeBoyer* action be consolidated

28  under this Litigation.

613312_1

### 2.    The State Action

18.    On August 25, 2005, Brad Greenspan ("Greenspan"), Intermix's founder and the Company's former Chief Executive Officer ("CEO") and Chairman, filed *Greenspan v. Intermix Media, Inc., et al.*, Case No. BC338786, in the Los Angeles Superior Court ("State Court"), alleging that the Board breached its fiduciary duties to shareholders in connection with the sale of the Company to News Corp.   Mr. Greenspan later amended his complaint to add claims of: (i) tortious interference with prospective economic advantage; (ii) statutory unfair competition; (iii) aiding and abetting by VantagePoint; and (iv) indemnification. Mr. Greenspan also broke down his breach of fiduciary duty claims into three separate claims for breach of the duty of loyalty, and breach of the duty to maximize shareholder value. Aside from his breach of fiduciary duty and aiding and abetting claims, Mr. Greenspan alleged harms unique to himself as opposed to the rest of the Company's shareholders.

19.    On August 26, 2005, on behalf of Ron Sheppard and the Company shareholders, Robbins Geller filed *Sheppard v. Rosenblatt, et al.*, Case No. BC338945, in the State Court, alleging that the Board and VantagePoint breached their fiduciary duties and/or aided and abetted in the breach of fiduciary duties in connection with the Acquisition and seeking injunctive relief.

20.    On August 30, 2005, the law firm of Kreindler & Kreindler LLP filed *Friedmann v. Intermix Media, Inc., et al.*, Case No. BC339083, in the State Court, alleging that the Board and VantagePoint breached their fiduciary duties and/or aided and abetted in the breach of fiduciary duties in connection with the Acquisition.

21.    On September 7, 2005, the *Friedmann* plaintiff sought and obtained, through an *ex parte* application, expedited discovery and a schedule to litigate a request for a preliminary injunction to halt the Acquisition.

22.    At some point before September 21, 2005, the *Friedmann* plaintiff agreed to withdraw his preliminary injunction motion in exchange for additional disclosures by defendants, namely disclosures regarding the existence of *Friedmann* and

*Sheppard* actions, a brief discussion of negotiations with "Company D," and additional discussion regarding merger provisions relating to stock options, premiums paid to owners of preferred stock , the relationship between two Intermix directors and VantagePoint, and the indemnification provisions of the Acquisition.

23. On September 23, 2005, Mr. Greenspan publicly announced an offer for 50% of the shares at $13.50 per share.

24. On September 26, 2005, the *Friedmann* plaintiff sought a temporary restraining order from the State Court, delaying the shareholder vote for a week. The State Court denied the *Friedmann* plaintiff's request, stating that he had not presented any evidence to show that Intermix shareholders would not have enough time to absorb the information about the Greenspan proposal and the Intermix Board's evaluation of that proposal by the September 30, 2005 shareholder vote date.

25. On November 15, 2005, the State Court consolidated the *Sheppard* and *Friedmann* actions under *In re Intermix Media, Inc. Shareholder Litigation*, Case No. BC338945 ("State Action"). The State Action and the *Greenspan* action were later coordinated for disposition by agreement of the parties. Defendants demurred to both complaints, plaintiffs opposed, and oral argument was heard on both matters on June 5, 2006. On October 6, 2006, Judge Kuhl dismissed both actions without leave to amend.

26. On or around November 14, 2006, Robbins Geller, on behalf of the *Sheppard* plaintiff, filed a separate statement in response to defendants' memoranda of costs, specifically disavowing any statements by the *Friedmann* plaintiff that could be construed as a concession that the class was fully informed of all material facts prior to the shareholder vote on the Acquisition.

27. Robbins Geller advised Mr. Sheppard, that, in its view, Judge Kuhl's decision was contrary to the law, and recommended that Mr. Sheppard appeal on behalf of the class. Mr. Sheppard concurred, and Robbins Geller attempted to appeal

613312_1

1  Judge Kuhl's decision.  Subsequently, the dismissal was affirmed by the California
2  Court of Appeals, and a writ of certiorari was denied by the California Supreme Court.

3  **C.    Filing of the Initial and Amended Complaints**

4      28.    On June 14, 2006, the law firm Goodman Sheridan & Roff LLP
5  ("Goodman"), on behalf of Jim Brown and Carrie Brown, filed a shareholder class
6  action in the United States District Court for the Central District of California, on
7  behalf of the shareholders of Intermix against certain of its officers, directors, and
8  VantagePoint, alleging violations of three counts of federal securities law violations:
9  §14(a) of the Exchange Act and the Rule 14a-9 promulgated under in connection with
10  the 2003 Proxy; §14(a) of the Exchange Act and the Rule 14a-9 promulgated under in
11  connection with the Proxy; and §20(a) of the Exchange Act.  The action was assigned
12  to the Honorable Judge F. Walter.   Based on Robbins Geller's experience and
13  knowledge of the history of Intermix and the litigation that had been existing since
14  2003, Robbins Geller agreed to represent plaintiffs Jim Brown and Carrie Brown with
15  Goodman going forward.

16      29.    On August 24, 2006, plaintiffs Jim Brown and Carrie Brown filed the
17  Amended Complaint ("AC") incorporating Robbins Geller's investigation, and adding
18  the Company's financial advisors, TWP and Montgomery as defendants.

19  **D.    Motions for Appointment of Lead Plaintiff and Lead Counsel**
20

21      30.    On August 28, 2006, Robbins Geller filed a motion for appointment of
22  Jim Brown and Carrie Brown as lead plaintiffs and Robbins Geller as lead counsel.
23  On September 19, 2006, Judge Walter granted the motion and appointed Jim Brown
24  and Carrie Brown as lead plaintiffs and Robbins Geller as lead counsel.

25  **E.    Filing of the Second Amended Complaint**

26      31.    Counsel for defendants informed Robbins Geller that they intended to file
27  motions to dismiss the AC.  On September 13, 2006, plaintiffs' counsel and counsel
28  for all defendants except Montgomery met and conferred as required by local rules to

613312_1

discuss defendants' anticipated motions to dismiss the AC.  During that discussion, defendants' counsel identified issues that plaintiffs' counsel believed they could address through further amendment to the AC, obviating the need for the motions to dismiss.  Plaintiffs' counsel negotiated a stipulation with defendants that contemplated same.

32.     On September 15, 2006, the parties filed a joint stipulation and proposed order seeking leave for plaintiffs to file a Second Amended Complaint and continuing the dates by which defendants must respond.  On or around September 18, 2006, Judge Walter granted the proposed order.

33.     Since plaintiffs agreed to be ready to file the Second Amended Complaint within two weeks of an order granting plaintiffs' motion for lead plaintiffs and lead counsel, plaintiffs immediately began to prepare for filing a Second Amended Complaint.

34.     On September 27, 2006, Lead Counsel filed the Second Amended Complaint ("SAC").  The SAC did not name Carrie Brown as plaintiff, so the Court vacated her appointment as one of the lead plaintiffs on October 4, 2006.  The SAC contained additional factual detail and additional allegations, including, among other things, allegations: identifying the materially misleading statements or omissions; setting forth why they were false and misleading; and stating that defendants' preparation and dissemination of the false and misleading 2003 Proxy and Proxy was an essential link in the accomplishment of the proxy objective.

**F.     Rule 26(f) Report and Scheduling Order**

35.     On October 11, 2006, the parties participated in a phone conference pursuant to Fed. R. Civ. P. 26(f).  In that conference, the parties discussed their positions, including their positions regarding discovery.  Lead Counsel pressed defendants' counsel on the need for discovery, arguing that Lead Plaintiff had addressed the issues previously identified by defendants in the SAC, that defendants

1    were unlikely to succeed in any motions to dismiss, and that discovery should proceed
2    as the action had been going since June 2006.

3          36.    On October 13, 2006, the parties filed a joint Rule 26(f) report.  In the
4    joint report, Lead Plaintiff stated that he would be prepared to submit a discovery,
5    motion, and trial schedule before the October 23, 2006 Scheduling Conference should
6    the Court request one.

7          **G.    Oppositions to Defendants' Motions to Dismiss the SAC**

8          37.    On October 19, 2006, defendants filed three separate motions to dismiss
9    the SAC.  Defendants' arguments were set forth in approximately 65 pages of
10   briefing.

11         38.    In the motion to dismiss filed by the officers and directors of Intermix
12   ("Intermix defendants"), they contended, among other things, that the allegations of
13   the SAC: were inconsistent with judicially noticeable documents; did not plead
14   materiality, loss causation, and damages for the §14(a) and Rule 14a-9 claims; and did
15   not plead the underlying violations of federal securities law for the §20(a) and Rule
16   14a-9 claims.

17         39.    VantagePoint joined in the Intermix defendants' motion to dismiss.

18         40.    TWP and Montgomery ("Banker defendants") joined in the Intermix
19   defendants' motion to dismiss.  The Banker defendants additionally contended that the
20   allegations in the SAC failed to allege that the financial advisors' fairness opinions
21   were objectively and subjectively false as required.

22         41.    On November 20, 2006, Lead Counsel filed three opposition briefs to
23   address each motion to dismiss.  In his opposition briefs, Lead Plaintiff argued that
24   defendants made actionable misstatements or omitted facts which were material when
25   soliciting proxies from the shareholders of Intermix and that he adequately pled his
26   claims in the SAC.

27         42.    Specifically, in response to the arguments raised by VantagePoint, Lead
28   Plaintiff argued, among other things, that: defendants' arguments amounted to factual

613312_1                                      - 12 -

1  arguments inappropriate on a motion to dismiss; he adequately alleged that defendants
2  failed to disclose material information in the 2003 Proxy regarding the impact that
3  shareholder approval of a financing package would have on the Company's ability to
4  use its net operating loss carryforwards ("NOLs"); he adequately alleged that
5  defendants failed to disclose material information in the Proxy regarding the value of
6  the Company's MySpace asset, the inadequacy of the valuations undertaken by the
7  Banker defendants, and the alternatives that were available to the Company.

8      43.    In response to the arguments raised by the Intermix defendants, Lead
9  Plaintiff argued, among other things, that he had sufficiently pled his §14(a) claims
10 with particularity as he sufficiently identified: the false and misleading statements
11 and/or omissions; the parties who were responsible for those statements/omissions;
12 where and when those statements/omissions were made; and why the parties made the
13 statements/omissions.

14     44.    In response to the arguments raised by the Banker defendants, Lead
15 Plaintiff argued that the fairness opinions given by TWP and Montgomery were
16 objectively and subjectively false in that both financial advisors knew that the
17 MySpace asset was worth considerably more than that which was being offered in the
18 merger consideration and that scienter need not be demonstrated to state a claim under
19 §14(a) of the Exchange Act and Rule 14a-9.

20     45.    On December 6, 2006, defendants filed their reply briefs in support of
21 their motions to dismiss.

22     46.    Lead Counsel prepared for the hearing on defendants' motions to dismiss,
23 which was continued to February 26, 2007.

24 **H.**    **Transfer and Organization**

25     47.    On October 23, 2006, Lead Counsel attended a scheduling conference
26 pursuant to which the Court set the discovery cut-off date for September 10, 2007 and
27 the trial date for October 30, 2007.

28

613312_1

48.    On October 30, 2006, Lead Counsel filed a declaration as ordered by Judge Walter at the October 23, 2006 scheduling conference. In the declaration, Lead Counsel identified for the Court three other actions in California state and federal court that involved Intermix in connection with events similar to those that formed the factual basis for this Litigation. Lead Counsel set forth the name of the cases, what type of cases they were, the firm which represented the plaintiffs in the cases, the claims in the cases, the substantive events that occurred in the cases, and the current status of the cases. Lead Counsel also explained that the claims that remained pending in any of the cases were not duplicative of the claims in this Litigation, because, among other things, only the Litigation contained claims in connection with the 2003 Proxy, and this Litigation contained unique claims in connection with the Proxy, including claims involving the Company's financial advisor and claims involving the Company's Myspace asset. Lead Counsel at the same time informed the Court that it was possible that it would be efficient to hear Lead Plaintiff's claims with respect to the Proxy in this Litigation with the derivative §14(a) claims on the Proxy in the *LeBoyer* action which was pending at the time.

49.    On February 13, 2007, Judge Walter transferred the Litigation to the calendar of the Honorable George H. King, for all further proceedings.

50.    The February 26, 2007 hearing on defendants' motions to dismiss was taken off calendar. The Court instructed the parties to consider the relationship between this Litigation and the *LeBoyer* action and the most efficient way of advancing the cases.

51.    On June 11, 2007, the parties in this Litigation and the *LeBoyer* action held a status conference. The Court ordered consolidation of the cases under *Brown v. Brewer*, No. CV 06-3731-GHK(JTLx). The Court denied defendants' motions to dismiss in this Litigation without prejudice. The Court ordered the Lead Plaintiff and the *LeBoyer* plaintiff to file a consolidated First Amended Complaint within thirty days, and ordered the parties to file a stipulation and proposed order regarding the

- 14 -

1  timing of any motion to dismiss the consolidated First Amended Complaint within

2  five days.

3      52.    On June 20, 2007, the parties filed a stipulation regarding a briefing

4  schedule for the timing on any motion to dismiss the consolidated First Amended

5  Complaint ("CFAC Stip").  The CFAC Stip contemplated a meet and confer and

6  exchange schedule that the parties anticipated would permit the parties to submit a

7  joint brief, as ordered by the Court.

8      **I.**    **Filing of the Consolidated First Amended Complaint**

9      53.    On July 11, 2007, Lead Counsel submitted the Consolidated First

10  Amended Complaint ("CFAC"), which was, like the SAC, a stockholder class action

11  filed on behalf of the shareholders of Intermix against certain of its officers, directors,

12  and VantagePoint, alleging violations of three counts of federal securities law

13  violations:  (i) §14(a) of the Exchange Act and the Rule 14a-9 promulgated under in

14  connection with the 2003 Proxy; (ii) §14(a) of the Exchange Act and the Rule 14a-9

15  promulgated under in connection with the Proxy; and (iii) §20(a) of the Exchange Act

16  for controlling person liability.

17      54.    The CFAC also added three counts of state law violations in connection

18  with the Acquisition: (i) breach of fiduciary duty; (ii) aiding and abetting breach of

19  fiduciary duty; and (iii) for unjust enrichment.

20      **J.**    **Oppositions to Defendants' Motion to Dismiss the CFAC**

21      55.    On August 15, 2007, Lead Counsel met and conferred with defendants'

22  counsel and discussed defendants' intent to file a motion to dismiss on October 11,

23  2007 pursuant to the CFAC Stip.  At the meet and confer, defendants' counsel

24  indicated the basis of the relief defendants would be seeking in their motion to

25  dismiss.

26      56.    Lead Counsel immediately began preparing an opposition to defendants'

27  motion to dismiss.  One week later, on August 23, 2007, Lead Counsel provided an

28  initial draft of Lead Plaintiff's opposition to defendants' counsel.

57.     Lead Counsel then immediately began preparing for the second exchange as contemplated by the CFAC Stip.  On September 21, 2007, Lead Counsel provided the second draft of Lead Plaintiff's opposition to defendants' counsel.

58.     Lead Counsel prepared for the final exchange contemplated by the CFAC Stip.  On October 5, 2007, Lead Counsel provided the final draft of Lead Plaintiff's opposition to defendants' counsel.

59.     On October 11, 2007, the parties filed the Joint Brief Regarding Defendants' Motion to Dismiss ("Joint Brief").

60.     In the Joint Brief, defendants contended that: (1) Lead Plaintiff's §14(a) claims with respect to the 2003 Proxy were time-barred because the limitation period for §14(a) claims was one year from discovery or three years from the violation, or alternatively, Lead Plaintiff's §14(a) claims failed for failure to plead causation; (2) Lead Plaintiff's §14(a) claims with respect to the Proxy failed for failure to adequately plead materiality and causation; (3) Lead Plaintiff's §20(a) claim failed for failure to plead the underlying violation; (4) Lead Plaintiff's fiduciary duty claim failed for failure to plead materiality, causation, any claim was extinguished by shareholder ratification, and/or the exculpatory clause in Intermix's Certificate of Incorporation shielded defendants from liability; and (5) Lead Plaintiff failed to state a claim as to the aiding and abetting claim and the unjust enrichment claim.

61.     Lead Plaintiff, in his opposition, addressed the various arguments raised by defendants and argued that no argument supported a dismissal of the CFAC.

62.     Specifically, in response to defendants' arguments regarding Lead Plaintiff's claims based on the 2003 Proxy, Lead Plaintiff argued that Congress never set forth a statute of limitations for §14(a) claims, thus, the Court should follow the limitations period set forth in analogous California state law which was two years from discovery or three years from the violation.  Lead Plaintiff argued that his claims were not time-barred since he brought his claims within two years of discovering the impact of the VantagePoint financing on the Company's NOLs, which he did when he

1   read Intermix's Form 10-Q on February 14, 2005. Lead Plaintiff additionally argued

2   that he had sufficiently demonstrated causality by alleging that he was damaged by

3   defendants' conduct.

4            63.    In response to defendants' arguments regarding Lead Plaintiff's claims

5   based on the Proxy, Lead Plaintiff argued that defendants had duties to disclose the

6   type of information that was missing from the Proxy, the various

7   omissions/misstatements were material under relevant case law, and he had

8   sufficiently demonstrated causality by alleging that he was damaged by defendants'

9   conduct. Lead Plaintiff argued that because he adequately pled the underlying breach,

10  he adequately pled his §20(a) claim as well.

11           64.    In response to defendants' arguments regarding Lead Plaintiff's fiduciary

12  duty claim, Lead Plaintiff argued that the appropriate standard of review was the

13  enhanced judicial scrutiny standard because the Acquisition was a sale of control.

14  Lead Plaintiff argued that defendants could not satisfy their burden under the

15  enhanced judicial scrutiny standard because defendants procured material benefits for

16  themselves, agreed to unwarranted deal protection devices, made no attempt to

17  maximize shareholder value, relied on conflicted financial advisors, and failed to

18  disclose material information regarding the Acquisition to shareholders.    Lead

19  Plaintiff additionally argued that the shareholder vote did not ratify the Acquisition

20  because shareholders were not fully informed and Del. Corp. Code §102(b)(7) did not

21  absolve defendants because it was not applicable where, as here, the alleged breach

22  involved bad faith, intentional misconduct or disloyalty.

23           65.    Lead Plaintiff also addressed defendants' arguments with respect to his

24  aiding and abetting claim and the unjust enrichment claim.

25           66.    On December 4, 2007, the Court decided that it would take defendants'

26  motion to dismiss the CFAC under submission without oral argument.

27           67.    On December 17, 2007, defendants submitted a Statement of Recent

28  Decisions to the Court, directing the Court's attention to two recent cases decided in

- 17 -

the Delaware Chancery Court: (1) *In re CheckFree Corp. S'holders Litig.*, No. 3193-CC, 2007 Del. Ch. LEXIS 148 (Del. Ch. Nov. 1, 2007) (denying a preliminary injunction to block a merger); and (2) *Globis Partners, L.P. v. Plumtree Software, Inc.*, No. 1577-VCP, 2007 WL 4292024 (Del. Ch. Nov. 30, 2007) (dismissing a complaint alleging breach of fiduciary duty in connection with a merger).

68.   On January 17, 2008, the Court issued its order on defendants' motion to dismiss the CFAC. With respect to Lead Plaintiff's claims based on the 2003 Proxy, the Court held that the proper limitations period was the lesser of one year from discovery or three years from the violation, unless the claim involved fraud, which then extended the limitations period to a 2/5 limit under the Sarbanes-Oxley Act of 2002. Because Lead Plaintiff alleged only negligence, the Court found his claims based on the 2003 Proxy time-barred under the 1/3 limit. The Court, however, granted Lead Plaintiff leave to amend to plead fraud if he wished.

69.   With respect to Lead Plaintiff's claims based on the Proxy, the Court held that his allegations were insufficient to constitute a short and plain statement of the claim and/or did not meet the heightened pleading standard under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which required a pleading to specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading. The Court granted Lead Plaintiff leave to amend, and specifically instructed him that he should: enumerate which statements in the Proxy were misleading and why; detail specific statements that should have been made for the purposes of his allegations based on omissions; identify the specific statements in the Proxy that were rendered misleading as a result of these omissions, and explain why the omissions render such statements misleading; and plead causation.

70.   With respect to Lead Plaintiff's unjust enrichment claim, the Court held that he failed to allege a relation between the enrichment and impoverishment in the CFAC. The Court granted Lead Plaintiff leave to amend this claim as well.

613312_1

71.     The Court declined to rule on the sufficiency of Lead Plaintiff's §20(a) claim, breach of fiduciary duty claim, and the aiding and abetting claim, pending amendment of the CFAC.

**K.     Filing of the Consolidated Second Amended Complaint**

72.     Lead Counsel immediately got to work on preparing a Consolidated Second Amended Complaint to address all the points raised by the Court in its January 17, 2008 motion to dismiss ruling.

73.     After two weeks of substantial effort, Lead Counsel filed the 73-page, Consolidated Second Amended Complaint on February 8, 2008 (the "CSAC").  The CSAC, like the CFAC, was a stockholder class action filed on behalf of the shareholders of Intermix against certain of its officers, directors, and VantagePoint, alleging violations of six counts of federal securities law and state violations: (i) §14(a) of the Exchange Act and the Rule 14a-9 promulgated under in connection with the 2003 Proxy; (ii) §14(a) of the Exchange Act and the Rule 14a-9 promulgated under in connection with the Proxy; (iii) §20(a) of the Exchange Act for controlling person liability; (iv) for breach of fiduciary in connection with the Acquisition;  (v) aiding and abetting breach of fiduciary duty; and (vi) for unjust enrichment.

74.     Lead Counsel worked to ensure that the CSAC contained additional detail and additional allegations directly in response to the Court's January 17, 2008 motion to dismiss ruling, including, among other things, allegations: (1) pleading fraud for the purposes of claims based on the 2003 Proxy; (2) identifying specific misleading statements in, and omissions from, the Proxy and providing why such statements and omissions were misleading; (3) pleading causation for the purposes of claims based on the Proxy; and (4) pleading a relation between defendants' enrichment and Lead Plaintiff's impoverishment.

613312_1

### L.    Oppositions to Defendants' Motions to Dismiss the CSAC

75.    On February 28, 2008, defendants filed their motions to dismiss the CSAC. Defendants split up the arguments between them by filing two motions and joinders, totaling 45 pages.

76.    In VantagePoint's motion, defendants argued that: (1) with respect to Lead Plaintiff's claims based on the 2003 Proxy, recent case law established Congressional intent not to apply a longer limitations period to a §14(a) claim, or alternatively, Lead Plaintiff failed to properly plead fraud under the heightened requirements of Rule 9(b) and the PSLRA; (2) with respect to Lead Plaintiff's claims based on the 2003 Proxy, he failed to plead scienter under the PSLRA, and failed to plead causation; and (3) with respect to Lead Plaintiff's unjust enrichment claim, the premium received by defendants were not connected to any loss to Lead Plaintiff and the Class.

77.    In the motion filed by the Intermix defendants, defendants argued that: (1) with respect to Lead Plaintiff's claims based on the Proxy, he failed to plead materiality of the identified statements/omissions; (2) with respect to Lead Plaintiff's claims against the Banker defendants, he failed to allege that the fairness opinions were subjectively and objectively false; and (3) Lead Plaintiff failed to plead that the material misstatement caused his loss – *i.e.*, Lead Plaintiff failed to plead loss causation under the standard of *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005).

78.    Defendants did not set forth any arguments on Lead Plaintiff's breach of fiduciary claim, aiding and abetting claim, and §20(a) claim, and instead, reasserted and incorporated by reference the grounds raised in their prior motions to dismiss.

79.    Defendants requested that the Court dismiss the entire CSAC with prejudice.

80.    Lead Plaintiff submitted his Omnibus Opposition to defendants' motions to dismiss the CSAC on March 28, 2008. In his opposition, Lead Plaintiff argued that

he adequately alleged his §14(a) claim based on the Proxy because the following omissions could not be immaterial as a matter of law: (1) failure to include information about the value of MySpace, Intermix's crown jewel asset; (2) failure to disclose internal management projections underlying the Company's financial advisors' analyses; (3) failure to include information regarding defendants' outstanding liability in derivative suits; and (4) the interest of a potential competing bidder, Viacom Inc. ("Viacom"), in acquiring Intermix. Lead Plaintiff also argued that he adequately alleged his §14(a) claim based on the Proxy against the Banker defendants because MySpace was worth more than what the Banker defendants represented it was worth, and the Banker defendants were aware that the Acquisition consideration was not a fair price based on their access to the Company's non-public financial information. Lead Plaintiff also argued that he adequately pled causation as to his §14(a) claim because, contrary to defendants' arguments, the standard set forth in *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970), was applicable to his claim, not the standard set forth in *Dura*, a §10b case. Lead Plaintiff argued that he adequately pled causation under *Mills*, which only required him to plead that the Proxy was an essential link in the approval of Acquisition.

81. With respect to Lead Plaintiff's claims based on the 2003 Proxy, he argued that he adequately pled: (1) fraud, as the CSAC detailed how VantagePoint conspired with directors and officers to remove the previous CEO from the picture to push through the VantagePoint Transactions; (2) scienter, as the CSAC alleged that defendants participated in the fraud to protect their jobs; and (3) causation, as the CSAC alleged that the 2003 Proxy was used to obtain shareholder approval of the VantagePoint Transactions.

82. Lead Plaintiff additionally argued that defendants' duties of disclosure were broader under state law than under federal law, so that his state law claims would necessarily survive any dismissal of his federal claims.

613312_1

83.     On April 18, 2008, defendants filed their reply briefs in support of their motions to dismiss the CSAC.

84.     On April 30, 2008, the Court decided that it would take defendants' motions to dismiss the CSAC under submission without oral argument.

85.     On July 14, 2008, the Court issued its opinion on defendants' motions to dismiss the CSAC.  The Court dismissed: Lead Plaintiff's §14(a) and §20(a) claims based on the 2003 Proxy; Lead Plaintiff's claim based on the Proxy against the Banker defendants; and Lead Plaintiff's unjust enrichment claim.  With respect to Lead Plaintiff's claims based on the 2003 Proxy, the Court determined that Lead Plaintiff had failed to plead the requisite level of scienter, and thus, failed to allege fraud and could not benefit from the 2/5 limitations period under Sarbanes-Oxley Act of 2002. With respect to Lead Plaintiff's claims based on the Proxy against the Banker defendants, the Court determined that Lead Plaintiff had failed to plead subjective falsity.   With respect to Lead Plaintiff's unjust enrichment claim, the Court determined that there was no relation between the purported enrichment and impoverishment.

86.     On the other hand, the Court upheld Lead Plaintiff's §14(a) claims based on the Proxy against the Intermix defendants and VantagePoint.  The Court held that Lead Plaintiff had adequately pled material omissions from the Proxy, because, among other things, (1) there was a reasonable likelihood that a reasonable shareholder would have considered specific financial information regarding MySpace, a critical asset, important in deciding how to vote; (2) investors were likely to be concerned about the Company's internal projections; and (3) the extinguishment of defendants' outstanding liability in derivative suits was not a remote possibility, as in fact, the *LeBoyer* action had contained derivative claims against defendants before they were dismissed for Mr. LeBoyer's lack of standing caused by the sale of the Company to News Corp.  Moreover, the Court agreed with Lead Plaintiff and held that the causation standard in *Mills*, not *Dura*, was the appropriate standard for Lead

- 22 -

1  Plaintiff's §14(a) claims.  The Court also upheld Lead Plaintiff's §20(a) claims based
2  on the Proxy.

3      87.    The Court upheld Lead Plaintiff's breach of fiduciary claim and the
4  aiding and abetting claim.  The Court agreed with Lead Plaintiff that the appropriate
5  standard of review was the enhanced judicial scrutiny standard, which was satisfied by
6  the CSAC.

7      88.    On August 4, 2008, defendants filed answers to the CSAC.

8      **M.    Second Rule 26(f) Report and Scheduling Order**

9      89.    On August 12, 2008, the Court issued an Order Setting Scheduling
10  Conference.

11      90.    Beginning on or around September 10, 2008, the parties met and
12  conferred pursuant to the Court's order and discussed the matters set forth in Fed. R.
13  Civ. P. 26(f) as well as the items specified in the Court's order.

14      91.    On or around September 16, 2008, defendants' counsel informed Lead
15  Counsel that defendants intended to file a motion for partial summary judgment on
16  Lead Plaintiff's §14(a), §20, and state law disclosures claims on the basis that there
17  was no causation and/or that there were no damages resulting from any alleged
18  disclosure violation.

19      92.    Lead Counsel and defendants' counsel prepared a joint Report of Parties'
20  Planning Meeting on October 6, 2008.

21      93.    On October 20, 2008, Lead Counsel attended a Scheduling Conference.
22  Lead Counsel argued strongly for the need for discovery, including in-depth discovery
23  regarding the real value of MySpace, and discovery regarding defendants' motion for
24  partial summary judgment (discussed below).

25      94.    On or around October 28, 2008, the Court set a scheduling order setting,
26  among other things, the deadline for the completion of fact discovery on April 20,
27  2009, expert discovery on June 19, 2009, and for the filing of summary judgment
28  motions on September 28, 2009.

613312_1

### N.   Initial Disclosures Pursuant to Rule 26(a)(1)

95.   On September 26, 2008, Lead Plaintiff's counsel served defendants with Lead Plaintiff's initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1).

### O.   Opposition to Defendants' Motion for Partial Summary Judgment

96.   On October 6, 2008, the Intermix defendants filed a motion for partial summary judgment on Lead Plaintiff's §14(a) and §20 disclosures claims, arguing that there was no causation and/or that there were no damages resulting from any alleged disclosure violation.  This motion was joined in by VantagePoint.  In their motion, defendants relied once more on *Dura* and its articulated standard for pleading loss causation, arguing, among other things, that defendants' interpretation of the law was consistent with legislative intent.  Defendants also argued that Lead Plaintiff suffered no economic loss and could not proceed on the benefit-of-the-bargain theory of damages because the alleged omissions were not related to the Acquisition consideration, as defendants contended were required under case law.

97.   On October 27, 2008, Lead Counsel prepared and submitted Lead Plaintiff's opposition to defendants' motion for partial summary judgment.  Lead Counsel also applied, at the same time and alternatively, for a denial or continuance of defendants' motion for partial summary judgment pursuant to Rule 56(f).  In support of Lead Plaintiff's opposition and application, Lead Plaintiff argued that defendants' loss causation argument was foreclosed as it was already considered and rejected by the Court in its ruling on defendants' motions to dismiss the CSAC, and that defendants' damages argument was premature because no discovery had yet been conducted in the Litigation.

98.   The Court took defendants' motion for partial summary judgment under submission without oral argument on November 7, 2008.

99.    On November 10, 2008, the Court denied defendants' motion for partial summary judgment, agreeing with Lead Plaintiff that to the extent defendants were seeking summary judgment on the basis of questions of law, the motion was a re-argument of the causation issues previously decided by the Court, and to the extent defendants were seeking summary judgment on the factual basis of damages, the motion was premature as the factual record was not yet developed.

**P.    Motion for Class Certification**

100.    On November 14, 2008, Lead Counsel filed a motion for class certification.   The motion for class certification demonstrated that all elements required for certification were established.  As to numerosity, Intermix was a public company whose stock had been traded on American Stock Exchange and had more than 35 million shares outstanding during the relevant time period.  Under established law, the Court was entitled to presume that the numerosity requirement was satisfied under these circumstances.  The briefing also established that there were at least ten questions of law or fact common to the proposed class, satisfying the element of commonality.   Typicality and adequacy were also established in that the Lead Plaintiff's claims were both typical of the proposed class and there were no unique defenses to the Lead Plaintiff's claims which rendered it atypical.  Lead Plaintiff, along with the other proposed class members, were directly and similarly harmed by defendants' conduct – all were deprived of the full value of their interests in Intermix. Further, Lead Plaintiff was knowledgeable and committed, and he had hired adequate counsel.  Lead Plaintiff also established that common issues predominated and that a class action was superior to a plethora of individual actions.

101.    On January 14, 2009, defendants filed an opposition to Lead Plaintiff's motion for class certification.  Defendants asserted a vigorous attack on typicality and adequacy because, among other reasons, defendants doubted Lead Plaintiff's familiarity with the Litigation.

613312_1

- 25 -

102.   On February 13, 2009, Lead Counsel filed a reply in support of their motion for class certification.

103.   On May 29, 2009, the Court granted Lead Plaintiff's motion for class certification but did not certify the class to give Lead Plaintiff an opportunity to address the requests from defendants to redefine the class.  Lead Plaintiff filed a response on June 8, 2009, arguing that the plaintiffs in the State Action should not be carved out of the class without notice.

104.   On June 22, 2009, the Court certified a class consisting of:  All holders of Intermix common stock, from July 18, 2005 through the consummation of the Acquisition, who were harmed by defendants' improper conduct at issue in the litigation, and excluding defendants and any person, firm, trust, corporation or other entity related to or affiliated with any defendant.

**Q.     Discovery Directed to Lead Plaintiff**

105.   On or around November 5, 2008, VantagePoint served document requests on Lead Plaintiff.  On December 5, 2008, Lead Plaintiff served his objections and responses to VantagePoint's document requests.

106.   On November 6, 2008, VantagePoint served interrogatories on Lead Plaintiff.  On December 5, 2008, Lead Plaintiff served his objections and responses to VantagePoint's interrogatories.

107.   On November 25, 2008, VantagePoint filed a notice of deposition to Lead Plaintiff.  Lead Plaintiff was deposed on December 10, 2008.

108.   On March 9, 2009, the various VantagePoint entities each propounded a set of 25 contention interrogatories to Lead Plaintiff for a total of 40 interrogatories.  On April 15, 2009, defendants Rosenblatt and Brewer served separate contention interrogatories to Lead Plaintiff.

109.   Starting from April 10, 2009, Lead Counsel discussed with defendants' counsel the issue of whether the interrogatories were proper.  With respect to VantagePoint's interrogatories, Lead Counsel took the position that the number was

- 26 -

613312_1

improper on the ground that the various VantagePoint entities had always acted in unison in the Litigation, and that the Federal Rules of Civil Procedure limited parties to only 25 interrogatories which could not be multiplied by divvying up between nominally separate parties. On April 28, 2009, Lead Plaintiff provided his arguments to VantagePoint. On May 1, 2009, VantagePoint filed a motion to compel the interrogatory responses from Lead Plaintiff. The parties submitted a Joint Stipulation setting forth their respective positions on May 1, 2009.

110. With respect to defendants Rosenblatt's and Brewer's interrogatories, Lead Plaintiff took the position that the number of interrogatories was improper and that the interrogatories contained improper subparts. On May 18, 2009, defendants Rosenblatt and Brewer joined VantagePoint's motion to compel. On May 19, 2009, after hearing oral argument, the Court granted defendants' motion to compel.

111. Lead Counsel submitted Lead Plaintiff's revised responses to defendants' contention interrogatories on June 2, 2009.

**R.    Document Discovery**

112. Lead Counsel spent considerable time drafting and propounding document requests and document subpoenas and reviewing and analyzing the documents produced in response thereto.

113. Starting on or around November 4, 2008, Lead Plaintiff served document requests on the Intermix defendants and VantagePoint.

114. Starting on or around November 5, 2008, Lead Plaintiff served subpoenas and/or document requests to various non-parties, including: (1) Viacom; (2) News Corp.; (3) Tom Anderson (MySpace); (4) Chris DeWolfe (MySpace); (5) Montgomery; (6) TWP; (7) Geoffrey Yang (Redpoint Ventures, investor in Myspace); (8) Michael Lang (News Corp.); (9) Josh Berman (MySpace); (10) Julia Angwin (author of *Stealing MySpace*); (11) Adam Goldenberg (Intermix executive); (12) Lisa Terrill (Intermix Chief Financial Officer); (13) Ross Levinsohn (News Corp.); (14) Donald Ressler (Intermix); (15) Sherman Atkinson (Intermix

- 27 -

613312_1

1    management); (16) Morgan Stanley (financial advisor to Viacom); and (17) W. Alex

2    Voxman (Latham & Watkins, legal advisor to Intermix).

3        115.   With respect to the document requests to News Corp., on or around

4    February 17, 2009, Lead Counsel had a discussion with counsel for News Corp.

5    (which was the same counsel for defendants) regarding their disagreement with

6    respect to the relevance of Lead Plaintiff's document requests.   Lead Counsel argued

7    that: (i) internal News Corp. documents generated during the negotiation process were

8    relevant to alleged breaches of fiduciary duty by defendants because such documents

9    reflected a contemporaneous record of those issues and events that were not available

10    from the other parties and non-parties to the Litigation; (ii) internal News Corp.

11    documents generated both pre- and post-signing of the merger agreement were

12    relevant both to defendants' alleged breaches of fiduciary duty and dissemination of

13    the allegedly false and misleading Proxy, both for the reasons discussed above in (i)

14    and because, pursuant to §2.5 of the Merger Agreement, News Corp. provided

15    information to and comments on the Proxy and would therefore have pertinent internal

16    documents of that process; and (iii) internal News Corp. documents generated post-

17    Acquisition were relevant to establishing the extent of the damages to the Class.

18    When News Corp. refused to produce documents, on or around March 10, 2009, Lead

19    Counsel filed a motion to compel production of documents from News Corp. in the

20    United States District Court, Southern District of New York.   After briefing by News

21    Corp., and reply briefing by Lead Counsel, the Southern District of New York heard

22    and granted in part Lead Plaintiff's motion to compel News Corp. to produce

23    additional documents.   Specifically, the court ordered News Corp. to produce

24    documents to Lead Plaintiff relating to News Corp.'s valuation of Intermix prior to the

25    Acquisition.

26        116.   On April 22, 2009, seeking additional post-merger valuation documents,

27    Lead Counsel filed a motion for reconsideration of this order, and directed the court to

28    a recent Delaware case, *In re John Q. Hammons Hotels Inc. S'holder Litig.*, No. 758-

613312_1

1    CC, 2009 Del. Ch. LEXIS 41 (Del. Ch. Mar. 25, 2009), wherein the Delaware

2    Chancery Court determined that post-valuation documents were relevant.   After

3    opposition and reply briefs, the court denied the motion for reconsideration, stating

4    that, among other things, the Delaware case was not controlling.

5         117.   Lead Counsel also fought hard to obtain non-privileged documents

6    (discussed below).

7         118.   With respect to the other document requests, Lead Counsel was able to

8    negotiate with defendants and the parties to either obtain all the documents requested,

9    or obtain a smaller subset if the request was duplicative or could be narrowed.  Lead

10   Counsel estimates that defendants and third parties produced approximately 123,000

11   pages of documents in total.

12   **S.      Deposition Discovery**

13        119.   Lead Counsel spent considerable time preparing for and taking

14   depositions, as well as dealing with various issues that arose during the process.

15        120.   Lead Counsel made a good faith attempt to limit the numbers of

16   depositions from 40 to 22.  On or around March 30, 2009, Lead Counsel was informed

17   that Viacom changed its position to a refusal to produce a deponent without a court

18   order.

19        121.   On or around March 31, 2009, Lead Counsel filed an *ex parte* application

20   for an extension of discovery deadlines, based on certain difficulties that Lead

21   Plaintiff was having in securing discovery from defendants and third parties, including

22   documents from News Corp. and the deposition of Viacom.  On April 7, 2009, the

23   Court granted Lead Plaintiff's *ex parte* application and continued the fact discovery

24   deadline to May 20, 2009, and the expert discovery completion date to July 20, 2009.

25        122.   Lead Counsel negotiated with defendants' counsel regarding the number

26   of depositions.  On April 21, 2009, the parties filed a stipulation stating that Lead

27   Plaintiff could take up to 20 depositions and that defendants could consider in good

28   faith Lead Plaintiff's request for two additional depositions, if necessary.

- 29 -

613312_1

123.   The depositions of the following defendants and other non-party witnesses were taken by Lead Counsel:  (1) defendant Richard Rosenblatt was deposed on March 13, 2009; (2) defendant Daniel Mosher was deposed on March 25, 2009; (3) Blake Warner (TWP, Intermix financial advisor) was deposed on April 2, 2009; (4) James Min (Montgomery, Intermix financial advisor) was deposed on April 8, 2009; (5) defendant Brett Brewer was deposed on April 9, 2009; (6) Michael Montgomery (Montgomery, Intermix financial advisor) was deposed on April 14, 2009; (7) Geoffrey Yang (Redpoint Ventures, MySpace investor) was deposed on April 14, 2009; (8) Josh Berman (MySpace) was deposed on April 15, 2009; (9) Stuart Epstein (Morgan Stanley, Viacom financial advisor) was deposed on April 17, 2009; (10) Michael Lang (News Corp.) was deposed on April 17, 2009; (11) Alex Voxman (Latham & Watkins, Intermix legal advisor) was deposed on April 22, 2009; (12) Tom Freston (Viacom) was deposed on April 29, 2009; (13) Lisa Terrill (Intermix Chief Financial Officer) was deposed on April 29, 2009; (14) Denmark West (Viacom) was deposed on May 7, 2009; (15) Christopher Lipp (defendant that was subsequently dismissed) was deposed on May 8, 2009; (16) Gordon Crawford (Capital Research & Management, identified by defendants in their supplemental disclosures) was deposed on May 14, 2009; (17) Robert Kitts (TWP, Intermix financial advisor) was deposed on May 14, 2009; (18) defendant Andrew Sheehan was deposed on May 15, 2009; (19) Julia Angwin (author of *Stealing MySpace*) was deposed on May 19, 2009; and (20) Chris DeWolfe (MySpace) was deposed on September 10, 2009.  Lead Counsel also cross examined during depositions noticed by defendants of the following individuals identified by defendants in their supplemental disclosures: (1) Sean Cooper (WestEnd Capital Management, LLC) on May 11, 2009; and (2) J. Patterson McBaine (Gruber & McBaine Capital Management, LLC) on May 12, 2009.

124.   As is apparent from the scheduling of over 20 depositions in approximately three months, Lead Counsel worked around the clock to review the hundreds of thousands of pages of documents produced, on a rolling basis, by

- 30 -

613312_1

1    defendants and third parties, and to take the depositions that took place across the

2    country.

3         125.   Defendants' experts were deposed as follows: (1) Jesse M. Fried was

4    deposed on July 17, 2009; (2) Peter Tamny was deposed on July 22, 2009; (3)

5    Bradford Cornell was deposed on August 12, 2009; and (4) Paul Gompers was

6    deposed on August 13, 2009.

7         126.   Lead Plaintiff's experts were also deposed: (1) Steven Davidoff was

8    deposed on July 14, 2009; (2) Gregory Brundage was deposed on July 15, 2009; (3)

9    John C. Coffee was deposed on July 29, 2009; (4) William Kennedy was deposed on

10   July 31, 2009.

11        127.   On March 18, 2009, defendants filed their Supplemental Disclosures

12   listing fifteen additional persons they believed to have knowledge relevant to the

13   Litigation.  After Lead Counsel noticed depositions and/or served subpoenas to these

14   individuals, the parties negotiated and came to agreement not to depose most of these

15   individuals on the understanding that defendants would not call these individuals to

16   testify in trial.

17        **T.    Attorney-Client Privilege Issue**

18        128.   On March 31, 2009, defendants produced privilege and redaction logs to

19   Lead Plaintiff.  Lead Counsel reviewed the logs and determined that the majority of

20   the entries were so vague that Lead Plaintiff was unable to determine whether the

21   documents were improperly being withheld.  When Lead Plaintiff received documents

22   from Viacom (on April 10, 2009) and documents from individuals at MySpace, Lead

23   Counsel was able to ascertain that many of these documents should have also been

24   produced by defendants.

25        129.   Likewise, Lead Counsel repeatedly attempted to secure disclosure of

26   defendants' counsel advice through deposition questions and was repeatedly informed

27   that defendants would not be permitted to answer the questions.

28

613312_1

130.   Lead Counsel informed defendants of their intention to file a motion to compel.  Lead Plaintiff's position was that: defendants could not use attorney-client privilege as both a sword and shield by pointing to counsel as the source of information that led to certain conclusions, then refusing to disclose that information; and defendants could not extend the privilege to communications regarding non-privileged issues simply because they channeled their communications through attorneys.   On April 28, 2009, Lead Counsel served a draft Joint Stipulation containing Lead Plaintiff's arguments as to the attorney-client privilege issue, which set forth 133 documents that Lead Plaintiff was seeking as well as the legal bases for his demand.  On May 1, 2009, the parties met and conferred and defendants agreed to produce unredacted copies of all but 14 of the 133 documents demanded by Lead Plaintiff.   Defendants further agreed to produce the remaining documents for the Court's in camera review.  Lead Counsel filed Lead Plaintiff's motion to compel non-privileged testimony and documents on May 8, 2009.   The parties filed the Joint Stipulation setting forth their positions on May 8, 2009.

131.   The Court heard oral argument on Lead Plaintiff's motion to compel on May 19, 2010.   With respect to testimony, on the basis of defendants' explicit representation that they would not rely on the advice of counsel defense, the Court denied Lead Plaintiff's motion.  With respect to documents, the Court denied Lead Plaintiff's motion without prejudice, and ordered that the parties conduct further meet and confer to determine which additional documents on the privilege log defendants should further produce.

**U.      Expert Opinions and Reports**

132.   Expert opinions were also offered in this case on the issues of Delaware law on breaches of fiduciary duty, contract interpretation regarding the MySpace Option, damages, and the financing market in which Intermix operated.  On June 8, 2009, the parties stipulated to extending the discovery completion date to August 4, 2009 (and the dispositive motion cutoff date to October 13, 2009).   There were two

- 32 -

1   rounds of expert reports on these issues with a total of twelve expert reports between
2   the parties.

3       133.   Lead Plaintiff submitted the opinions of his four experts on or around
4   May 20, 2009, as follows: (1) Expert Report of John C. Coffee, Jr.; (2) Expert Report
5   of Steven M. Davidoff; (3) Expert Report of G. William Kennedy; and (4) Expert
6   Report of Gregory R. Brundage.

7       134.   Defendants submitted three expert reports around May 20, 2009, as
8   follows: (1) Expert Report of Bradford Cornell; (2) Expert Report of Paul A.
9   Gompers; and (3) Expert Report of Peter D. Tamny.

10      135.   In response to defendants' expert reports, on June 18, 2009, Lead
11  Plaintiff submitted the following two rebuttal reports: (1) Rebuttal Expert Report of
12  John C. Coffee, Jr.; and (2) Rebuttal Expert Report of G. William Kennedy.

13      136.   In response to Lead Plaintiff's expert reports, on June 18, 2009,
14  defendants submitted the following three rebuttal reports: (1) Expert Rebuttal Report
15  of Paul A. Gompers; (2) Expert Rebuttal Report of Peter D. Tamny; and (3) Expert
16  Rebuttal Report of Jesse M. Fried.

17  **V.     Dismissal of VantagePoint and defendant Lipp**

18      137.   Lead Counsel and counsel for VantagePoint discussed the possibility of
19  dismissing VantagePoint from the Litigation.  It was Lead Counsel's position that
20  such a dismissal would focus the issues going forward for the purposes of trial.  On
21  June 8, 2009, the parties filed a stipulation dismissing VantagePoint without prejudice.
22  The Court dismissed VantagePoint on June 10, 2009.

23      138.   Lead Counsel and counsel for defendants discussed the possibility of
24  dismissing defendant Lipp from the Litigation. It was Lead Counsel's position that
25  such a dismissal would focus the issues going forward for the purposes of trial.  On
26  August 25, 2009, the parties filed a stipulation dismissing Lipp without prejudice.
27  The Court dismissed Lipp on August 28, 2009.

28

613312_1

W.   **Early Mediation**

139.   On or around August 21, 2009, the parties attempted two times to mediate a resolution before the Honorable Alexander H. Williams, III.  Those efforts proved unsuccessful.

X.   **The Motions for Summary Judgment**

140.   Beginning on or around August 19, 2009, Lead Counsel and counsel for defendants began to discuss the format and content of the parties' motions for summary judgment, pursuant to the Court's October 30, 2008 Order.  The parties had different interpretations of the Order, and after spending significant time meeting and conferring, the parties filed a joint stipulation on September 2, 2009, setting forth specific details regarding the format and procedure each party would follow.  The Court signed the proposed order on September 4, 2009.

141.   On or about October 19, 2009, the parties filed their Joint Brief Re Parties' Cross Motions for Summary Judgment.

1.   **Defendants' Motion for Summary Judgment**

142.   Defendants' summary judgment motion was a vigorous attack on Lead Plaintiff's breach of fiduciary claim.  Defendants argued that: (1) the exculpatory provision in Intermix's Articles of Incorporation insulated defendants from personal liability for breaches of duty of care, so that Lead Plaintiff was required to demonstrate a breach of duty of loyalty; (2) the recent Delaware Supreme Court decision of *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 244 (Del. 2009), set a high bar that required Lead Plaintiff to show that defendants utterly failed to attempt to obtain the best sale price to show bad faith for a breach of duty of loyalty claim; (3) Lead Plaintiff could not meet the bar set by *Lyondell* because defendants were knowledgeable and took actions in connection with the Acquisition; and (4) Lead Plaintiff could not show that the majority of the Board was interested in the merger.

143.   Defendants' summary judgment motion was also a vigorous attack on the key elements of Lead Plaintiff's §14(a) claim.  First, defendants claimed that there

- 34 -

613312_1

1   was no evidence to support Lead Plaintiff's allegations that defendants made material

2   misstatements or omitted material facts in the Proxy.  Defendants argued that alleged

3   omissions – *i.e.*, omissions regarding management projections, defendants' liability

4   from derivative lawsuits, Viacom's interest and the MySpace Option[3] – were not

5   material and/or already disclosed.  Second, defendants contended that there was no

6   evidence that defendants acted negligently for the scienter element of Lead Plaintiff's

7   §14(a) claim.  Third, defendants contended that there was no evidence available from

8   which Lead Plaintiff could prove that the Intermix shareholders suffered any

9   economic loss.

10      144.   Lead Plaintiff took each of defendants' arguments head on in the joint

11   brief.  With respect to defendants' argument regarding Lead Plaintiff's breach of

12   fiduciary claim, Lead Plaintiff argued in response that: (1) *Lyondell* did not change

13   existing Delaware law on the duty of loyalty and *Lyondell* was not applicable because

14   its facts were distinguishable from the factual record developed in this Litigation; (2)

15   defendants Rosenblatt and Montgomery conspired to sabotage Viacom's efforts to

16   acquire Intermix in favor of News Corp., including active misrepresentation to the

17   Board, for self-interested reasons, in breach of their duty of loyalty; and (3) the Board

18   was complicit and/or deceived by Rosenblatt, in breach of their duty of loyalty.

19      145.   With respect to defendants' arguments regarding Lead Plaintiff's §14(a)

20   claim, Lead Plaintiff pointed to case law, the factual record, and analysis by his

21   experts to demonstrate that there was, at least, a question of fact as to the materiality

22   of each alleged omission, negligence, and economic loss.  Lead Plaintiff also argued

23   that defendants failed to address the alleged omission with respect to MySpace's

24   current revenues and profits.

---

[3]   The "MySpace Option" refers to Intermix's option as set forth in the MySpace, Inc. Stockholders Agreement dated February 11, 2005 ("MSA"), which permitted Intermix to purchase the remaining 47% of MySpace that it did not own at a set price under certain conditions.

613312_1

146.   Not surprisingly, Lead Plaintiff's view of what the evidence developed during discovery showed was in stark contrast to the state of play described by the defendants' summary judgment motion.  In support of his opposition to defendants' motion for summary judgment, Lead Plaintiff identified 522 facts in the record that demonstrated that there was, at least, one material fact in dispute, demonstrating the Litigation could not be resolved without trial.  The statement of uncontroverted and controverted facts submitted in connection with the joint brief was 224 pages in length.

### 2.   Lead Plaintiff's Motion for Partial Summary Adjudication

147.   Lead Plaintiff moved for summary adjudication of a single issue: whether News Corp.'s offer on or before July 15, 2005 was a "bona fide third-party offer" as contemplated under the MSA.  Lead Plaintiff argued that: (1) under Black's Legal Dictionary, case law and common practice, the July 15, 2005 offer had to be considered a "bona fide third-party offer" under the MSA; and (2) if defendants understood the July 15, 2005 offer to be a "bona fide third-party offer" under the MSA, they breached their fiduciary duties and violated §14(a) by justifying their conduct on the premise that the MySpace Option could be frozen, when under the MSA, the MySpace Option could not be frozen upon receipt of a "bona fide third-party offer."

148.   In response, defendants argued that the term "bona fide third-party offer" was ambiguous, and defendants did not understand the July 15, 2005 offer to be a "bona fide third-party offer" under the MSA.

### 3.   Defendants' Notice of New Authority

149.   After the parties filed their joint brief on their cross-motions for summary judgment and adjudication, but before the Court issued an order with respect to same, on February 1, 2010, defendants filed a Notice of Recent Authority, directing the Court's attention to *New York City Employees' Retirement System v. Jobs*, 593 F.3d

- 36 -

1018 (9th Cir. 2010) – a case they stated addressed the loss causation element of a §14(a) claim. Lead Counsel filed Lead Plaintiff's response on February 11, 2010, arguing that *New York City Employees' Retirement System* had no effect on this Litigation and that defendants were improperly attempting once again to challenge the Court's previous ruling on loss causation.

### 4.   Order on Summary Judgment and Summary Adjudication

150.   On June 17, 2010, the Court issued its Opinion and Order on the parties' cross motions for summary judgment and summary adjudication. The Court denied Lead Plaintiff's motion for summary adjudication, holding that the interpretation of "bona fide third-party offer" under the MSA was not a purely legal question.

151.   The Court denied defendants' motion for summary judgment with respect to Lead Plaintiff's claim for breach of fiduciary duty. After analyzing the evidence presented by Lead Plaintiff and defendants, the Court agreed with Lead Plaintiff, among other things, that: (1) *Lyondell* did not work any transformation in Delaware law on the duty of loyalty; (2) there was evidence of Rosenblatt's motivation for the alleged bidder favoritism; (3) there was evidence that Rosenblatt deliberately dodged, if not frustrated, an arguably imminent bid from Viacom; (4) there was evidence as to whether the Board put the entire process in the hands of Rosenblatt; and (5) there was evidence as to whether a majority of directors were interested or manipulated by someone who was.

152.   The Court denied in part, and granted in part, defendants' motion for summary judgment with respect to Lead Plaintiff's federal securities claim. The Court granted defendants' motion for summary judgment as to the purported material omissions concerning Viacom and the MySpace Option, and as to the unavailability of the benefit-of-the-bargain damages theory and the lost opportunity damages theory to Lead Plaintiff. The Court denied defendants' motion for summary judgment as to the rest, agreeing with Lead Plaintiff, among other things, that: (1) defendants did not

- 37 -

1  make any threshold showing entitling them to summary judgment on the basis of the

2  alleged omission as to MySpace's then-current revenue and profits, management

3  projections, and information about derivative lawsuits; (2) a finding of negligence will

4  flow from a finding of materiality and defendants' participation and/or review of the

5  Proxy; and (3) the out-of-pocket damages theory was available for Lead Plaintiff.

6  **Y.    *Daubert* Motion and Motion to Strike**

7      153.   On November 30, 2009, defendants filed a motion to exclude the

8  opinions of G. William Kennedy, Lead Plaintiff's damages expert under *Daubert* (the

9  "*Daubert* Motion"). Defendants submitted a declaration from their expert Bradford

10  Cornell in support of their *Daubert* Motion.

11      154.   Lead Counsel contended that first, Lead Plaintiff should be given the

12  opportunity to depose Cornell on the basis of his new declaration. Lead Counsel

13  negotiated with defendants' counsel and the parties filed a stipulation setting forth a

14  deposition schedule in advance of the hearing on defendants' *Daubert* Motion. Lead

15  Counsel deposed Cornell on December 15, 2009.

16      155.   On December 22, 2009, Lead Counsel filed Lead Plaintiff's opposition to

17  defendants' *Daubert* Motion. Lead Plaintiff argued that defendants' *Daubert* Motion

18  amounted to a disagreement about the persuasiveness of Kennedy's expert opinion,

19  and was a determination only for a trier of fact. Lead Plaintiff submitted a declaration

20  from Kennedy in support of his opposition.

21      156.   On December 22, 2009, Lead Plaintiff also filed a motion to strike

22  defendants' *Daubert* Motion. Lead Plaintiff challenged the prematurity of defendants'

23  *Daubert* Motion before the Court issued its summary judgment order, contended that

24  Cornell was not responsive in his deposition and that defendants were refusing to

25  produce any documents relevant to his criticism of Kennedy, and stated that the

26  information in the new Cornell declaration was improperly made known to him after

27  the expert deadline had passed.

28

613312_1

157.   Moreover, because defendants represented that the *Daubert* Motion was to exclude Kennedy's opinion offered in support of Lead Plaintiff's opposition to defendants' summary judgment motion, Lead Plaintiff took the position that the *Daubert* Motion was a belatedly-filed part of defendants' summary judgment motion. On January 11, 2010, Lead Plaintiff filed a motion to strike defendants' summary judgment motion for failure to abide by the Court's October 19, 2009 summary judgment order.

158.   The Court addressed defendants' *Daubert* Motion and Lead Plaintiff's motion to strike on June 17, 2010, the same date the Court issued its Opinion and Order on the parties' cross motions for summary judgment and summary adjudication. The Court denied both defendants' *Daubert* Motion and Lead Plaintiff's motion to strike. As discussed above, after finding that Kennedy's testimony was sufficient to at least raise triable issues on damages from out-of-pocket losses, the Court also denied defendants' motion for summary judgment on the out-of-pocket losses issue.

**Z.   Negotiating the Settlement**

159.   Following the Court's June 17, 2010 order regarding summary judgment, the parties agreed that a further mediation session would be productive and agreed to mediate before Anthony Piazza, Esq.  The parties provided Mr. Piazza with written materials to familiarize him with the case.  Following a full day of negotiations on October 21, 2010, the parties reached an agreement-in-principle to resolve the Litigation for $45 million.

160.   Lead Counsel began the process of documenting the settlement agreement. On October 27, 2010, the parties filed a Joint Report notifying the Court that the parties reached resolution of the Litigation.

161.   On December 23, 2010, Lead Plaintiff filed the Stipulation of Settlement with the Court.

162.   On February 7, 2011, Lead Plaintiff filed the Amended Stipulation of Settlement with the Court.

- 39 -

613312_1

**AA.   Motion for Preliminary Approval of Class Action
Settlement**

163.   On December 27, 2010, Lead Plaintiff filed an unopposed motion for
preliminary approval of class action settlement.  On January 31, 2011, the parties
appeared before the Court on Lead Plaintiff's Unopposed Motion for Preliminary
Approval of Settlement.

164.   On February 17, 2011, the Court granted Lead Plaintiff's unopposed
motion for preliminary approval of class action settlement, subject to two minor edits.

**III.   THE FACTORS SUPPORTING APPROVAL OF THE
SETTLEMENT**

165.   As shown above, the Settlement is the product of hard-fought litigation
and takes into consideration the risks specific to this case.  The Settlement is also the
result of arm's-length negotiations between experienced counsel who have concluded
that the Settlement is fair, reasonable, and adequate and should be approved by the
Court.  The Settlement was negotiated by experienced counsel for Lead Plaintiff and
defendants with a firm understanding of both the strengths and weaknesses of their
respective positions, and was negotiated with an experienced mediator who further
pointed out potential risks to both parties if the Litigation should go to trial.

166.   After careful evaluation and analysis with the participation and
consideration of the Lead Plaintiff, Lead Counsel has determined it is in the best
interests of the Class to resolve the Litigation on the terms agreed to in the Settlement.

167.   Lead Plaintiff and Lead Counsel believe the Settlement represents a very
good result for the Class.  Lead Counsel is not only skilled and experienced in
securities litigation and mergers and acquisition litigation such as this, but it has also
spent a considerable amount of time gaining full and complete knowledge of the
Litigation through extensive motion practice, intensive factual discovery, and
extensive expert consultations that had occurred by the time the Settlement was
reached.  The Settlement confers a substantial benefit on the Class and eliminates
significant risks relating to continuing the Litigation.  The Settlement avoids the

- 40 -

613312_1

hurdles Lead Plaintiff would have to clear with respect to proving, among other things, the existence of defendants' breaches of fiduciary duty, the materiality of defendants' misstatements and omissions, and the amount of such damages at trial, and any post-trial appeals. Moreover, the risks involved in prosecuting this Litigation further, coupled with the associated time and expense, when measured against the size of the Settlement Amount, fully justify the Settlement.

168.   The proposed Settlement – that Lead Counsel believes is in the top ten largest common fund recoveries ever achieved in a merger-related action – is a substantial result for the Class.

## IV.   STRENGTH OF LEAD PLAINTIFF'S CASE COMPARED TO THE AMOUNT OF THE SETTLEMENT

169.   The amount offered in settlement was an important consideration in Lead Plaintiff's and Lead Counsel's decision to settle the Litigation and weighs heavily in favor of the Settlement. Here, the Class will receive $45 million in cash in exchange for the release of all claims against defendants.

170.   Lead Plaintiff and the Class faced a significant risk relating to proving to a jury the existence of defendants' bad faith, disloyalty, materially false and misleading statements, that those statements were made with scienter, and the amount of such damages. All these risks have been avoided as a result of the Settlement. Lead Counsel is aware, for example, that if defendants were able to persuade a jury to believe defendants' version of the factual record, persuade the jury to believe defendants' view as to the significance of the alleged omissions from the Proxy, or persuade the jury to attach more weight to the expert opinions of defendants rather than Lead Plaintiff's experts, the Class's opportunity for recovery would be significantly diminished, if not eliminated.

171.   Moreover, the cost of continuing to pursue the Litigation, including the costs of any post-trial appeals which defendants were certain to make, would likely

613312_1

greatly outweigh the amount of any increased recovery that might be obtained through further litigation.

## V.   THE COMPLEXITY, LENGTH, AND EXPENSE OF FURTHER LITIGATION

172.   An analysis of the risk, expense, complexity, and likely duration of further litigation, also warrants the Court's approval of the Settlement.  As described above, Lead Plaintiff and the Class faced significant risks in connection with continuing to prosecute the Litigation.

173.   Lead Plaintiff faced the risks inherent in taking a case to trial; *i.e.*, that it is impossible to predict how a trier of fact will resolve the conflicting evidence and testimony presented by the parties, especially in this Litigation, where the evidence that would be presented concerns complicated issues of bad faith, disloyalty, materiality, falsity, and damages.  To prove breach of fiduciary duty, for example, Lead Plaintiff would have been required to convince the trier of fact, among other things: that Rosenblatt did, in fact, favor News Corp. over Viacom because he wanted future employment from News Corp.; that Rosenblatt did, in fact, dodge and frustrate an imminent bid from Viacom; that Rosenblatt manipulated the Board and/or the Board consciously permitted Rosenblatt to control and run the sales process.  And, to prove violations of federal securities law, Lead Plaintiff would have been required to convince the trier of fact, among other things, that there was a substantial likelihood that a reasonable shareholder would have viewed information about MySpace's then-current revenue and profits, management projections, and derivative lawsuits important in deciding how to vote on the Acquisition.  As noted by the Court in its summary judgment order, this would require the trier of fact to infer from certain evidence, like emails, things hard to prove like a person's intent and would require the trier of fact to assess the falsity or misleading nature of statements or omissions in the Proxy.

613312_1

174.   Moreover, Lead Plaintiff faced the challenge of proving damages to the trier of fact.  Lead Plaintiff's expert and defendants' expert on damages were both highly qualified experts that looked at the same body of evidence and drew different conclusions.  Lead Plaintiff would have to convince the trier of fact to attach more weight to his expert's opinion.  Moreover, on the more technical level, the only damages theory available to Lead Plaintiff after the Court's order on summary judgment was the out-of-pocket losses theory.  Under that theory, Lead Plaintiff would have been required to convince the trier of fact what the "fair value" of Intermix, including its MySpace asset, was at the time of the Acquisition.  By 2009, however, MySpace was a different asset than it was in 2005, and it was likely that the trier of fact would perceive MySpace to be obsolete in comparison to contemporary popular websites like Facebook, and would believe MySpace to be worth less than what News Corp. paid for it in the Acquisition, or worth nothing at all.  Thus, Lead Plaintiff would have to deal with the possible assessment by the jury, that when taking in consideration post-Acquisition facts, Lead Plaintiff and the Class actually obtained more than they were entitled to in the Acquisition and so were entitled to little or no damages.

175.   The expense and delay of further litigation support the Settlement.  Even a favorable post-trial judgment would leave Lead Plaintiff facing a certain appeal by defendants to challenge the various legal theories, arguments and evidence put forth and or remittitur of any damages number achieved by Lead Plaintiff.  In an action of this complexity, the costs associated with preparation for any post-trial appeals (coupled with the costs associated with preparation for trial and trial) would be very high.  Moreover, absent the Settlement, extensive time would pass before the Class would receive a recovery, if any.

176.   In short, Lead Plaintiff faced a daunting and highly uncertain road to achieving any recovery whatsoever for Intermix's shareholders, much less a recovery of the magnitude obtained through the present settlement. Lead Plaintiff and Lead

- 43 -

613312_1

1   Counsel firmly believe the Settlement is a tremendous result for Intermix's

2   shareholders under the circumstances.

3   **VI.   THE REACTION OF THE CLASS MEMBERS TO THE PROPOSED SETTLEMENT**

4

5   177. Mailing of the Notice to potential Class Members commenced on

6   February 18, 2011. The deadline for objecting to the Settlement – April 21, 2011 –

7   has not yet passed but, to date, no objections to the Settlement, the Plan of Allocation

8   or the request for fees and expenses have been received. Lead Counsel will respond to

9   any objections by May 2, 2011 in accordance with the Notice Order.

    **VII.   THE EXPERIENCE AND VIEWS OF COUNSEL**
10
         The experience and views of counsel weigh in favor of this Court's approval of
11
    the Settlement. Lead Counsel is an extremely accomplished firm, specializing in
12
    plaintiffs' securities class actions and merger-related actions. In addition, as set forth
13
    above, Lead Counsel are knowledgeable regarding all the circumstances at issue.
14
    Lead Counsel have vigorously prosecuted this Litigation against defendants for four
15
    years, and have pursued related litigation for seven years, including litigation all the
16
    way up to the California Supreme Court, and, in light of the risks involved in further
17
    litigation, believe that the Settlement is in the best interests of the Class.
18
    **VIII.   THE PRESENCE OF GOOD FAITH, ARM'S-LENGTH NEGOTIATIONS**
19

20   178. It is clear that the Settlement is not the product of collusion and an

21   analysis of this factor weighs in favor of the Court's approval of the Settlement. As

22   discussed above, this Litigation was hard fought and the parties engaged in arm's-

23   length settlement negotiations prior to reaching the Settlement. At all times during

24   and between the mediation and settlement negotiations, Lead Counsel zealously

25   advocated Lead Plaintiff's position in the best interests of the Class. Counsel for

26   defendants vigorously advanced defendants' positions during these negotiations as

27   well. But for the Settlement – an agreement that Lead Plaintiff and Lead Counsel

28   believe to be in the best interests of the Class in light of the strengths of Lead

613312_1

1  Plaintiff's claims and the risks involved in further litigation – Lead Counsel were
2  prepared to continue prosecuting the Litigation against defendants.

3  **IX.  THE EXTENT OF DISCOVERY COMPLETED AND THE STAGE OF THE PROCEEDINGS**

4
5       179.  The extent of discovery completed and the stage of the proceedings also
   weighs in favor of the Settlement.  By the time the Settlement was reached Lead
6
   Counsel had sufficient knowledge and understanding of the merits of the claims
7
   alleged in the Litigation and the defenses asserted by defendants to determine that the
8
   Settlement is in the best interests of the Class.  Lead Counsel obtained this knowledge
9
   through related litigation; pursuing, investigating, and researching the facts and issues
10
   required to draft the complaints; opposing defendants' motions to dismiss; reviewing
11
   and analyzing hundreds of thousands of pages of documents produced by defendants
12
   and third parties; preparing for and conducting over two dozen fact and expert
13
   depositions; conferring with experts; completing expert discovery; opposing
14
   defendants' summary judgment motions; and analyzing the Court's ruling on
15
   defendants' summary judgment motion.  The only thing left was a trial.  The
16
   knowledge and insight gained by Lead Counsel during approximately seven years of
17
   litigation provided Lead Counsel with more than sufficient information to evaluate the
18
   strengths and weaknesses of the Class's claims and defendants' defenses.
19
   **X.  THE PLAN OF ALLOCATION**
20
       180.  The Plan of Allocation, which is set forth in the Notice sent to Class
21
   Members, is simple and straightforward.  All Class Members will receive their
22
   prorated share of the settlement proceeds.
23
       181.  Specifically, under the Plan of Allocation set forth in the Notice, a claim
24
   will be calculated as follows:
25
           Each share tendered for which a Claimant held between July 18,
26
       2005 and September 30, 2005, and received $12.00 in cash pursuant to
27
       the Acquisition for which a valid Claim Form was submitted will be
28

- 45 -

613312_1

allocated a *pro rata* share of the Net Settlement Fund. An Authorized Claimant's Recognized Claim Amount will equal that *pro rata* amount multiplied by the number of shares the Authorized Claimant tendered for which Claimant received $12.00 in cash pursuant to the Acquisition.

182.   Moreover:

If any funds remain in the Net Settlement Fund because of uncashed distributions or other reasons, then, after the Claims Administrator has made reasonable and diligent efforts to have Authorized Claimants cash their distribution checks, any balance remaining in the Net Settlement Fund one (1) year after the initial distribution of such funds shall be redistributed to Class Members who have cashed their initial distribution and who would receive at least $20.00 from such redistribution, after payment of any unpaid costs or fees incurred in administering the Net Settlement Fund for such redistribution. If any funds shall remain in the Net Settlement Fund six (6) months after such redistribution, then such balance shall be contributed to not-for-profit 501(c)(3) organizations designated by Plaintiff's Lead Counsel.

183.   The Court has reserved jurisdiction to allow, disallow, or adjust the claim of any Class Member on equitable grounds.

184.   Finally, the Notice states that:

Payment pursuant to the Plan of Allocation approved by the Court shall be conclusive against all Authorized Claimants. No person shall have any claim against Plaintiff, Plaintiff's Lead Counsel, or the Claims Administrator or other agent designated by Plaintiff's Lead Counsel arising from distributions made substantially in accordance with the Stipulation, the Plan of Allocation, or further orders of the Court. Plaintiff, Defendants, their respective counsel, and all other Released

- 46 -

Persons shall have no responsibility or liability whatsoever for the investment or distribution of the Settlement Fund, the Net Settlement Fund, the Plan of Allocation, or the determination, administration, calculation, or payment of any Claim Form or nonperformance of the Claims Administrator, the payment or withholding of taxes owed by the Settlement Fund, or any losses incurred in connection therewith.

## XI. LEAD PLAINTIFF'S COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

185.   In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Plaintiff's counsel are also applying to the Court for an award of attorneys' fees and expenses.  Specifically, Lead Plaintiff's counsel are applying for a fee of 27% of the Settlement Amount and requesting payment of expenses incurred in the prosecution of the Litigation in the amount of $851,286.91, plus interest on both amounts at the same rate earned on the Settlement Amount.

### A.    The Requested Fee of 27% of the Settlement Fund Is Fair and Reasonable

186.   For our extensive efforts on behalf of the Class, Lead Plaintiff's counsel are applying for compensation from the Settlement Amount on a percentage basis. The percentage method is the appropriate method for awarding fees because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery in the shortest amount of time required under the circumstances, is supported by public policy, has been recognized as appropriate by the United States Supreme Court for cases of this nature, and represents the overwhelming current trend in most circuits including the Ninth Circuit.

187.   The fee application is being submitted by Lead Plaintiff's counsel with the prior approval of Lead Plaintiff.  As set forth in Lead Plaintiff's counsel's Memorandum of Points and Authorities in Support of an Award of Attorneys' Fees and Expenses ("Fee Memorandum"), a 27% fee is fair and reasonable for attorneys'

- 47 -

1  fees in common fund cases such as this and is within the range of the percentages

2  typically awarded in securities class actions in this Circuit.

3      188.   As more fully set forth in the Fee Memorandum, Lead Plaintiff's counsel

4  believe that the fee request is reasonable given the Lead Plaintiff's approval of the

5  requested fees, the excellent recovery obtained for the benefit of the Class, the risks of

6  litigation, the contingent nature of counsel's representation, the complexity of the

7  legal and factual questions at issue, and the extensive efforts of counsel.

8              **1.      The Excellent Settlement Achieved**

9      189.   Courts have consistently recognized that the result achieved is a major

10  factor to be considered in making a fee award. *See Hensley v. Eckerhart*, 461 U.S.

11  424, 436 (1983) ("most critical factor is the degree of success obtained").   This

12  favorable settlement of $45 million was achieved as a result of very extensive and

13  creative prosecutorial efforts, contentious and complicated motion practice, and

14  arduous settlement negotiations, as detailed herein. As a result of the Settlement,

15  thousands of Members of the Class will benefit and receive significant compensation

16  for their losses and avoid the very substantial risk of no recovery in the absence of a

17  settlement.

18              **2.      The Risks as to Both Liability and Damages**

19      190.   Numerous cases have recognized that risk is another important factor in

20  determining an appropriate fee award. *E.g., Camden I Condo. Ass'n v. Dunkle*, 946

21  F.2d 768, 775 (11th Cir. 1991); *Lindy Bros. Builders v. Am. Radiator & Standard

22  Sanitary Corp.*, 540 F.2d 102, 117 (3d Cir. 1976); *Detroit v. Grinnell Corp.*, 495 F.2d

23  448, 470 (2d Cir. 1974).

24      191.   As discussed in greater detail above, this case had exceptionally severe

25  risk factors concerning proving bad faith, disloyalty, falsity, scienter, loss causation,

26  and damages to a trier of fact.   Due to the daunting burden of proving these elements

27  of the claims, Lead Plaintiff's success was by no means assured.

28

613312_1

### 3.    The Diligent Prosecution of This Case

192.   The fee is also warranted in light of the extensive efforts on the part of Lead Plaintiff's counsel, as outlined above, that were required to produce the Settlement.   Lead Plaintiff's counsel and their in-house professionals and paraprofessionals spent 8,958.36 hours on the case, *inter alia*, conducting formal and informal discovery, responding to defendants' discovery requests, drafting complaints, reviewing and analyzing documents, taking and defending depositions, consulting with experts, mastering the relevant facts and dynamics of Intermix's business, and negotiating this outstanding settlement.   In addition, Lead Counsel were required to research and draft comprehensive memoranda of law concerning difficult and novel issues in connection with the motion to dismiss, the motion for class certification, and summary judgment.

### 4.    The Complexity of This Action's Factual and Legal Questions

193.   Courts have recognized that the novelty and difficulty of the issues in a case are significant factors to be considered in making a fee award.  As demonstrated by the discussion above, in this Litigation, Lead Plaintiff addressed numerous, novel and complex issues of substantive federal and Delaware law throughout the Litigation. Lead Plaintiff also had to address new case law that emerged during the Litigation and that defendants argued changed the legal landscape and supported a dismissal of Lead Plaintiff's claims.  By way of example, the Delaware Supreme Court case of *Lyondell* was decided on March 27, 2009, right before defendants moved for summary judgment.  Lead Counsel had to address and respond to *Lyondell*-based arguments by defendants, who vigorously argued the case set a new high bar for Lead Plaintiff to show bad faith or disloyalty by defendants.  In a similar vein, had this Settlement not been reached, the complex factual and legal questions at issue would continue to be the subject of substantial analysis and dispute.   Moreover, as discussed above, numerous complex issues would be involved in proving liability, including whether

- 49 -

defendants acted in bad faith or disloyally, whether defendants' statements were false, whether the statements were material, whether defendants acted with scienter, and whether Lead Plaintiff and the Class suffered damages, as well as whether such damages could be proven, and the amount thereof.

### 5. The Contingent Nature of the Case and the Financial Burden Carried by Lead Plaintiff's Counsel

194.   A determination of a fair fee must include consideration of the contingent nature of the fee, the financial burden carried by plaintiffs' counsel, and the difficulties which were overcome in obtaining the settlement.

195.   This action was prosecuted by Lead Plaintiff's counsel on an "at-risk" contingent fee basis. Lead Plaintiff's counsel committed 8,958.36 hours of attorney and paraprofessional time and incurred $851,286.91 in expenses in the prosecution of the action. The resulting lodestar is $4,763,375.10 and results in a modest 2.55 multiplier of counsel's time. Lead Plaintiff's counsel also fully assumed the risk of an unsuccessful result and should be fairly compensated for their efforts. Lead Plaintiff's counsel have received no compensation for their services during the course of the Litigation and have incurred very significant expenses in litigating for the benefit of the Class. Any fee and expense award to Lead Plaintiff's counsel has always been at risk and completely contingent on the result achieved and on this Court's exercise of its discretion in making any award. Moreover, as discussed above, Lead Plaintiff's counsel incurred $851,286.91 in expenses – a significant amount with a very real risk of not recovering any of it – in order to effectively litigate this case to a successful conclusion for Lead Plaintiff and the Class.

196.   Lead Plaintiff's counsel's efforts were performed on a wholly-contingent basis, despite significant risk and in the face of determined, relentless opposition. Under these circumstances, it necessarily follows that we are justly entitled to the award based on the benefit conferred and the common fund obtained.

- 50 -

### 6.   Standing and Expertise of Lead Counsel

197.   The expertise and experience of lead counsel is another important factor in setting a fair fee.   Lead Counsel is among the most experienced and skilled practitioners in the securities litigation and mergers litigation field, and has long and successful track records in such cases.   Moreover, the fact that Lead Counsel has demonstrated a willingness and ability to prosecute complex cases such as this, including its willingness to take related litigation all the way up to the California Supreme Court, was undoubtedly a factor that encouraged defendants to engage in settlement discussions.

### 7.   Standing and Caliber of Opposing Counsel

198.   The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel.   Lead Plaintiff was opposed in this case by very skilled and highly-respected counsel. Defendants were represented by attorneys from Hogan Lovells US LLP and Orrick, Herrington & Sutcliffe, LLP, who spared no effort in the defense of their clients.   In the face of this knowledgeable and formidable defense, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade the defendants to settle the Litigation on terms that are extremely favorable to the Class.

### 8.   Public Policy Considerations

199.   Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws.   If this important public policy is to be carried out, plaintiffs' counsel should be adequately compensated, taking into account the risks undertaken in prosecuting securities class actions.

200.   As a result of Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties, Lead Counsel achieved a significant recovery for the benefit of the Class.   In circumstances such as these, and in consideration of Lead Counsel's hard work and the highly favorable result achieved, the requested 27% fee is reasonable and should be approved.

- 51 -

613312_1

### 9.    The Request for Payment of Expenses Is Reasonable

201.    Lead Counsel also requests payment of expenses reasonably and necessarily incurred during the prosecution of the Litigation.   Lead Counsel respectfully submits that the expense application is appropriate, fair, and reasonable and should be approved in the amount requested.   A breakdown of the expenses is contained in the declarations of Ellen Gusikoff Stewart, George A. Shohet, and Christy Goodman, submitted herewith by Lead Plaintiff's counsel.

202.    The expenses for which payment is being sought were necessary and appropriate for the prosecution of this case.   These include expenses for experts, consultants, and investigators; depositions and court transcripts; class notice; photocopying, document imaging and database management; computerized, legal and factual research devoted to the case; costs incurred for out-of-town travel; telephone and postal charges; messenger and overnight delivery services; telecopy and facsimile charges; and similar case-related costs.   Courts have typically found that such expenses are properly paid from a fund recovered by counsel for the benefit of a class.

### 10.    Lead Plaintiff Is Entitled to a Service Award

203.    Lead Counsel also requests a reasonable service award in the amount of $10,000 to Lead Plaintiff as compensation and consideration for his efforts as the representative of the Class.   Over the course of this Litigation, Lead Plaintiff expended a significant amount of hours to fulfill his duties as a representative of the Class. Lead Plaintiff: (i) had numerous discussions over the phone and in person with Lead Counsel to discuss the case; (ii) reviewed multiple filings in the Litigation, including complaints and pleadings; (iii) participated in strategy decisions and decisions regarding litigation tactics; (iv) was actively involved in discovery, including testifying in a deposition on December 10, 2008, and providing personal information in response to discovery requests from defendants; and (v) was actively involved in settlement negotiations, including attending mediation sessions held between the parties.

- 52 -

613312_1

1 **XII.   CONCLUSION**

2        204.   For all of the foregoing reasons, Lead Counsel respectfully request the

3 Court approve the Settlement, the Plan of Allocation, and the fee and expense

4 application, and award Lead Counsel 27% of the Settlement Fund plus $851,286.91 in

5 expenses, plus the interest earned thereon at the same rate and for the same period as

6 that earned on the Settlement Amount until paid.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

613312_1

1    I declare under penalty of perjury that the foregoing is true and correct.

2  Executed this 21st day of March, 2011, at San Diego, California.

3

4

5                                      RANDALL J. BARON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 21, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 21, 2011.

s/ Ellen Gusikoff Stewart
ELLEN GUSIKOFF STEWART

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: elleng@rgrdlaw.com

55

# Mailing Information for a Case 2:06-cv-03731-GHK -SH

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Randall J Baron**
  randyb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Rebecca M Couto**
  rebecca.couto@lw.com

- **Asheley G Dean**
  asheley.dean@hoganlovells.com,LA-Records@hhlaw.com,dolores.valencia@hoganlovells.com

- **Christy W Goodman**
  c.w.goodman@sbcglobal.net

- **Ellen Anne Gusikoff Stewart**
  elleng@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Bety Javidzad**
  bety.javidzad@hoganlovells.com,LA-Docketing@hoganlovells.com

- **Stephen M Knaster**
  sknaster@orrick.com

- **James N Kramer**
  jkramer@orrick.com,jthompson@orrick.com

- **Amy A Laughlin**
  alaughlin@orrick.com

- **Teodora Manolova**
  tmanolova@orrick.com

- **Elizabeth A Moriarty**
  elizabeth.moriarty@hoganlovells.com,pdelarosa@hhlaw.com,bea.goncalves@hoganlovells.com,cmelias@hhlaw.com

- **Pamela S Palmer**
  pamela.palmer@lw.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com

- **Julie A Shepard**
  julie.shepard@hoganlovells.com,LA-Docketing@hoganlovells.com,LA-Records@hoganlovells.com

- **George A Shohet**
  georgeshohet@gmail.com

- **Richard Lee Stone**
  richard.stone@hoganlovells.com,maria.reyes@hoganlovells.com

- **Michael D Torpey**
  mtorpey@orrick.com

- **David T Wissbroecker**
  dwissbroecker@rgrdlaw.com,e_file_sd@rgrdlaw.com

56

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Erin Bansal**
Orrick Herrington and Sutcliffe
405 Howard Street
San Francisco, CA 94105

**Stephen J Oddo**
Lerach Coughlin Stoia Geller Rudman and Robbins
655 West Broadway, Suite 1900
San Diego, CA 92101